PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-4549 & 14-4550
_____


DANIEL BINDERUP

Appellant (No. 14-4550)

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
DIRECTOR BUREAU OF ALCOHOL TOBACCO
FIREARMS & EXPLOSIVES

Appellants (No. 14-4549)


_____


Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 5-13-cv-06750)
District Judge: Honorable James Knoll Gardner
_____

Nos. 15-1975 & 15-1976

───────────

JULIO SUAREZ

Appellant (No. 15-1976)

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
DIRECTOR BUREAU OF ALCOHOL TOBACCO
FIREARMS & EXPLOSIVES

Appellants (No. 15-1975)

───────────

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-14-cv-00968)
District Judge: Honorable William W. Caldwell

───────────

Argued June 1, 2016

Before: McKEE, <u>Chief Judge</u>, AMBRO, FUENTES[*],
SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN,
GREENAWAY, Jr., VANASKIE, SHWARTZ,

───────────────

[*] Judges Nygaard and Roth sat for the consolidated
argument but participated as members of the *en banc* Court

KRAUSE, RESTREPO, NYGAARD[*],
and ROTH[*], <u>Circuit Judges</u>

(Opinion filed: September 7, 2016)

Benjamin C. Mizer, Esquire
   Principal Deputy Assistant Attorney General
Zane D. Memeger, Esquire
   United States Attorney
Mark B. Stern, Esquire
Michael S. Raab, Esquire
Patrick Nemeroff, Esquire  (Argued)
Abby C. Wright, Esquire
United States Department of Justice, Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

      Counsel for Appellants/Cross-Appellees
      Attorney General United States of America;
      Director Bureau of Alcohol Tobacco Firearms &
      Explosives

---

only in Nos. 14-4549 and 14-4550 pursuant to 3d Cir. I.O.P. 9.6.4. Judge Sloviter participated in the panel argument and conference in Nos. 15-1975 and 15-1976, but assumed inactive status on April 4, 2016, before rehearing *en banc* and the filing of this opinion. Judge Fuentes assumed senior status on July 18, 2016, after rehearing *en banc* but before the filing of this opinion.

Alan Gura, Esquire  (Argued)
Gura & Possessky, PLLC
916 Prince Street, Suite 107
Alexandria, VA   22314

Douglas Gould, Esquire
925 Glenbrook Avenue
Bryn Mawr, PA   19010

     Counsel for Appellees/Cross-Appellants
     Daniel Binderup, Julio Suarez

Stefan B. Tahmassebi, Esquire
National Rifle Association of America
11250 Waples Mill Road
Fairfax, VA   22309

     Amicus Curiae Counsel
     National Rifle Association of America

————————————

OPINION OF  THE  COURT

————————————

AMBRO, <u>Circuit Judge</u>, announced the judgments of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, an opinion with respect to Parts III.A, III.B, III.C.1, III.C.2, and III.C.3.a, in which FUENTES, SMITH, GREENAWAY, Jr., VANASKIE, KRAUSE, and ROTH, <u>Circuit Judges</u>, joined, and an opinion with respect to Parts III.C.3.b, III.D, and IV, in which SMITH and GREENAWAY, Jr., <u>Circuit Judges</u>, joined. FUENTES, <u>Circuit Judge</u>, filed an opinion concurring in part, dissenting in part, and dissenting from the judgments, in which McKEE,

4

Chief Judge, VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and ROTH, Circuit Judges, joined. HARDIMAN, Circuit Judge, filed an opinion concurring in part and concurring in the judgments, in which FISHER, CHAGARES, JORDAN, and NYGAARD, Circuit Judges, joined.

## **TABLE OF CONTENTS**

I. Background .........................................................................7

II. The Challengers' Statutory Argument.............................10

III. The Challengers' Constitutional Argument ...................13

    A. The Second Amendment ..............................................13

    B. The Framework for As-Applied Second Amendment Challenges...................................................................18

    C. Step One of the *Marzzarella* Framework ....................22

       1. The Challengers Presumptively Lack Second Amendment Rights..................................................22

       2. The Traditional Justification for Denying Felons the Right to Arms ........................................................23

       3. The Challengers' Circumstances.............................26

          a. Distinguishing the Historically Barred Class .......26

          b. Application to the Challengers.............................28

    D. Step Two of the *Marzzarella* Framework ...................34

IV. Conclusion....................................................................40

Federal law generally prohibits the possession of firearms by any person convicted in any court of a "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Excluded from the prohibition is "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." *Id.* § 921(a)(20)(B). And there is also an exemption for "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored," where the grant of relief does not expressly preserve the firearms bar. *Id.* § 921(a)(20).

In *United States v. Marzzarella* we adopted a framework for deciding facial and as-applied Second Amendment challenges. 614 F.3d 85 (3d Cir. 2010). Then in *United States v. Barton* we held that the prohibition of § 922(g)(1) does not violate the Second Amendment on its face, but we stated that it remains subject to as-applied constitutional challenges. 633 F.3d 168 (3d Cir. 2011).

Before us are two such challenges. In deciding them, we determine how a criminal law offender may rebut the presumption that he lacks Second Amendment rights. In particular, a majority of the Court concludes that *Marzzarella*, whose two-step test we reaffirm today, drives the analysis.[1]

---

[1] Parts III.A–C.3.a preserve the *Marzzarella* framework for deciding Second Amendment challenges and overrule aspects of *Barton* that are inconsistent with it. Seven Judges join those Parts expressly. Chief Judge McKee and Judges Shwartz and Restrepo, who join Judge Fuentes's opinion, agree that *Marzzarella* controls the Second Amendment analysis, but do not join any of Part III because they reject the notion that the *Marzzarella* framework can be

Meanwhile, a separate majority holds that the two as-applied challenges before us succeed. Part IV of this opinion sets out how, for purposes of future cases, to make sense of our fractured vote.

## I. Background

In 1996 Daniel Binderup began a consensual sexual relationship with a 17-year-old female employee at his bakery. Binderup was 41 years old at the time and was aware that his employee was a minor, though she was over the legal age of consent in Pennsylvania (16). Two years later, Binderup pled guilty in a Pennsylvania state court to corrupting a minor, a misdemeanor subject to possible imprisonment for up to five years. 18 Pa. Cons. Stat. §§ 6301(a)(1)(i), 1104. Despite this, Binderup's sentence was the colloquial slap on the wrist: probation (three years) and a $300 fine plus court costs and restitution. His criminal record shows no subsequent offenses.

In 1990 police stopped Julio Suarez on suspicion of driving while intoxicated. During the stop, police noticed that Suarez was carrying a .357 Magnum handgun, as well as two "speed loaders" (devices that allow one to load all chambers of a revolver mechanically rather than inserting bullets one-by-one). He had no permit for the gun. He later pled guilty in a Maryland state court to unlawfully carrying a handgun without a license, a misdemeanor subject to possible imprisonment for "not less than 30 days and not [more than] three years or a fine of not less than $250 and not [more than] $2,500 or both." Md. Code Ann. art. 27, § 36B(b) (1990) (now codified at Md. Code Ann. Crim. Law § 4-203). Suarez

---

reconciled with any aspect of *Barton*'s as-applied Second Amendment analysis, which they would overrule entirely.

7

nonetheless received a suspended sentence of 180 days' imprisonment and a $500 fine, followed by a year of probation that he completed successfully. Eight years later, he was convicted again in a Maryland state court, this time for the state-law misdemeanor of driving under the influence of alcohol. Only the first of the convictions was subject to § 922(g)(1). Suarez now lives in Pennsylvania and since 1998 has led a life free of run-ins with the law. He holds a "Secret" federal government security clearance in connection with his job as a consultant for a government contractor.

Pennsylvania law disqualified Binderup and Suarez (collectively, the "Challengers") from possessing firearms due to their convictions, but in 2009 they successfully petitioned the Pennsylvania courts to remove that prohibition. Federal law, however, continues to bar them from possessing firearms because their convictions have not been expunged or set aside, they have not been pardoned, and their civil rights have not been restored. *See* 18 U.S.C. § 921(a)(20); *Logan v. United States*, 552 U.S. 23, 37 (2007). Nor has the Attorney General granted them relief under 18 U.S.C. § 925(c), which allows her to remove the prohibition on a case-by-case basis "if it is established to [her] satisfaction" that a barred individual "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

Binderup and Suarez want to obtain guns to defend themselves and their families within their homes, but they have not attempted to do so for fear of violating § 922(g)(1). As a result, each filed a complaint in federal District Court (Binderup in the Eastern District of Pennsylvania, Suarez in the Middle District of Pennsylvania) seeking declaratory and injunctive relief. They claim as a matter of statutory construction that § 922(g)(1) does not apply to their convictions and, if it does, the statute is unconstitutional as

8

applied. The Government opposed the lawsuits, and the parties in both cases filed cross-motions for summary judgment.

The District Courts rejected the Challengers' statutory argument but held that § 922(g)(1) is unconstitutional as applied. The United States District Court for the Eastern District of Pennsylvania ruled that § 922(g)(1) is unconstitutional as applied to Binderup because he "distinguishe[d] himself from those individuals traditionally disarmed as the result of prior criminal conduct and demonstrate[d] that he poses no greater threat of future violent criminal activity than the average law-abiding citizen." *Binderup v. Holder*, No. 13-cv-6750, 2014 WL 4764424, at \*1 (E.D. Pa. Sept. 25, 2014). The Court did not analyze the constitutionality of § 922(g)(1) under any form of means-ends scrutiny, meaning it did not evaluate the law to assess whether its purpose—the end sought—matches appropriately the means chosen to achieve it. *Id.* at \*20–21. Depending on the importance of the rights involved and the nature of the burden on them, a law's purpose may need to be only legitimate and the means to achieve it rational (called rational basis scrutiny); the purpose may need to be important and the means to achieve it substantially related (called intermediate scrutiny); or the purpose may need to be compelling and the means to achieve it narrowly tailored, that is, the least restrictive (called strict scrutiny). The latter two tests we refer to collectively as heightened scrutiny to distinguish them from the easily met rational basis test.

The United States District Court for the Middle District of Pennsylvania applied "a two[-]prong test for Second Amendment challenges" derived from our case law. *Suarez v. Holder*, --- F. Supp. 3d ----, No. 1:14-CV-968, 2015 WL 685889, at \*6–7 (M.D. Pa. Feb. 18, 2015). It found first that Suarez has Second Amendment rights notwithstanding

9

his 1990 conviction because he demonstrated that "he is no more dangerous than a typical law-abiding citizen." *Id.* at *10. Then the Court applied means-ends scrutiny (in that case, strict scrutiny) and determined that § 922(g)(1) is unconstitutional as applied to him due to the severity of the burden it imposes. *Id.* at *7 & n.9.

The Government appealed the summary judgments, and the Challengers' cross-appealed the District Courts' interpretations of the dispossession statute. The District Courts had jurisdiction under 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202. We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

Separate panels heard the appeals, and the Court *sua sponte* consolidated them for rehearing *en banc*. Our review is plenary. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir. 2003).

## II. The Challengers' Statutory Argument

Section 922(g)(1), as noted, does not cover state misdemeanors "punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). The Challengers argue that the exception includes any state misdemeanor that, like theirs, could have been punished by less than two years' imprisonment.

We disagree. The exception in § 921(a)(20)(B) covers any crime that *cannot* be punished by more than two years' imprisonment. It does not cover any crime that *can* be punished by more than two years in prison. In other words, § 921(a)(20)(B)'s use of "punishable by" means "subject to a maximum penalty of." Although we have never explicitly defined it this way, we have at least twice relied on that understanding in interpreting the relationship between

10

§ 921(a)(20)(B) and § 922(g)(1). *See United States v. Essig*, 10 F.3d 968, 969–71 (3d Cir. 1993) (relying on an understanding of "punishable" that refers to whether the maximum potential sentence for a state misdemeanor exceeds two years, not whether a lesser sentence might be imposed); *United States v. Schoolcraft*, 879 F.2d 64, 69–70 (3d Cir. 1989) (explaining that a "misdemeanor punishable [by] up to seven years in prison" was "not a misdemeanor subject to a sentence of two years or less"). The D.C. Circuit's opinion in *Schrader v. Holder* supports our decision, as it distinguishes crimes carrying a maximum term of imprisonment of more than two years from those "punishable by a term of imprisonment of two years or less" under § 921(a)(20)(B). 704 F.3d 980, 986 (D.C. Cir. 2013). And the Supreme Court drew a similar distinction in *Logan*. *See* 552 U.S. at 34 ("[Section] 921(a)(20)(B) . . . places within [§ 922(g)(1)'s] reach state misdemeanor convictions *punishable by more than two years' imprisonment*." (emphasis added)). Although this language is a *dictum*, "we should not idly ignore" its inclusion in the Supreme Court's thorough discussion of § 921(a)(20)(B). *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000).

Even if we were writing on a blank slate, we would reject the Challengers' interpretation. When considering a crime's potential punishment, we ordinarily refer only to the maximum punishment a court may impose. As the District Court in *Suarez* perceptively observed, when a crime has maximum and minimum possible punishments, we describe it as being "punishable" by that specific range; and when a crime references only a maximum punishment, "we ordinarily identify only the upper boundary" of that range, as "[a]ll lower possible terms of imprisonment are included by implication." 2015 WL 685889, at *3. That is why we would not describe a crime carrying a specified term of imprisonment of up to three years as one "punishable by a

11

term of imprisonment of two years or less." By contrast, a misdemeanor carrying a ceiling of 18 months' imprisonment would properly be described in the criminal law context as a crime "punishable by a term of imprisonment of two years or less" and on its face would not trigger the bar on gun possession. Accordingly, "subject to a maximum possible penalty of" is the best reading of the phrase "punishable by" as used in § 921(a)(20)(B).

Our interpretation also makes sense in light of similar language in the United States Sentencing Guidelines. They provide three distinct grades of probation and supervised release violations—Grades A, B, and C—with Grade A violations treated most severely and Grade C least severely. *See* U.S.S.G. §§ 7B1.1(a), 7B1.4(a). The Challengers' interpretation of the phrase "punishable by" would erode those distinctions. Since Grade C applies only to offenses "punishable by a term of imprisonment of one year or less," U.S.S.G. § 7B1.1(a)(3), the Challengers' interpretation would render offenses punishable by more than a year (Grade B), as well as even more serious offenses described as Grade A, eligible for Grade C treatment. This would be an absurd result.

In a last-ditch effort, the Challengers argue that § 921(a)(20)(B)'s use of "punishable" merits application of the rule of lenity (that ambiguous criminal laws be construed in favor of defendants) or the constitutional avoidance doctrine (that ambiguous statutory language be construed to avoid serious constitutional doubts). Both of these principles require ambiguity in the statute. *See Voisine v. United States*, 579 U.S. ___, 136 S. Ct. 2272, 2282 n.6 (2016). As there isn't any here, they give no plausible defense.

In sum, the Challengers' argument that their convictions fall within § 921(a)(20)(B)'s exception to

§ 922(g)(1) has no traction. Their misdemeanor convictions were punishable by more than two years' imprisonment. Hence they cannot seek refuge in § 921(a)(20)(B) and are subject to the bar of § 922(g)(1).

## III. The Challengers' Constitutional Argument

### A. The Second Amendment

The Challengers contend that, notwithstanding how we rule on their statutory argument, § 922(g)(1) is unconstitutional as applied to them. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court invalidated a law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. 570, 628 (2008). In so doing, the Court held the Second Amendment protects an individual's right to possess a firearm "unconnected with militia service." *Id.* at 582. At the "core" of the Second Amendment is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 634–35; *Barton*, 633 F.3d at 170–71; *Marzzarella*, 614 F.3d at 89. Two years after *Heller*, in *McDonald v. City of Chicago*, the Court held that the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*" because the right is "fundamental" to "our system of ordered liberty." 561 U.S. 742, 778, 791 (2010).

Although the Second Amendment guarantees an individual right, it is "not unlimited." *Heller*, 554 U.S. at 626; *see United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012); Eugene Volokh, *Implementing the Right to*

13

*Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009).[2] *Heller* catalogued a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the scope of the right. 554 U.S. at 626–27 & n.26; *see Marzzarella*, 614 F.3d at 91 (treating the "presumptively lawful regulatory measures" listed in *Heller* as "exceptions to the right to bear arms"). They include, but are not limited to, "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27; *see McDonald*, 561 U.S. at 786. These measures comport with the Second Amendment

---

[2] Professor Volokh's taxonomy of possible gun regulations divides them into

> [(1)]"what" restrictions (such as bans on machine guns, so-called "assault weapons," or unpersonalized handguns), [(2)] "who" restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or [juveniles]), [(3)] "where" restrictions (such as bans on carrying in public, in places that serve alcohol, or in parks, or bans on possessing [guns] in public housing projects), [(4)] "how" restrictions (such as storage regulations), [(5)] "when" restrictions (such as waiting periods), [(6)] "who knows" regulations (such as licensing or registration requirements), and [(7)] taxes and other expenses.

Volokh, 56 UCLA L. Rev. at 1443.

because they affect individuals or conduct unprotected by the right to keep and bear arms. *See Heller*, 554 U.S. at 631, 635 (suggesting that one is "disqualified from the exercise of Second Amendment rights" if he is "a felon" or "insane"). For example, bans on "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," are permissible because those weapons fall outside the historical "scope of the right." *Id.* at 625; *see United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 141–44 (3d Cir. 2016); *Marzzarella*, 614 F.3d at 91–93.

As to cases involving burdens on Second Amendment rights, *Heller* did not announce which level of scrutiny applies but cautioned that challenges based on those rights are not beaten back by the Government supplying a rational basis for limiting them. 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

Some judges—including Judge Hardiman and those colleagues who join his opinion concurring in the judgments—and commentators have interpreted *Heller* to mean that any law barring persons with Second Amendment rights from possessing lawful firearms in the home even for self-defense is *per se* unconstitutional; that is, no scrutiny is needed. *See* Hardiman Op. Typescript at 13–19; *Heller v. District of Columbia*, 670 F.3d 1244, 1272–73 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); Volokh, 56 UCLA L. Rev. at 1462; Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 377, 380 (2009); *see also United States v. McCane*, 573 F.3d 1037, 1047–50 (10th Cir. 2009) (Tymkovich, J.,

concurring). But neither the Supreme Court nor any court of appeals has held that laws burdening Second Amendment rights evade constitutional scrutiny. Rather, when faced with an as-applied Second Amendment challenge, they agree that some form of heightened scrutiny is appropriate after it has been determined that the law in question burdens protected conduct. *See, e.g.*, *Marzzarella*, 614 F.3d at 97–101 (applying intermediate scrutiny and, in the alternative, strict scrutiny to § 922(k)'s prohibition on possession of any firearm with a destroyed serial number); *United States v. Williams*, 616 F.3d 685, 692–93 (7th Cir. 2010) (applying intermediate scrutiny to § 922(g)(1)); *United States v. Chovan*, 735 F.3d 1127, 1141–42 (9th Cir. 2013) (same with respect to § 922(g)(9)'s disarmament of a domestic-violence misdemeanant); *United States v. Chester*, 628 F.3d 673, 682–83 (4th Cir. 2010) (same); *United States v. Reese*, 627 F.3d 792, 802–05 (10th Cir. 2010) (same with respect to § 922(g)(8)'s dispossession of certain persons subject to a domestic restraining order); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 326–29 (6th Cir. 2014) (applying strict scrutiny to § 922(g)(4)'s dispossession of any person "who has been committed to a mental institution"), *reh'g en banc granted, opinion vacated* (Apr. 21, 2015).

That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical. It is no different than saying that the Government may prevent an individual with First Amendment rights from engaging in First Amendment conduct—even conduct at the core of the First Amendment—if it makes the showing necessary to surmount heightened scrutiny. *See, e.g.*, *FEC v. Wis. Right to Life*, 551 U.S. 449, 464–65 (2007) (applying strict scrutiny to a statute prohibiting political speech at the core of the First Amendment); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 102–03 (1947) (upholding the constitutionality of prohibitions on certain political activities

16

by federal employees notwithstanding the First Amendment). Thus burdens on Second Amendment rights are subject to scrutiny in much the way that burdens on First Amendment rights are. *Drake v. Filko*, 724 F.3d 426, 434–36 (3d Cir. 2013); *see* NRA Amicus Br. at 13–15 (asserting that burdens on core Second Amendment rights should be subject to strict scrutiny). Far from subjecting the Second Amendment to an "entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780 (plurality opinion), this view uses "the structure of First Amendment doctrine [to] inform our analysis of the Second Amendment," *Marzzarella*, 614 F.3d at 89 n.4; *see id.* ("*Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.").

Even if a law that "completely eviscerates the Second Amendment right" would be *per se* unconstitutional under *Heller*, Hardiman Op. Typescript at 18, § 922(g)(1) is no such law. Notwithstanding that provision (and as already noted), persons convicted of disqualifying offenses may under some circumstances possess handguns if (1) their convictions are expunged or set aside, (2) they receive pardons, or (3) they have their civil rights restored. 18 U.S.C. § 921(a)(20). And were Congress to fund 18 U.S.C. § 925(c), they could ask the Attorney General to lift the ban in their particular cases. Though some of these statutory avenues for relief are closed to Binderup and Suarez, *see infra* Part III.D, the remaining opportunities for them to overcome the ban contrast starkly with the District of Columbia law in *Heller* that made it a crime to carry an unregistered firearm and prohibited entirely the registration of handguns by individuals; there was nothing Mr. Heller could do to possess a handgun lawfully while outside his job as a District of Columbia special police officer guarding the Federal Judicial Center (in other words, he guarded judges). *See* 554 U.S. at 574 (citing D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001)); *Parker*

17

*v. District of Columbia*, 478 F.3d 370, 373–74 (D.C. Cir. 2007); *cf. United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (noting that disarmament under § 922(g)(9) is ordinarily not "perpetual" because of exceptions similar to those under § 922(g)(1)); *Chovan*, 735 F.3d at 1138 (same).

To say that § 922(g)(1) is *per se* unconstitutional as applied to anyone with Second Amendment rights notwithstanding the statute's escape hatches is a bridge too far. For starters, that would condemn without exception all laws and regulations containing preconditions for the possession of firearms by individuals with Second Amendment rights. By that reasoning, any law prohibiting an individual from possessing a handgun unless he passes a physical examination (to show he is capable of handling a firearm safely) or completes firearm training (to show he knows how to handle a firearm safely) would similarly be *per se* unconstitutional, even if it is the least restrictive means of achieving a compelling government interest. There is no precedent for crippling the Government's ability to regulate gun ownership in this manner. And to guarantee absolutely the ability to keep and bear arms even in cases where disarmament would survive heightened scrutiny would be a radical departure from our post-*Heller* jurisprudence and risk undermining many commonplace constitutional gun regulations.

## B. The Framework for As-Applied Second Amendment Challenges

Unlike a facial challenge, an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d

18

Cir. 2010)); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (internal quotation marks omitted)). Accordingly, our review of Binderup's and Suarez's as-applied challenges requires us to consider whether their particular circumstances remove them from the constitutional sweep of § 922(g)(1).

Two of our precedents—*Marzzarella* and *Barton*—have guided how we approach as-applied Second Amendment challenges. The former involved an as-applied challenge to 18 U.S.C. § 922(k), which bars the possession of any firearm with an obliterated serial number. It derived from *Heller* a "two-pronged approach to Second Amendment challenges" to firearm restrictions. 614 F.3d at 89. We first consider "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If not, the challenged law must stand. But if the law burdens protected conduct, the proper course is to "evaluate the law under some form of means-end scrutiny," *id.*, that form in *Marzzarella* being intermediate scrutiny, *id.* at 97. "If the law passes muster under [the] standard [applied], it is constitutional. If it fails, it is invalid." *Id.* at 89. As to § 922(k), we held that the law withstood intermediate scrutiny "even if it burden[ed] protected conduct" by fitting reasonably with the important "law enforcement interest in enabling the tracing of weapons via their serial numbers." *Id.* at 95, 98. (We also noted in a *dictum* that the law would survive strict scrutiny, were that the test, because the provision serves a compelling interest through the least-restrictive means. *Id.* at 99–101.)

Nearly every court of appeals has cited *Marzzarella* favorably. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254 n.49 (2d Cir. 2015); *Chovan*, 735

F.3d at 1136–37; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194–96 (5th Cir. 2012); *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller*, 670 F.3d at 1252–53; *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *Chester*, 628 F.3d at 680–83; *Reese*, 627 F.3d at 800–05. Indeed, it has escaped disparagement by any circuit court.

A year after *Marzzarella* we decided *Barton*, which involved a felon convicted under the provision now before us—§ 922(g)(1). Barton raised facial and as-applied Second Amendment challenges to the firearm ban. After dispensing with his facial challenge and confirming the availability of as-applied challenges under the Second Amendment, we ruled that "the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." 633 F.3d at 173. Because Barton's prior convictions for possession of cocaine with intent to distribute and for receipt of a stolen firearm (as well as his illegal post-conviction sale of a firearm with an obliterated serial number) were "closely related to violent crime," we concluded that he lacked Second Amendment rights. *Id.* at 174. Put another way, Barton did not present "facts about himself and his background that distinguish[ed] his circumstances from those of persons historically barred from Second Amendment protections," *id.*, so he was "disqualified from the exercise of Second Amendment rights," *id.* at 174 (quoting *Heller*, 554 U.S. at 635), and his as-applied challenge could not succeed.

Read together, *Marzzarella* and *Barton* lay out a framework for deciding as-applied challenges to gun regulations. At step one of the *Marzzarella* decision tree, a challenger must prove, per *Barton*, that a presumptively lawful regulation burdens his Second Amendment rights. This

20

requires a challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, *id.* at 173, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class, *id.* at 174.

No doubt a challenger cannot prevail merely on his say-so. Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections. Not only is the burden on the challenger to rebut the presumptive lawfulness of the exclusion at *Marzzarella*'s step one, but the challenger's showing must also be strong. That's no small task. And in cases where a statute by its terms only burdens matters (*e.g.*, individuals, conduct, or weapons) outside the scope of the right to arms, it is an impossible one. But if the challenger succeeds at step one, the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny, discussed further below, at step two of the *Marzzarella* analysis.

The Challengers, the District Court in *Binderup*, and some of our colleagues claim that *Marzzarella* and *Barton* set standards for different types of as-applied Second Amendment challenges and that only *Barton* controls challenges to § 922(g)(1); *Marzzarella* has no role in the analysis. Our view is that, at least in pertinent part, each complements the other for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure like § 922(g)(1). *Barton* identifies the two hurdles that an individual presumed to lack Second Amendment rights must overcome to rebut the presumption at step one of the

21

*Marzzarella* framework.[3] Rebutting it permits testing the law or regulation under heightened scrutiny at step two. With this understanding, *Marzzarella* and *Barton* are neither wholly distinct nor incompatible.

### C. Step One of the *Marzzarella* Framework

#### 1. The Challengers Presumptively Lack Second Amendment Rights

*Heller* teaches that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." 554 U.S. at 626 & 627 n.26. Traditionally, "felons" are people who have been convicted of any crime "that is punishable by death or imprisonment for more than one year." 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.6 (2d ed. 2015); *cf. Carachuri-Rosendo v. Holder*, 560 U.S. 563, 567 (2010) (quoting 18 U.S.C. § 3559(a)).

Section 922(g)(1) bars the possession of firearms by anyone convicted of "a crime punishable by imprisonment for a term exceeding one year." This means that its prohibition extends to anyone convicted of a crime meeting the

---

[3] Though *Barton* clarifies the types of showings that a challenger must make at step one of the *Marzzarella* framework, it defines too narrowly the traditional justification for why a criminal conviction may destroy the right to arms (*i.e.*, it limits felon disarmament to only those criminals likely to commit a violent crime in the future) and, by extension, defines too broadly the class of offenders who may bring successful as-applied Second Amendment challenges to § 922(g)(1) (*i.e.*, it allows people convicted of serious crimes to regain their right to arms). *See infra* Parts III.C.1–3.a.

traditional definition of a felony, though Congress excluded anyone convicted of a "State offense classified by the laws of the State as a misdemeanor" unless it is punishable by more than two years' imprisonment. 18 U.S.C. § 921(a)(20)(B).

Binderup and Suarez were each convicted of a misdemeanor subject to § 922(g)(1): Binderup's was punishable by up to five years' imprisonment; Suarez's by up to three years in prison. The Pennsylvania and Maryland legislatures classify their respective offenses as misdemeanors. However, based on their maximum possible punishments, they meet the traditional definition of a felony, and Congress treats them as felonies for purposes of § 922(g)(1). As a result, Binderup and Suarez are subject to a firearm ban that is, per *Heller*, "presumptively lawful."

### 2. The Traditional Justification for Denying Felons the Right to Arms

Turning to the first hurdle of step one, we look to the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights. "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *see, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 491–92 (2004); Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L Rev. 657, 679 (2002); David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626–27 (2000); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480

(1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs., Winter 1986, at 143, 146; Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983). Several of our sister circuits endorse the "virtuous citizen" justification for excluding felons and felon-equivalents from the Second Amendment's ambit. *See, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) ("[F]elons were excluded from the right to arms because they were deemed unvirtuous." (internal quotation marks omitted)); *Yancey*, 621 F.3d at 684–85; *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[T]he right to bear arms does not preclude laws disarming . . . unvirtuous citizens (*i.e.*, criminals)." (quoting Kates, Jr., 49 Law & Contemp Probs. at 146)); *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) ("In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'").

People who have committed or are likely to commit "violent offenses"—crimes "in which violence (actual or attempted) is an element of the offense," *Skoien*, 614 F.3d at 642; *see Voisine*, 136 S. Ct. at 2280—undoubtedly qualify as "unvirtuous citizens" who lack Second Amendment rights. *Barton*, 633 F.3d at 173–74; *see United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (recognizing "a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 727–28 (2009). But *Heller* recognized "longstanding prohibitions on the possession of firearms by felons," not just violent felons. 554 U.S. at 626. The category of "unvirtuous citizens" is thus broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or non-violent. *See Skoien*, 614 F.3d at 640–41; *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); Don B. Kates &

24

Clayton E. Cramer, *Second Amendment Limitations & Criminological Considerations*, 60 Hastings L.J. 1339, 1363–64 (2009); *see also Vongxay*, 594 F.3d at 1115 ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms."). To the extent *Barton* suggests that people who commit serious crimes retain or regain their Second Amendment rights if they are not likely to commit a violent crime, 633 F.3d at 174, it is overruled. *See infra* Part III.C.3.a.

The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era. "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *Skoien*, 614 F.3d at 640 (quoting *Heller*, 554 U.S. at 604). That report "asserted that citizens have a personal right to bear arms 'unless for *crimes committed*, or real danger of public injury.'" *Id.* (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). "[C]rimes committed"—violent or not—were thus an independent ground for exclusion from the right to keep and bear arms. And there is reason to believe that felon disarmament has roots that are even more ancient. *See* Kates, Jr., 82 Mich. L. Rev. at 266 ("Felons simply did not fall within the benefits of the common law right to possess arms.").

The takeaway: persons who have committed serious crimes forfeit the right to possess firearms much the way they "forfeit other civil liberties, including fundamental constitutional rights." *Barton*, 633 F.3d at 175.

25

### 3. The Challengers' Circumstances

#### a. Distinguishing the Historically Barred Class

Having identified the traditional justification for denying some criminal offenders the right to arms—that they are "unvirtuous" because they committed serious crimes—we turn to how other criminal offenders may distinguish their circumstances from those of people who historically lacked the right to keep and bear arms. *Barton* suggests two ways to satisfy this second hurdle of step one: the first is that a challenger may show that he never lost his Second Amendment rights because he was not convicted of a serious crime; the second is that a challenger who once lost his Second Amendment rights by committing a serious crime may regain them if his "crime of conviction is decades-old" and a court finds that he "poses no continuing threat to society." 633 F.3d at 174.

We agree with *Barton* only insofar as it stands for the unremarkable proposition that a person who did not commit a serious crime retains his Second Amendment rights. Setting aside what makes a crime "serious" in the Second Amendment context and whether § 922(g)(1) covers any non-serious crimes—issues we address in Part III.C.3.b and on which there is disagreement, *see* Fuentes Op. Typescript at 19–20—being convicted of a non-serious crime does not demonstrate a lack of "virtue" that disqualifies an offender from exercising those rights.

But our agreement with *Barton* ends there. We reject its claim that the passage of time or evidence of rehabilitation will restore the Second Amendment rights of people who committed serious crimes. That view stems from *Barton*'s misplaced focus at *Marzzarella*'s step one on the probability

26

of violent recidivism and is inconsistent with the true justification for the disarmament of people who commit serious crimes: they are "unvirtuous." *See supra* Part III.C.2. A challenger's risk of violent recidivism tells us nothing about whether he was convicted of a serious crime, and the seriousness of the purportedly disqualifying offense is our sole focus throughout *Marzzarella*'s first step.

There is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited. To the extent Congress affords such a remedy in 18 U.S.C. § 921(a)(20) or 18 U.S.C. § 925(c), that is a matter of legislative grace; the Second Amendment does not require that those who commit serious crimes be given an opportunity to regain their right to keep and bear arms in that fashion. Indeed, the Supreme Court and our Court have recognized in the Second Amendment context that the Judicial Branch is not "institutionally equipped" to conduct "a neutral, wide-ranging investigation" into post-conviction assertions of rehabilitation or to predict whether particular offenders are likely to commit violent crimes in the future. *United States v. Bean*, 537 U.S. 71, 77 (2002); *see Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 230–31 (3d Cir. 2002) (en banc); *cf.* S. Rep. 102-353, at 19 (1992) (doubting that even the Executive Branch could feasibly grant individualized exceptions to § 922(g)(1) based on an offender's supposed rehabilitation because doing so is "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made").

In short, only the seriousness of the purportedly disqualifying offense determines the constitutional sweep of statutes like § 922(g)(1) at step one. To the extent *Barton* holds that people convicted of serious crimes may regain their

27

lost Second Amendment rights after not posing a threat to society for a period of time, it is overruled.

### b. Application to the Challengers

We now consider whether the Challengers have shown that their crimes are not serious. As a preliminary matter, we note that Judge Fuentes, those colleagues joining his opinion dissenting from the judgment, and the Government deny the possibility of successful as-applied Second Amendment challenges to § 922(g)(1). *See, e.g.*, Gov't *Binderup* Br. at 14; Gov't *Suarez* Br. at 15; Fuentes Op. Typescript at 18–40. In their view, § 922(g)(1), at least in its current form, is constitutional in all its applications because it does not burden the Second Amendment rights of felons or felon-equivalents who, because of their convictions, lack Second Amendment rights. Put another way, they believe that all crimes subject to § 922(g)(1) are disqualifying because their maximum possible punishments are conclusive proof they are serious.

But that view puts the rabbit in the hat by concluding that all felons and misdemeanants with potential punishments past a certain threshold lack the right to keep and bear arms when, despite their maximum possible punishment, some offenses may be "so tame and technical as to be insufficient to justify the ban." *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). *Heller* confirms such a showing is possible, as it describes prohibitions on the possession of firearms by felons as only "presumptively lawful." 554 U.S. at 626–27 & n.26. Unless flagged as irrebutable, presumptions are rebuttable. *See Barton*, 633 F.3d at 173; *Williams*, 616 F.3d at 692. Indeed, under the approach of Judge Fuentes and those colleagues who join his opinion dissenting from the judgments, the Government could make an end-run around the Second Amendment and undermine the right to keep and bear arms in contravention of *Heller*. A

28

crime's maximum possible punishment is "purely a matter of legislative prerogative," *Rummel v. Estelle*, 445 U.S. 263, 274 (1980), subject only to "constitutional prohibitions on irrational laws," *Heller*, 554 U.S. at 628 n.27; *see United States v. Walker*, 473 F.3d 71, 79 (3d Cir. 2007). Yet *Heller* teaches that the Government needs more than a rational basis "to overcome the right to keep and bear arms." 554 U.S. at 628 n.27; *see Marzzarella*, 614 F.3d at 95–96. Therefore, to determine whether the Challengers are shorn of their Second Amendment rights, *Heller* requires us to consider the maximum possible punishment but not to defer blindly to it.

At the same time, there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights. Unlike the "historically unprotected categories of speech" that are First Amendment exceptions "long familiar to the bar," *United States v. Stevens*, 559 U.S. 460, 468, 470 (2010), the category of serious crimes changes over time as legislative judgments regarding virtue evolve. For example, though only a few exceedingly serious crimes were "felonies" at early common law, by the time of our country's founding "many new felonies were added by English statute." 1 *Wharton's Criminal Law* § 17 (15th ed. 2015); *see, e.g.*, 4 William Blackstone, *Commentaries* *18 ("[N]o less than a[ ] hundred and sixty [actions] have been declared by act of parliament to be felonies without benefit of clergy; or, in other words, to be worthy of instant death."); Francis Bacon, *Preparation for the Union of Laws of England and Scotland*, *in* 2 *The Works of Francis Bacon, Lord Chancellor of England* 163–64 (1841) (listing dozens of felonies, including "[w]here a man stealeth certain kinds of hawks" or "invocates wicked spirits"). The upshot is that "exclusions need not mirror limits that were on the books in 1791" to comport with the Second Amendment. *Skoien*, 614 F.3d at 641. Rather, we will presume the judgment of the legislature is correct and treat any crime

29

subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.

Here, upon close examination of the Challengers' apparently disqualifying convictions, we conclude that their offenses were not serious enough to strip them of their Second Amendment rights. For starters, though the Challengers' crimes meet the generic definition of a felony and Congress's definition of a felony for purposes of § 922(g)(1), the Pennsylvania and Maryland legislatures enacted them as misdemeanors. Misdemeanors are, and traditionally have been, considered less serious than felonies. *See Baldwin v. New York*, 399 U.S. 66, 70 (1970); *misdemeanor*, Black's Law Dictionary (10th ed. 2014); 1 LaFave, *Substantive Criminal Law* § 1.6. Congress tried to ensure that only serious crimes would trigger disarmament under § 922(g)(1) by exempting from the ban any state-law misdemeanant whose crime was punishable by less than two years' imprisonment. 18 U.S.C. § 921(a)(20)(B). But we believe that accommodation still paints with too broad a brush, for a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying.

This is not to say that state misdemeanors cannot be serious. No doubt "some misdemeanors are . . . 'serious' offenses," *Baldwin*, 399 U.S. at 70, and "numerous misdemeanors involve conduct more dangerous than many felonies," *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). *See Johnson v. United States*, 559 U.S. 133, 149–50 (2010) (Alito, J., dissenting) ("At common law . . . many very serious crimes, such as kidnapping and assault with the intent to murder or rape, were categorized as misdemeanors."). And the maximum possible punishment is certainly probative of a misdemeanor's seriousness. But Congress may not overlook

30

so generally the misdemeanor label, which, in the Second Amendment context, is also important.

Other considerations, however, confirm our belief that the Challengers' crimes were not serious. As explained above, violent criminal conduct—meaning a crime "in which violence (actual or attempted) is an element of the offense," *Skoien*, 614 F.3d at 642; *see Voisine*, 136 S. Ct. at 2280—is disqualifying. *See* Part III.C.2. But neither Challenger's offense had the use or attempted use of force as an element.[4] Though, as explained, it is possible for non-violent crimes to be serious, the lack of a violence element is a relevant consideration.

Also important is that each Challenger received a minor sentence by any measure: Binderup was sentenced to three years' probation (a condition of which was to avoid contact with his employee) and a $300 fine plus court costs and restitution, while Suarez received a suspended sentence of 180 days' imprisonment and a $500 fine. That is because severe punishments are typically reserved for serious crimes.

---

[4] Though we look only to a crime's elements rather than to the way it actually was committed, we note as an aside that the District Court in *Binderup* explained that "[t]here is simply nothing in the record here which would support a reasonable inference that [Binderup] used any violence, force, or threat of force to initiate or maintain the sexual relationship with his seventeen-year-old employee" or "that he even engaged in any violent or threatening conduct." 2014 WL 4764424, at *22. Similarly, the District Court in *Suarez* described Suarez's misdemeanor as "minor and non-violent." 2015 WL 685889, at *9.

31

Additionally, punishments are selected by judges who have firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of pre-sentence reports prepared by trained professionals. With not a single day of jail time, the punishments here reflect the sentencing judges' assessment of how minor the violations were.

Finally, there is no cross-jurisdictional consensus regarding the seriousness of the Challengers' crimes. Some states treat consensual sexual relationships between 41 and 17 year olds as serious crimes, *see* Gov't *Binderup* Br. at 17–19 & n.4, but the vast majority of states do not, *see* Asaph Glosser *et al.*, *Statutory Rape: A Guide to State Laws and Reporting Requirements* 6–7 (Dec. 15, 2004), *available at* https://aspe.hhs.gov/sites/default/files/pdf/75531/report.pdf (last visited Aug. 25, 2016). Binderup's conduct arguably would have been criminal in a few other states because his 17-year-old sexual partner was his employee, yet it still would have been legal in many states. Similarly, though some states punish the unlicensed carrying of a concealed weapon as a serious crime, *see* Gov't *Suarez* Br. at 16-17 n.5, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon, *see* Thomson Reuters, *50 State Survey: Right to Carry a Concealed Weapon (Statutes)* (October 2015); U.S. Gov't Accountability Off., *States' Laws and Requirements for Concealed Carry Permits Vary Across Nation* 73–74 (2012), *available at* http://www.gao.gov/assets/600/592552.pdf (last visited Aug. 25, 2016); Law Ctr. to Prevent Gun Violence, *Concealed Weapons Permitting*, http://smartgunlaws.org/gun-laws/policy-areas/firearms-in-public-places/concealed-weapons-permitting/ (last visited Aug. 25, 2016). Were the Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to

carry their burden at step one. But because they have shown that there is no consensus regarding the seriousness of their crimes, their showing at step one is that much more compelling.[5]

In sum, the Challengers have carried their burden of showing that their misdemeanors were not serious offenses despite their maximum possible punishment.[6] This leads us to

[5] Judge Fuentes and those colleagues who join his opinion dissenting from the judgments caution that this approach is not "workable" and "places an extraordinary administrative burden on district courts," Fuentes Op. Typescript at 2, 71, but the criteria we use to assess the seriousness of a misdemeanor subject to § 922(g)(1)—the elements of the offense, the actual sentence, and the state of the law—are easily administrable. These objective indications of seriousness are well within the ambit of judgment exercised daily by judges. Courts are also well suited to the task of identifying serious crimes in the Second Amendment context, as in other constitutional contexts the Judicial Branch is charged with discerning "objective criteria reflecting the seriousness with which society regards [an] offense." *Baldwin*, 399 U.S. at 68; *see, e.g.*, *Blanton v. City of North Las Vegas*, 489 U.S. 538, 543–44 (1989) (Sixth Amendment); *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1985) (Fourth Amendment); *Smith v. United States*, 360 U.S. 1, 9 (1959) (Fifth Amendment).

[6] Our decision is limited to the cases before us, which involve state-law misdemeanants bringing as-applied Second Amendment challenges to § 922(g)(1). This is important because when a legislature chooses to call a crime a

33

conclude that Binderup and Suarez have distinguished their circumstances from those of persons historically excluded from the right to arms. That, in turn, requires the Government to meet some form of heightened scrutiny at the second step of the *Marzzarella* framework.

### D.  Step Two of the *Marzzarella* Framework

Next, we consider whether § 922(g)(1) survives heightened scrutiny as applied. On this record, it does not. No doubt § 922(g)(1) is intended to further the government interest of promoting public safety by "preventing armed mayhem," *Skoien*, 614 F.3d at 642, an interest that is both important and compelling. But whether we apply intermediate scrutiny or strict scrutiny—and we continue to follow the lead of *Marzzarella* in choosing intermediate scrutiny, 614 F.3d at 97—the Government bears the burden of proof on the appropriateness of the means it employs to further its interest. *See, e.g.*, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S.

---

misdemeanor, we have an indication of non-seriousness that is lacking when it opts instead to use the felony label. We are not confronted with whether an as-applied Second Amendment challenge can succeed where the purportedly disqualifying offense is considered a felony by the authority that created the crime. On the one hand, it is possible to read *Heller* to leave open the possibility, however remote, of a successful as-applied challenge by someone convicted of such an offense. At the same time, even if that were so, the individual's burden would be extraordinarily high—and perhaps even insurmountable. In any event, given that neither Challenger fits that description, we need not decide the question.

469, 480 (1989); *Johnson v. California*, 543 U.S. 499, 505, 506 n.1 (2005).

Here the Government falls well short of satisfying its burden—even under intermediate scrutiny. The record before us consists of evidence about the Challengers' backgrounds, including the time that has passed since they last broke the law. It contains no evidence explaining why banning people like them (*i.e.*, people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety. The Government claims that someone like Suarez is "particularly likely to misuse firearms" because he belongs to a category of "potentially irresponsible persons," Gov't *Suarez* Br. at 27–28, and that someone like Binderup is "particularly likely to commit additional crimes in the future," Gov't *Binderup* Br. at 35. But it must "present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments." *Heller*, 670 F.3d at 1259. In these cases neither the evidence in the record nor common sense supports those assertions.

The Government relies on a number of off-point statistical studies to argue that it is reasonable to disarm the Challengers because of their convictions. It notes that felons generally commit violent crimes more frequently than non-felons, *see* Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 1994*, at 6 (2002), and that the "denial of handgun purchases [to convicted felons] is associated with a reduction in risk for later criminal activity of approximately 20–30%," Mona A. Wright *et al.*, *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999). But these studies estimate the likelihood that incarcerated felons will reoffend after their release from prison. The Challengers were not incarcerated and are not felons under state law; they are state-law

35

misdemeanants who spent no time in jail. The Government cannot draw any reasonable conclusions about the risk posed by their possession of firearms from such obviously distinguishable studies. It claims that even criminals placed on probation rather than sent to prison have a heightened risk of recidivism, but the study it cites found that, "[g]enerally, the risk of recidivism was highest during the first year after admission to probation," and that "[a]s released prisoners and probationers age, they tend to exhibit lower rates of recidivism." Iowa Div. of Crim. & Juvenile Justice Planning, *Recidivism Among Iowa Probationers* 2 (July 2005), *available at* http://publications.iowa.gov/15032/ (last visited Aug. 25, 2016). Binderup's and Suarez's offenses are 20 and 26 years old, respectively, so that study tells us little, if anything, about the risk of recidivism in these cases.[7]

---

[7] As discussed, evidence of how individuals have lived their lives since committing crimes is irrelevant under *Marrzarella*'s first step, as there is no historical support for rehabilitation being a consideration in determining whether someone has Second Amendment rights. However, at step two of the analysis the question is no longer whether the Challengers fall within the Second Amendment's protections. They do. Our task now is to decide whether the Government can disarm them despite these protections. Whereas our obligation at step one is to draw constitutional lines—separating those who have Second Amendment rights from those who do not—at step two we must ask whether the Government has made a strong enough case for disarming a person found after step one to be eligible to assert an as-applied challenge. This turns in part on the likelihood that the Challengers will commit crimes in the future. Thus, under the

36

The Government also claims to have studies of particular relevance to each Challenger's situation, but this argument too misses the mark. As to Binderup, the Government cites studies from several states that it contends would classify him as a sex offender on account of his criminal conduct. *See* Gov't *Binderup* Br. at 33–34; *see also id.* at 28 n.8 (citing a Pennsylvania study showing that individuals convicted of certain sexual offenses have a 50–60% chance of rearrest within three years of release from prison). Binderup unsurprisingly disputes that label. We need not delve into the weeds here, as, much like the more general studies discussed above, the sex-offender specific studies focus on people who were incarcerated. It is not helpful to draw inferences about the usefulness of disarming Binderup from those off-point studies.

As to Suarez, the Government emphasizes that persons arrested for "weapons offenses" are rearrested at high rates, Gov't *Suarez* Br. at 30 & nn.10–11 (citing studies), and relies on a study indicating that California handgun purchasers in 1977 "who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses," were more likely than people with no criminal histories to be charged later with a violent crime, *see* Garen J. Wintemute *et al.*, *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 Am. Med. Ass'n 2083, 2086 (1998). Yet that study only addresses the risk of recidivism within 15 years of a conviction for an unspecified "nonviolent firearm-related offense[]." *Id.* at 2086. Common sense tells us that recidivism

right circumstances the passage of time since a conviction can be a relevant consideration in assessing recidivism risks.

rates would change with the passage of an additional 11 years (Suarez was convicted 26 years ago) and vary based on the circumstances of the prior conviction.

This is not to say that empirical studies are irrelevant to as-applied Second Amendment challenges. Parties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction. In these cases, empirical studies could have demonstrated an appropriate fit between the Challengers' total disarmament and the promotion of public safety if they contained reliable statistical evidence that people with the Challengers' backgrounds were more likely to misuse firearms or were otherwise irresponsible or dangerous. The Government simply presented no such evidence.[8]

Additionally, that federal law gives Binderup and Suarez opportunities to escape the effect of § 922(g)(1) does not save the statute from unconstitutionality under the

---

[8] Judge Fuentes and those colleagues who join his opinion dissenting from the judgments suggest that our heightened scrutiny analysis boils down to the Challengers asking us to trust that they will not misuse firearms because we cannot make predictive judgments about the need to disarm the Challengers "with any degree of confidence." Fuentes Op. Typescript at 55. We disagree. Under either form of heightened scrutiny it is the Government's burden to prove that the restriction is appropriately tailored. The problem in our cases is that because the Government's evidence sweeps so broadly, it does not establish that the restriction serves an important interest even as applied to people *like* the Challengers, let alone to the Challengers themselves.

circumstances. For starters, several avenues are closed to them altogether: they may not apply for relief under § 925(c) because that provision has been unfunded for years, *see Logan*, 552 U.S. at 28 n.1; and Suarez is ineligible for expungement or the restoration of his civil rights, *see* Md. Code, Crim. P., § 10-105; *Logan*, 552 U.S. at 31–32. Those avenues that remain open to them do not satisfy even intermediate scrutiny. Binderup's record may be expunged only after he reaches age 70 (or is dead for three years), 18 Pa. Cons. Stat. § 9122(b), but as there is no evidence showing it is reasonable to ban Binderup from possessing a firearm today, there is certainly no evidence to show that it is reasonable to keep that ban in place until his 70th birthday. The only remaining option is for Binderup and Suarez to receive pardons from the Governors of Pennsylvania and Maryland, respectively. (Pardons are, as already noted, an independent ground for relief from the firearm disability in § 922(g)(1), and Binderup must receive a pardon to restore his civil rights. *See* 42 Pa. Cons. Stat. § 4502(a)(3).) But the Government has presented no evidence or explanation as to why a Governor's decisions about pardons—"a classic example of unreviewable executive discretion," *Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009)—are reasonably related to the risk posed by the Challengers' possession of firearms. Though a pardon would reflect well on Binderup and Suarez, it is hardly reasonable to treat the absence of a pardon—rare by any measure—as adequate proof of a continuing need to disarm them indefinitely.

The Challengers' isolated, decades-old, non-violent misdemeanors do not permit the inference that disarming people like them will promote the responsible use of firearms. Nor is there any evidence in the record to show why people like them remain potentially irresponsible after many years of apparently responsible behavior. Without more, there is not a substantial fit between the continuing disarmament of the

Challengers and an important government interest. Thus, § 922(g)(1) is unconstitutional as applied to them.

## IV. Conclusion

When sorting out a fractured decision of the Court, the goal is "to find a single legal standard" that "produce[s] results with which a majority of the [Court] in the case articulating the standard would agree." *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 947 F.2d 682, 693 (3d Cir. 1991), *modified on other grounds*, 505 U.S. 833 (1992)). We have at times "looked to the votes of dissenting [judges] if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue." *Id.* And when no single rationale explaining the result enjoys the support of a majority of the Court, its holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 69 n.15 (1976) (plurality opinion)).

Applying those interpretive tools here, the following is the law of our Circuit: (1) the two-step *Marzzarella* framework controls all Second Amendment challenges, including as-applied challenges to § 922(g)(1); (2) a challenger will satisfy the first step of that framework only if he proves that the law or regulation at issue burdens conduct protected by the Second Amendment; (3) to satisfy step one in the context of an as-applied challenge to § 922(g)(1), a challenger must prove that he was not previously convicted of a serious crime; (4) evidence of a challenger's rehabilitation or his likelihood of recidivism is not relevant to the step-one analysis; (5) as the narrowest ground supporting the Court's judgments for Binderup and Suarez, the considerations discussed above will determine whether crimes are serious

(*i.e.*, disqualifying) at step one; and (6) if a challenger makes the necessary step-one showing, the burden shifts to the Government at step two to prove that the regulation at issue survives intermediate scrutiny.

In the cases before us, though Binderup and Suarez fail to show that their misdemeanor offenses are not subject to § 922(g)(1), they have rebutted the presumption that they lack Second Amendment rights by distinguishing their crimes of conviction from those that historically led to exclusion from Second Amendment protections. This meets the first-step test of *Marzzarella*. At step two, the Government has failed to present sufficient evidence to demonstrate under even intermediate scrutiny that it may, consistent with the Second Amendment, apply § 922(g)(1) to bar Binderup and Suarez from possessing a firearm in their homes. Accordingly, we affirm the judgments of the District Courts.

*Daniel Binderup v. Attorney General of the United States;*
*Director Bureau of Alcohol Tobacco Firearms & Explosives*
Nos. 14-4550, 14-4549

*Julio Suarez v. Attorney General of the United States;*
*Director Bureau of Alcohol Tobacco Firearms & Explosives*
Nos. 15-1975, 15-1976

HARDIMAN, *Circuit Judge*, concurring in part and concurring in the judgments, joined by FISHER, CHAGARES, JORDAN, and NYGAARD, *Circuit Judges*.

The Second Amendment secures an individual "right of the people" to keep and bear arms unconnected to service in the militia. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This "pre-existing" right was included in the Bill of Rights in light of the troubles the colonists experienced under British rule and the Founders' appreciation of the considerable power that was transferred to the new federal government. Without a specific guarantee in our fundamental charter, it was feared that "the people" might one day be disarmed. *See id.* at 598–99. At the same time, the Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among "the people" entitled to keep and bear arms.

The laws of the United States prohibit felons and certain misdemeanants from possessing firearms. 18 U.S.C. § 922(g)(1). Guided by the Supreme Court's characterization of felon dispossession as "presumptively lawful" in *Heller*, we held in *United States v. Barton* that this prohibition does not on its face violate the Second Amendment. 633 F.3d 168 (3d Cir. 2011). In doing so we stated that § 922(g)(1) remains subject to as-applied constitutional challenges. *Id.* at 172–75.

These consolidated appeals present two such challenges. Daniel Binderup and Julio Suarez—each permanently barred from possessing firearms because of prior misdemeanor convictions—contend that § 922(g)(1) is unconstitutional as applied to them.

It is. The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment. And because Binderup and Suarez have demonstrated that their crimes of conviction were nonviolent and that their personal circumstances are distinguishable from those of persons who do not enjoy Second Amendment rights because of their demonstrated proclivity for violence, the judgments of the District Courts must be affirmed.

I

We agree with all our colleagues that Binderup and Suarez are subject to disarmament under the plain terms of 18 U.S.C. § 922(g)(1).[1] We also agree with Judges Ambro, Smith, and Greenaway that the District Court correctly held

---

[1] Given the Court's universal agreement that § 922(g)(1) is *unambiguous* as to whom it covers and what it criminalizes, we have trouble comprehending the Dissent's fears that our approach for assessing the statute's as-applied constitutionality under the Second Amendment (set forth *infra*) puts it at risk of being declared unconstitutionally vague under the Due Process Clause. *See* Dissent at 71–74. Our view is simply that certain applications of this pellucid statute might be unconstitutional.

2

that § 922(g)(1) is unconstitutional as applied to Binderup and Suarez. But we perceive flaws in Judge Ambro's opinion.[2]

To begin with, our colleagues misapprehend the traditional justifications underlying felon dispossession, substituting a vague "virtue" requirement that is belied by the historical record. Then, under the guise of "reaffirm[ing]" the two-step test of *United States v. Marzzarella*, Ambro Op. 6, they actually expand that test—and along with it, the judicial power. For our colleagues hold that even with respect to persons entitled to Second Amendment rights, judges may pick and choose whom the government may permanently disarm if the judges approve of the legislature's interest balancing. Despite Binderup's and Suarez's success today, our colleagues have retained "the power to decide on a case-by-case basis whether the [Second Amendment] right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. This is demonstrated by the fact that all but three of our dissenting colleagues—who have concluded that *all* as-applied challenges to § 922(g)(1) must fail—join the bulk of Judge Ambro's constitutional analysis. By contrast, we would hold—consistent with *Heller*—that non-dangerous persons convicted of offenses unassociated with violence may rebut the presumed constitutionality of § 922(g)(1) on an as-applied basis, and that when a law eviscerates the core of the Second

---

[2] Although a majority of the Court joins two portions of Judge Ambro's opinion and a plurality joins others, the outcome-determinative sections are supported by only three judges. To minimize confusion, we will refer to the opinion as "Judge Ambro's opinion" and will indicate whether the relevant portion thereof was backed by a majority or not where necessary.

3

Amendment right to keep and bear arms (as § 922(g)(1) does by criminalizing exercise of the right entirely), it is categorically unconstitutional.

A

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held the Second Amendment protects an individual right to possess a firearm unconnected to service in a militia, and to use that weapon for traditionally lawful purposes, such as self-defense within the home. 554 U.S. at 595. The Second Amendment "elevates above *all* other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"—a right that is at the "core" of the Second Amendment. *Id.* at 635 (emphasis added). Two years after *Heller*, in *McDonald v. City of Chicago*, the Court held the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*," explaining that the right is "fundamental" to "our system of ordered liberty." 561 U.S. 742, 778 (2010).

Although the Second Amendment is an enumerated fundamental right, it is "not unlimited." *Heller*, 554 U.S. at 626. "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). A range of "who," "what," "where," "when," and "how" restrictions relating to firearms are permitted—many based on the scope of the Second Amendment and others based on their satisfaction of some level of heightened scrutiny. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-*

4

*Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009) (distinguishing between "'what' restrictions (such as bans on machine guns, so-called 'assault weapons,' or unpersonalized handguns), 'who' restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or 18-to-20-year-olds), 'where' restrictions (such as bans on carrying in public, in places that serve alcohol, or in parks, or bans on possessing [guns] in public housing projects), 'how' restrictions (such as storage regulations), [and] 'when' restrictions (such as waiting periods)"); *United States v. Huitron-Guizar,* 678 F.3d 1164, 1166 (10th Cir. 2012) (applying the same heuristic).

For instance, the right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Likewise, the Supreme Court has acknowledged the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* (internal quotation marks omitted). In addition, *Heller* catalogued a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the parameters of the right. *Id.* at 627 n.26. These include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms."[3] *Id.* at 626–27. Critically,

---

[3] At least one of our sister courts has characterized *Heller*'s list of "presumptively lawful" regulations as dicta. *See United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). But "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings." *United*

such "traditional restrictions go to show the *scope* of the right, not its lack of fundamental character." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring) (emphasis added). The reason, for example, that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," is that they fall outside the historical "scope of the right"—not that the right yields to some important or compelling government interest. *Heller*, 554 U.S. at 625; *see also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).

The Supreme Court has not yet heard an as-applied Second Amendment challenge to a presumptively lawful ban on firearms possession. But that fact makes *Heller* and *McDonald* no less binding on our inquiry here.

B

1

Two of our decisions pertain to Binderup's and Suarez's as-applied challenges in these appeals. *United States*

---

*States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (treating *Heller*'s "presumptively lawful" language as binding); *see also United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) ("[T]o the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta."). Moreover, the Court doubled down on this language in *McDonald*. *See* 561 U.S. at 786. Hence, we have concluded that *Heller*'s list constitutes a limitation on the scope of its holding and does not qualify as dicta. *See Barton*, 633 F.3d at 171; *United States v. Huet*, 665 F.3d 588, 600 (3d Cir. 2012).

*v. Marzzarella* involved an as-applied challenge to a conviction under 18 U.S.C. § 922(k), which prohibits the possession of a handgun with an obliterated serial number—a "what" restriction limiting possession of a certain category of firearms. 614 F.3d at 87. Because this statute was not included in *Heller*'s list of presumptively lawful firearm regulations, we gleaned from *Heller* a "two-pronged approach to Second Amendment challenges." *Id.* at 89. We first consider "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If the conduct lies outside the Second Amendment's scope, the right does not apply and the challenged law must stand. But if the law burdens protected conduct, we determined that the proper course is to "evaluate the law under some form of means-end scrutiny." *Id.* "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

Applying that test to § 922(k)'s ban on the possession of firearms with obliterated serial numbers, we held that the law "would pass constitutional muster even if it burdens protected conduct." *Id.* at 95. In other words, we skipped the first step and proceeded to apply means-ends scrutiny. We chose intermediate scrutiny[4] because "[t]he burden imposed by the law does not severely limit the possession of firearms" and does not bar possession of an entire class of firearms. *Id.*

---

[4] Intermediate scrutiny "require[s] the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important,'" and requires "the fit between the regulation and the asserted objective be reasonable, not perfect." *Marzzarella*, 614 F.3d at 98 (citations omitted).

at 97. Under that standard, we concluded that the law is constitutional because it fits reasonably with the substantial or important "law enforcement interest in enabling the tracing of weapons via their serial numbers." *Id.* at 98. We also opined that the law would pass strict scrutiny[5] because it serves a compelling government interest through the "least-restrictive" means. *Id.* at 100.

A year after *Marzzarella* we decided *Barton*, which involved facial and as-applied challenges to the very law in question here: § 922(g)(1). Unlike the law at issue in *Marzzarella*—the "what" restriction codified in § 922(k)— the statute at issue in *Barton* (and in these appeals) was a presumptively lawful "who" restriction that prohibits certain people from possessing guns because of their membership in a criminal class. Barton was a felon who had been convicted of possessing firearms and ammunition in violation of § 922(g)(1). *Barton*, 633 F.3d at 169. We readily concluded that his facial challenge "must fail" in light of *Heller*'s list of presumptively lawful firearm regulations. *Id.* at 172. We reasoned that since a facial challenge requires a showing that the challenged law "is unconstitutional in all of its applications," *Heller* foreclosed a facial challenge to § 922(g)(1) because it is "presumptively lawful," meaning that, "under most circumstances, [it] regulate[s] conduct which is unprotected by the Second Amendment." *Id.*

Most relevant to these appeals is our analysis of Barton's as-applied challenge to § 922(g)(1). In that regard,

---

[5] "Strict scrutiny asks whether the law is narrowly tailored to serve a compelling government interest." *Marzzarella*, 614 F.3d at 96 n.14

8

we first determined that "*Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose" an as-applied challenge. *Id.* at 173. We reasoned that "[b]y describing the felon disarmament ban as presumptively lawful, the Supreme Court implied that the presumption may be rebutted."[6] *Id.* at 173 (internal citation and quotation marks omitted).

---

[6] At times, the Government seems to reject even the possibility of an as-applied Second Amendment challenge to a presumptively lawful regulation. *See, e.g.*, Gov't Suarez Br. 15 ("In recognizing section 922(g)(1) as a 'presumptively lawful regulatory measure[],' the Supreme Court did not suggest that the statute nonetheless could be subject to a successful as-applied constitutional challenge." (internal citation omitted)); Gov't Binderup Br. 14 (same, verbatim). The Government retreated from that proposition somewhat at oral argument, reframing its position as an objection merely to as-applied challenges that rely on individualized review of whether a law is unconstitutional in light of the challenger's particular circumstances. But some degree of individualized assessment is part and parcel of all as-applied challenges. *See, e.g.*, *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (explaining that an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a *particular person* under *particular circumstances* deprived that person of a constitutional right" (emphases added)).

And our determination in *Barton* that § 922(g)(1) is subject to as-applied challenges is by no means an outlier. Several of our sister courts have either accepted or allowed the possibility of as-applied Second Amendment challenges

9

to presumptively lawful regulations. *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."); *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012) ("The *Heller* Court's holding that defines the core right to bear arms by law-abiding, responsible citizens does not preclude some future determination that persons who commit some offenses might nonetheless remain in the protected class of 'law-abiding, responsible' persons."); *Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (indicating willingness to consider an as-applied Second Amendment challenge to § 922(g)(1) but concluding it had not been raised properly).

Although the Dissent rests its conclusion on its determination that all persons covered by § 922(g)(1) fall outside the scope of the Second Amendment, it too expresses doubt as to the availability of as-applied constitutional challenges to this "presumptively lawful" statute. *See* Dissent at 21 (stating that *Marzzarella* "concluded that the 'better reading' of *Heller* was that [the list of presumptively lawful] measures were complete '*exceptions* to the right to bear arms'") (quoting *Marzzarella*, 614 F.3d at 91 and adding emphasis). *Marzzarella* held no such thing (indeed, it did not even involve a challenge to one of the presumptively lawful longstanding regulations identified by *Heller*). Rather, its examination of *Heller*'s list was geared toward determining whether such regulations were "presumptively lawful" based on the step-one question (the scope of the Second Amendment) or the step-two question (means-end scrutiny). Its conclusion that the former is the correct understanding of

10

Next, we explained what was required to mount a successful as-applied Second Amendment challenge to

*Heller* meant that "these longstanding limitations are exceptions to the right to bear arms." *Marzzarella*, 614 F.3d at 91. *Barton*'s characterization mirrored *Marzzarella*'s: it stated that a "lawful" longstanding regulation "regulates conduct 'fall[ing outside] the scope of the Second Amendment's guarantee.'" *Barton*, 633 F.3d at 172 (quoting *Marzzarella*, 614 F.3d at 91). But neither *Marzzarella* nor any other of our precedents has ever implied that *Heller*'s incomplete list of "presumptively lawful" firearm regulations "'*under any and all circumstances* do not offend the Second Amendment.'" Dissent at 10 (quoting *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) and adding emphasis). To so hold would ignore the meaning of the word "presumption." A presumption of constitutionality "is a presumption . . . [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption." *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 209 (1934) (emphasis added). We do not disagree that the *Heller* Court included this "presumptively lawful" language to provide some "assurance[]" that its decision "did not provide a basis for future litigants to upend any and all restrictions on the right to bear arms." Dissent at 36. Indeed, we have concluded that § 922(g)(1) is *facially* valid for this very reason. *See Barton*, 633 F.3d at 172. But we doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is "*presumptively* lawful." *Heller*, 554 U.S. at 627 n.26 (emphasis added).

11

§ 922(g)(1). We looked to the "historical pedigree" of the statute to ascertain "whether the traditional justifications underlying the statute support a finding of permanent disability in this case." *Id; see also id.* at 175 (noting that the constitutionality of the felon dispossession statute under the Second Amendment right depends "upon *whom* the right was intended to protect") (emphasis in original). Our analysis revealed that although persons convicted of violent crimes have been barred from firearm possession since 1931, it wasn't until thirty years later that Congress dispossessed nonviolent felons. *Id.* at 173. The historical record demonstrated that "the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Id.* Accordingly, we determined that the exclusion of felons and other criminals from the scope of the Second Amendment's protections was tethered to the time-honored practice of keeping firearms out of the hands of those likely to commit violent crimes. *Id.*

For the reasons discussed, we concluded that "[t]o raise a successful as-applied challenge, [one] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *Id.* at 174. We explained further:

> For instance, a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society.

*Id.* (internal citation omitted).

12

We had no trouble concluding that Barton failed to make this showing because he could not demonstrate that he was "no more likely than the typical citizen to commit a crime of violence." *Id.* To begin with, his prior disqualifying convictions were for possession of cocaine with intent to distribute and for receipt of a stolen firearm. *Id.* As we explained, "[c]ourts have held in a number of contexts that offenses relating to drug trafficking and receiving stolen weapons are closely related to violent crime"—again, the relevant historical justification for excluding the class of which Barton was a member from the Second Amendment's protections. *Id.* The record also indicated that Barton had not been rehabilitated such that he was "no more dangerous than a typical law-abiding citizen." *Id.* Indeed, he had recently admitted to selling a firearm with an obliterated serial number to a police informant. *Id.* For those reasons, we rejected Barton's as-applied challenge because he had failed "to demonstrate that his circumstances place him outside the intended scope of § 922(g)(1)." *Id.*

2

Our decisions in *Marzzarella* and *Barton* show that the threshold question in a Second Amendment challenge is one of scope: whether the Second Amendment protects the person, the weapon, or the activity in the first place. This requires an inquiry into "text and history." *Heller*, 554 U.S. at 595. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35. The "critical tool of constitutional interpretation" in this area is "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment

13

or ratification." *Id.* at 605 (emphasis in original); *see also Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the scope of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."). Hence, the scope of the right is discerned with reference to the "historical justifications" underlying traditional limits on the right's coverage. *Heller*, 554 U.S. at 635. The test we enunciated in *Barton* was directed at this very question. *See Barton*, 633 F.3d at 173 ("[T]o evaluate [an] as-applied challenge [to § 922(g)(1)], we look to [its] historical pedigree . . . to determine whether the traditional justifications underlying the statute support a finding of permanent disability in this case.").

The fact that *Barton* speaks to scope does not mean, as our colleagues and the Government insist, that it requires application of means-end scrutiny once it is determined that a presumptively lawful regulation has dispossessed someone who falls within the protection of the Second Amendment. It is true that courts typically apply some form of means-end scrutiny to as-applied challenges once it has been determined that the law in question burdens protected conduct. But when, as in these appeals, it comes to an as-applied challenge to a presumptively lawful regulation that *entirely bars* the challenger from exercising the core Second Amendment right, any resort to means-end scrutiny is inappropriate once it has been determined that the challenger's circumstances distinguish him from the historical justifications supporting

14

the regulation. This is because such laws are categorically invalid as applied to persons entitled to Second Amendment protection—a matter of scope.

This principle is based on *Heller* itself. That decision invalidated a municipal law that banned handgun possession in the home and required any lawful firearm to be kept disassembled and bound by a trigger lock at all times, rendering it inoperable.[7] *Heller*, 554 U.S. at 628. Especially significant for these appeals, the Court eschewed means-end scrutiny in assessing the constitutionality of the ban. Because the law precluded individuals from possessing an important class of firearms in the home even for self-defense (the right at the "core" of the Second Amendment) and required that all firearms within the home be rendered inoperable, it was unconstitutional without regard to governmental interests supporting the law or their overall "fit" with the regulation. *See Heller*, 554 U.S. at 629–30.

*Heller*'s reasoning bears this out. Specifically, with respect to the District of Columbia's requirement that all firearms in the home be "kept inoperable at all times," the Court said: "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense and *is hence unconstitutional*." *Id.* at 630 (emphasis added). Conspicuously absent from the Court's analysis is any mention of means-end scrutiny. Instead, the Court reasoned

---

[7] *McDonald* involved a similar handgun ban, but the Court limited its analysis to the incorporation question and remanded the case. 561 U.S. at 791. The City of Chicago subsequently lifted the ban and replaced it with a less restrictive ordinance. *See Ezell,* 651 F.3d at 689.

15

categorically: (1) the regulation entirely deprives protected persons from exercising the core of the Second Amendment right; (2) it's therefore unconstitutional. The same went for the District of Columbia's handgun ban. After concluding that the Second Amendment includes handguns, the Court didn't mince words: "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is *invalid*." *Id.* at 629 (emphasis added). A nineteenth century authority quoted by the Supreme Court in the paragraph preceding this conclusion should eliminate any doubt regarding the Court's categorical approach: "A statute which, under the pretence of regulating, *amounts to a destruction of the right*, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be *clearly unconstitutional*." *Id.* (quoting *State v. Reid*, 1 Ala. 612, 616–617 (1840)) (emphases added); *see also Bliss v. Com.*, 12 Ky. 90, 91 (1822) (suggesting that a regulation that "import[s] an entire destruction of the right of the citizens to bear arms in defense of themselves and the state" would be plainly unconstitutional). Hence, a law that burdens persons, arms, or conduct protected by the Second Amendment and that does so with the effect that the core of the right is eviscerated is unconstitutional.[8]

---

[8] The *Heller* Court declined to detail which form of scrutiny might apply in cases involving less severe burdens on Second Amendment rights but cautioned that rational basis scrutiny would never apply. *Id.* at 629 n.27. "If all that was required to overcome the right to keep and bear arms was a rational basis," the Court explained, "the Second Amendment

We are not the first to recognize this categorical rule. As the Seventh Circuit has explained, "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are *categorically* unconstitutional." *Ezell*, 651 F.3d at 703; *see also* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L. Rev. 375, 380 (2009) ("Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage."); *Heller v. D.C.*, 670 F.3d 1244, 1272–73 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("As to the ban on handguns[,] . . . the Supreme Court in *Heller* never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in *Heller* and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use—and thus that D.C.'s handgun ban was unconstitutional."); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014) ("[T]he rare law that 'destroys' the [core Second Amendment] right" requires "*Heller*-style per se invalidation.") (O'Scannlain, J.), *rev'd on reh'g en banc*, 2016 WL 3194315 (9th Cir. June 9, 2016).

would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.*

17

Although we suspect that most firearm regulations probably will not trigger this categorical rule, § 922(g)(1) certainly does. As applied to someone who falls within the protective scope of the Second Amendment, § 922(g)(1) goes even further than the "severe restriction" struck down in *Heller*: it completely eviscerates the Second Amendment right.[9] *Cf. United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (recognizing that "the broad scope of 18 U.S.C. § 922(g)(1)—which *permanently* disqualifies *all* felons from possessing firearms—would conflict with the 'core' self-defense right embodied in the Second Amendment" to the extent that its presumptive validity does not attach) (emphasis in original). Indeed, the Government's contention that one can fall within the protective scope of the Second Amendment yet nevertheless be permanently deprived of the right transforms what it means to possess a "right." Boiled down to its essence, the Government's position goes something like this: "You have the right to keep and bear arms, but you may never exercise that right because we have supplied good reasons." This understanding of the Second Amendment is too

---

[9] The Government wrongly asserts that we have recognized that "even laws that actually burden Second Amendment rights must only have a 'reasonable, not perfect,' fit with an important government interest." Gov't Br. 26 (quoting *Marzzarella*, 614 F.3d at 98). The Dissent agrees that intermediate scrutiny is the appropriate standard here. *See* Dissent at 41–45. But *Marzzarella* applied intermediate scrutiny (before going on to apply strict scrutiny, just in case) because the law under attack did not even "come close" to a ban on the possession of firearms in the home. *Marzzarella*, 614 F.3d at 97.

parsimonious a view of a constitutional right because a "right" that entitles its holder to nothing whatsoever "is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. When the Second Amendment applies, its core guarantee cannot be withdrawn by the legislature or balanced away by the courts.[10] Rather, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.[11]

---

[10] *See Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable . . . .").

[11] Judges Ambro and Fuentes deny that § 922(g)(1) eviscerates the right to keep and bear arms. In Judge Ambro's view, because "persons convicted of disqualifying offenses may possess handguns if (1) their convictions are expunged or set aside, (2) they receive pardons, or (3) they have their civil rights restored," the statute is akin to run-of-the-mill regulations imposing "preconditions" to firearm possession by individuals with Second Amendment rights, such as safety training requirements. Ambro Op. 17–18. Far from it. To begin with, the "only . . . option" available to Binderup and Suarez to satisfy the so-called "precondition" imposed by § 922(g)(1) is to receive pardons. *Id.* at 39. To frame this moonshot as a mere condition precedent to arms possession not unlike a training-course requirement strains credulity. Section 922(g)(1) is a *ban* on firearms possession subject to a few statutory exceptions, not a mere regulatory proviso that simply conditions exercise of the right on the completion of a background check or safety class.

For the reasons stated, *Barton* alone provides the standard for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure (like § 922(g)(1)

---

Indeed, *Heller* itself shows the "precondition" characterization of § 922(g)(1) to be unavailing. The handgun ban and disassembly ordinance struck down in that case likewise had exceptions that could be abstractly framed as "conditions precedent" to exercise of the Second Amendment right: the handgun ban was subject to an exception that the Chief of Police could issue one-year handgun licenses at his discretion and the disassembly ordinance allowed residents to keep lawful firearms in the home so long as they were rendered inoperable. *See Heller*, 554 U.S. at 574–75. But the Supreme Court did not understand the licensing exception as a condition precedent to handgun possession or the disassembly rule as a mere precondition on keeping firearms in the home; it viewed these carve-outs as "minor exceptions" and struck down both ordinances as unconstitutional destructions of the Second Amendment right. *Id.* at 575 n.1, 629–30. The Dissent's retort that *Heller* is distinguishable because there the "core 'right of law-abiding, responsible citizens to use arms in defense of hearth and home'" was implicated and here it is not because Binderup and Suarez's misdemeanors place them outside of that class puts the rabbit in the hat. Dissent at 45 (quoting *Heller*, 554 U.S. at 635). If Binderup's and Suarez's offenses *are not* of the type that were historically understood to remove them from the class of persons entitled to Second Amendment rights, § 922(g)(1) effects the same type of untenable "conditions" that were deemed unconstitutional in *Heller*.

that denies a core Second Amendment right to a certain class of persons. And our opinion in that case explains the two things an individual must do to mount a successful as-applied challenge. First, he must identify the traditional justifications for excluding from Second Amendment protections the class of which he is a member. *See Barton*, 633 F.3d at 172. Only justifications with "historical pedigree" are relevant for regulations imposing a permanent disability. *Id.* Second, he must present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class. *Id.* at 174. These facts must speak to the traditional justifications that legitimize the class's disability. In *Barton* we noted at least two ways of doing this: (1) "a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen," or (2) "a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society."[12] *Id.*

This does not mean, of course, that a dispossessed individual can win an as-applied challenge by promising to

---

[12] Our colleagues reject *Barton*'s mention of the possibility that "the passage of time or evidence of rehabilitation [might] restore the Second Amendment rights of people who committed serious crimes." Ambro Op. 26. We have not been presented with historical evidence one way or another whether this might be a route to restoration of the right to keep and bear arms in at least some cases, so we would leave for another day the determination whether that turns out to be the case.

21

behave well in the future.[13] Courts must diligently inquire into the facts to determine whether a challenger has

---

[13] The Government's and the Dissent's repeated citations on this point to *Pontarelli v. U.S. Department of Treasury* are inapposite. That case involved an appropriations ban that suspended the ability of the Bureau of Alcohol, Tobacco, and Firearms (ATF) to consider petitions from convicted felons for restoration of their firearms privileges under 18 U.S.C. § 925(c), a statute that also gives federal district courts jurisdiction to review applications denied by ATF. 285 F.3d 216, 217 (3d Cir. 2002). We concluded that "because the appropriations ban suspends ATF's ability to issue the 'denial' that § 925(c) makes a prerequisite, it effectively suspends that statute's jurisdictional grant." *Id.* Given that "[e]valuating a § 925(c) application requires a detailed investigation of the felon's background and recent conduct," which includes "interviewing a wide array of people, including the felon, his family, his friends, the persons whom he lists as character references, members of the community where he lives, his current and former employers, his coworkers, and his former parole officers," we noted as a "[p]olicy [c]onsideration[]" that without prior ATF involvement and an adversarial process, "courts are without the tools necessary to conduct a systematic inquiry into an applicant's background." *Id.* If courts "reviewed applications *de novo*," we reasoned, "they would be forced to rely primarily—if not exclusively—on information provided by the felon," which "would be dangerously one-sided." *Id.* (internal quotation marks and citation omitted). Contrary to the Government's and the Dissent's characterizations, a constitutional inquiry into a presumptively lawful statute is distinct from the one-sided, fact-intensive inquiry that would

22

adequately distinguished his own circumstances from those of persons historically barred from Second Amendment protections. *Heller* and *Barton* place the burden on the challenger to rebut the presumptive lawfulness of § 922(g)(1). *See Barton*, 633 F.3d at 174. That's no easy task. Government evidence regarding one's criminal history will require the challenger to make a strong showing to distinguish himself from others with criminal records. But to deny one even the opportunity to "develop [a] factual basis" in support of his constitutional claim would run afoul of both Supreme Court guidance regarding the scope of the Second Amendment and the concept of an as-applied challenge. *Id.* at 174.

## II

### A

We agree with the District Courts that § 922(g)(1) is unconstitutional as applied to Binderup and Suarez. As far as the historical justification for felon dispossession goes, we explained it in *Barton*: the time-honored principle that the right to keep and bear arms does not extend to those likely to commit violent offenses. Because the Supreme Court declined to "expound upon the historical justifications" for

---

have been called for were courts required to assess § 925(c) petitions in the first instance. Reviewing an as-applied constitutional challenge based on facts alleged by a challenger and weighing those facts against competing evidence proffered by the Government is not only something courts are equipped to do, it is our constitutional duty. *See* U.S. Const. arts. III and VI, cl. 2; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

the list of presumptively lawful firearm exclusions in *Heller*, 554 U.S. at 627 n.26, 635—leaving that task to us—*Barton*'s rationale warrants further explication. As stated, *Heller* instructs that the public understanding of the scope of the right to keep and bear arms at the time of the Second Amendment's enactment dictates the scope of the right today. *Id.* at 605. In undertaking this inquiry, we are reminded that "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring).

The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms. At the Pennsylvania ratifying convention, Constitutionalists and other opponents of the Federalists proposed language stating that "no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals.*" The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). Likewise, at the Massachusetts ratifying convention just months later, Samuel Adams offered a proposal that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens,* from keeping their own arms." Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788,* at 86 (Boston, William White 1856)

24

(emphasis added). And the New Hampshire convention proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Schwartz, 2 *The Bill of Rights: A Documentary History* at 761.

These proposals show that there was broad consensus between Federalists and their opponents on the existence and nature of the "natural right" to keep and bear arms for defensive purposes; what was controversial was whether the Constitution required a Bill of Rights to ensure the right to keep and bear arms (as so-called Anti-Federalists contended) or whether such an explicit guarantee was unnecessary in light of Congress's limited delegated powers and might in fact backfire by minimizing other, unenumerated liberties (as Federalists argued). *See* Stephen P. Halbrook, *The Founders' Second Amendment* 190–215 (surveying the debates at the ratifying conventions and highlighting the commonplace understanding that "dangerous persons could be disarmed"). Indeed, it is telling that in the crucibles of the ratifying conventions, such public declarations of the scope of the right to keep and bear arms did not provoke any apparent disagreement. *See id.* As we summarized in *Barton*, the "[d]ebates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered 'highly influential' by the Supreme Court in *Heller* . . . confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." 633 F.3d at 174. Hence, the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

A number of firearms restrictions from the founding and pre-founding era support this conclusion. Aside from

25

"complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race" (each of which today would be plainly unconstitutional), the founding generation also disarmed those who refused to pledge their loyalty to the Revolution, state, or nation. Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562 (2009). As the Fifth Circuit has explained, "[a]lthough these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); *see also United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (noting that Massachusetts required participants in Shays' Rebellion to obtain a pardon for taking up arms against the state, to swear allegiance to the state, and to give up their firearms for three years). This principle had some roots in the English arms tradition, wherein the Crown had the authority "to disarm not only papists, but dangerous and disaffected persons as well." Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. St. L. Rev. 351, 382 (2009); *cf.* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 164 (2007) (noting that although "English law supplied ample precedent" to disarm "'dangerous' citizens," the power was rarely practiced by early American governments). In short, "from time immemorial, various jurisdictions recognizing a right to arms have . . . taken the step of forbidding suspect groups from having arms," and "American legislators at the time of the

Bill of Rights seem to have been aware of this tradition." Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339, 1360 (2009); *see also* Marshall, 32 Harv. J.L. & Pub. Pol'y at 711–12 (examining later laws (upheld in courts) barring possession of firearms while intoxicated and possession of firearms by "tramps" (roaming beggars) and construing them in terms of the "present danger" of misconduct presented by such persons were they to carry firearms).

Although the debates from the ratifying conventions point strongly toward a limit on Second Amendment rights centered on dangerousness, dispossessory regulations enacted to that end were few and far between in the first century of our Republic. Consequently, some have reckoned that "[t]he historical evidence" regarding the scope of the Second Amendment "is inconclusive at best." *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (en banc) (Sykes, J., dissenting). We disagree. Even though "[t]he Founding generation had no laws . . . denying the right [to keep and bear arms] to people convicted of crimes," Winkler, 56 UCLA L. Rev. at 1563, novelty does not mean unconstitutionality. After all, "[t]he paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations." Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1354 (2009).

Thus, a common thread running through the words and actions of the Founders gives us a distinct principle to inform our understanding of the original public meaning of the text of the Second Amendment. *See, e.g.*, Marshall, 32 Harv. J.L.

& Pub. Pol'y at 698 ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); *id.* at 727–28 ("[T]o the extent that one can distill any guidance from the English disability and the Revolutionary disarmament, it would seem at most to be that persons who by their actions—not just their thoughts—betray a likelihood of violence against the state may be disarmed."); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms'*, 49 Law & Contemp. Probs. 151, 161 (1986) (concluding that "*violent criminals*, children, and those of unsound mind may be deprived of firearms" (emphasis added)). In sum, the historical record leads us to conclude that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed.[14]

---

[14] In arguing generally that all persons with criminal records are not entitled to Second Amendment rights, the Government and the Dissent emphasize the fact that "[w]e as a society require persons convicted of crimes to forfeit any number of rights and privileges, including the right to sit on a jury, the right to hold elective office, and the right to vote." Dissent at 2. But these forfeitable rights have different histories and different constitutional dimensions. Consider the right to vote, which like the right to keep and bear arms has been declared fundamental by the Supreme Court. *See Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). Although the

Supreme Court has concluded that the Fourteenth Amendment's Equal Protection Clause does not require states to advance a compelling interest before denying citizens who have been convicted of crimes the right to vote, *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974), that result was demanded by the Constitution's text. Specifically, the Court relied on the "understanding of those who adopted the Fourteenth Amendment, as reflected in [ ] express language" of Section 2 of the Fourteenth Amendment that affirmatively contemplates criminal disenfranchisement, despite Section 1's guarantee of equal protection of the laws. *Id.* Accordingly, felons fall outside the scope of the fundamental right to vote. *See Wesley v. Collins,* 791 F.2d 1255, 1261 (6th Cir. 1986) ("[T]he right of felons to vote is not fundamental."). Probably due to the breadth of this exclusion from the right to vote, the Supreme Court has not indicated that a disenfranchised criminal might succeed in demonstrating that such disenfranchisement is unconstitutional as applied to him in light of the historical understanding of the right. Rather, a challenger's only option is to show that a particular disenfranchisement provision is either irrational or discriminatory. *Richardson*, 418 U.S. at 56; *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). Thus, the scope of the right to vote is historically and textually distinct from the Second Amendment right.

Nor do limits on jury service or eligibility for public office offer any insight into the scope of the Second Amendment, not least because they are not fundamental rights. *See Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 332 (1970) ("The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair

Section 922(g)(1) sweeps much more broadly than this traditional ground for disarmament. *See Barton*, 633 F.3d at 173 ("Although 18 U.S.C. § 922(g) was meant to keep firearms out of the hands of presumptively risky people, Congress did not bar non-violent felons from possessing guns until 1961.") (internal quotation marks and citation omitted); *United States v. Booker*, 644 F.3d 12, 24 & n.14 (1st Cir. 2011) ("[I]n covering only those with a record of violent crime, § 922(g)(9) [(dispossession of domestic violence misdemeanants)] is arguably more consistent with the historical regulation of firearms than § 922(g)(1)," which "applies to all individuals convicted of a federal felony, thus encompassing individuals convicted of crimes as disparate as tax evasion and bank robbery. This breadth, and particularly the inclusion of nonviolent offenses, constitutes a significant departure from earlier understandings of a 'felony.' At common law, for example, '[o]nly the most serious crimes' were considered to be felonies." (internal citations omitted)); *supra* n.14. The upshot of all this is that the as-applied

---

character."); James M. Binnall, *Sixteen Million Angry Men: Reviving A Dead Doctrine to Challenge the Constitutionality of Excluding Felons from Jury Service*, 17 Va. J. Soc. Pol'y & L. 1, 3 (2009) ("The Supreme Court does not recognize the right to sit on a jury as fundamental."); *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014) (noting that there is no "fundamental right to run for public office"); U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. X.

These defeasible civil rights cannot be invoked to justify disarming Binderup and Suarez. They are different rights, with different histories and scopes, subject to different constitutional analyses.

constitutionality of § 922(g)(1) is tied to its historical justification: people who have demonstrated that they are likely to commit violent crimes have no constitutional right to keep and bear arms.[15]

B

The Government's divergent reading of the historical scope of the Second Amendment—also adopted in different ways by Judges Ambro and Fuentes—is unconvincing. Relying on the republican notion of "civic virtue," the Government maintains that Binderup's and Suarez's misdemeanor convictions place them outside the class of "those members of the polity who were deemed capable of exercising [the right to keep and bear arms] in a virtuous manner." Gov't Suarez Br. 14 (quoting Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L Rev. 657, 679 (2002)). To be sure, "[s]ome scholarship suggests that at the time of the nation's founding, the right to bear arms was not understood to extend to those convicted of a felony, either because they were not believed to be among 'the people' whose right to bear arms was protected, or because they

---

[15] This rationale is consonant with the governmental interest usually offered today as justification for dispossession: public safety. But the traditional principle that constrained the class of persons not entitled to keep and bear arms still governs. *See Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

lacked the requisite 'virtue' necessary for firearm possession." Alexander C. Barrett, Note, *Taking Aim at Felony Possession*, 93 B.U. L. Rev. 163, 194–95 & n.197 (2013) (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs. 143, 146 (1986) (offering that the right to keep and bear arms was tied to the idea of the "virtuous citizen," such that "the right to arms does not preclude laws disarming the unvirtuous (*i.e.*, criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue")); *see also* Don B. Kates, Jr. & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("[T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms.") (alteration in original).

This "virtue" standard—especially in the pliable version articulated by the Government—is implausible because the "civic republican" view of the scope of the Second Amendment is wrong. Although courts, scholars, and litigants have cited this supposed limitation,[16] this virtuous-

---

[16] *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) ("Whatever the pedigree of the rule against even nonviolent felons possessing weapons . . . most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'") (cited in Govt. Binderup Br. 13 and Govt. Suarez Br. 13–14); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[W]e observe that most scholars

citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the

___

of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).' We recognize, however, that the historical question has not been definitively resolved." (internal citations omitted)) (cited in Govt. Binderup Br. 12–13 and Govt. Suarez Br. 13–14).

*Yancey* relies on a 19th century treatise by Thomas M. Cooley for the proposition that the Constitution "protect[s] rights for "the People" excluding, among others, "the idiot, the lunatic, and the felon." 621 F.3d at 685 (citing Cooley, *A Treatise on Constitutional Limitations* 29 (Boston, Little Brown & Co. 1868)). But this interpretation of Cooley's *Treatise* has been thoroughly debunked (and, indeed, already had been prior to *Yancey*'s publication). *See* Marshall, 32 Harv. J.L. & Pub. Pol'y at 709–10 ("The . . . discussion in Cooley [cited for felon dispossession] . . . concerns classes excluded from *voting*. These included women and the property-less—both being citizens and protected by arms rights. When Cooley does address the right to keep and bear arms, one finds this: '[H]ow far it may be in the power of the legislature to regulate the right we shall not undertake to say. Happily there neither has been, nor, we may hope, is likely to be, much occasion for the examination of that question by the courts.'") (quoting Cooley, *Treatise* at 499 (Victor H. Lane ed., 7th ed. 1903)).

Second Amendment by proponents of the "sophisticated collective rights model" who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 491–92 (2004).[17]

Moreover, this supposed limitation on the Second Amendment stems from a misreading of an academic debate about "ideological interpretation," Cornell & DeDino, 73 Fordham L. Rev. at 528 n.29, the gist of which concerns the extent to which the Founders were civic republicans or libertarians as well as what bearing these ideologies might have had on how they understood the right to keep and bear arms. *See* Robert E. Shalhope, *The Ideological Origins of the Second Amendment*, 69 J. Am. Hist. 599, 599–601 (1982) (the article that served as contemporary scholars' principal source

---

[17] *Cf. Parker v. District of Columbia*, 478 F.3d 370, 378 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570 (rejecting the view that "the Second Amendment protects private possession of weapons *only* in connection with performance of *civic duties* as part of a well-regulated citizens militia organized for the security of a free state" (second emphasis added, internal quotation marks omitted)); David T. Hardy, 15 Wm. & Mary Bill Rts. J. 1237, 1241–84 (2007) (reviewing Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origin of Gun Control in America* (2006)) (marshaling considerable historical evidence against Cornell's "civic right only" approach).

for the "virtuousness" limitation). Unfortunately, this literature sheds no light on "who" was thought to enjoy the right to keep and bear arms (at least, none beyond the now-settled individual-versus-collective right interpretation). Rather, it relates to the *rationale* for having a right to keep and bear arms in the first place. *See id.* at 606–07 (characterizing the right to keep and bear arms as one with both individual- and collective-right elements and claiming that the Founders' unique blend of republicanism and libertarianism led them to "perceive[] a vital relationship between vigorous republican husbandmen and the possession of arms" and believe that a "man capable of defending himself with arms if necessary was prerequisite for maintaining the moral character to be a good republican"); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 L. & Contemp. Probs. 125, 132 (1986) (explaining that strains of civic republicanism in early-American culture viewed arms possession as critical to the virtue of the citizenry and the spirit of the state, but never characterizing the *possession* of virtue as a prerequisite to arms rights).

This literature does not help us identify the types of people who were not entitled to exercise Second Amendment rights.[18] Contemporary advocates of a "virtuousness"

---

[18] Not least because it rests largely on a theoretical foundation that the Supreme Court has twice now rejected. *See Heller*, 554 U.S. at 595; *McDonald*, 561 U.S. at 767–68. And as at least one scholar has surmised: "[i]f the Second Amendment *does* provide a right to own guns for self-defense, republicanism cannot supply the intellectual foundation for it." Williams, 101 Yale L.J. at 559 (emphasis added).

limitation have projected that constraint onto the right to keep and bear arms based on the fact that the very *existence* of the right was informed by republican philosophical principles.[19] That is not enough. We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that "virtuousness" was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.

Furthermore, it is hard to understand what the Government's proposed "virtuousness" limitation would even require. The Government has offered no guidance in this regard, except to urge that we defer to legislative judgments about what sorts of offenses or characteristics render one insufficiently "virtuous" to enjoy a fundamental right. The Dissent and to a lesser extent Judge Ambro have accepted this approach. The legislative judgments set forth in the margin are but a few illustrations of its deep flaws.[20] We doubt the

---

[19] One of the primary proponents of this school of thought has conceded that "[h]istorical scholarship has abandoned the notion that American political culture can be understood in terms of any single ideological tradition, and has embraced a more pluralistic conception of the intellectual world of the founders," though he remains a devotee of the civic-virtue limitation. Cornell & DeDino, 73 Fordham L. Rev. at 492.

[20] Were we to adopt the Government's proposed standard, consider a few examples of offenses that would (and currently do) render one permanently disqualified from possessing firearms. In Arizona, simple possession of any amount of marijuana is a felony punishable by enough jail time that any conviction triggers § 922(g)(1). *See* Ariz. Rev.

Stat. Ann. § 13-3405. As the Government would have it, the last three Presidents of the United States would have been forever barred from possessing firearms had their youthful indiscretions been prosecuted in the Copper State. Or consider Michigan, which has a generous (10-cents-per-container) repayment policy for recyclable cans and bottles returned to the state—so long as the beverage containers were purchased *in state*. But one who returns out-of-state containers is subject to a felony count of beverage return of nonrefundable bottles punishable by up to five years' imprisonment (thus disabling the conniving interstate recycler under § 922(g)(1)). *See* Mich. Comp. Laws Ann. § 445.574a(1)(d). This spells disqualification for Kramer, Newman, and at least one recent real-life offender. *See Seinfeld: The Bottle Deposit* (NBC television broadcast May 2, 1996); *Seinfeld-inspired 'Michigan bottle deposit scam' lands Kramer wannabe in hot water* (RT America Jun. 15, 2016), available at https://www.rt.com/viral/346835-seinfeld-michigan-bottle-deposit/. Finally, library theft in Pennsylvania constitutes a (federally disabling) misdemeanor of the first degree—punishable by up to five years' imprisonment—if the value of the material is $150 or more. 18 Pa. Stat. and Cons. Stat. Ann. § 3929.1. These examples illustrate the saliency of *Heller*'s admonition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures . . . think that scope too broad." 554 U.S. 634–35. We would contravene this instruction and set dangerous precedent for other constitutional rights were we to blithely accept that "[i]f the citizens of a particular state believe that a criminal offense is too minor to trigger disarmament, their remedy is to petition the state legislature

37

to amend the law—not to seek redress in the federal courts." Dissent at 61.

The Government's theory is all the more questionable when analogized to other constitutional rights, such as the First Amendment's free-speech guarantee. Like limitations on the scope of the Second Amendment, the unprotected status of obscenity, fighting words, and the like is rooted in our history. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383 (1992). These free-speech exceptions mean that while Congress can sharply restrict speech that amounts to obscenity or fighting words as traditionally understood, it may not substantially redefine what *counts as* obscenity or fighting words in order to reach otherwise protected expression. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 525 (1958) ("[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn."); *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940) ("[T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."); *Gooding v. Wilson*, 405 U.S. 518, 521–25 (1972) (statute that state claimed would only reach "fighting words" was unconstitutionally overbroad where its terms criminalized expression that a listener would find merely offensive or insulting). For instance, it would be plainly unconstitutional for a legislature to redefine "obscenity" in order to capture expression that would otherwise escape the traditional scope of obscenity as defined by the Supreme Court. *See Janicki v. Pizza*, 722 F.2d 1274, 1276 (6th Cir. 1983); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256 (2002). In other words, the historical scope of the First Amendment—not Congress—determines the parameters of the right.

Founders designed a fundamental constitutional right to turn on such vagaries. Although it "befits a diverse nation of fifty sovereign States and countless municipalities . . . [that] gun regulation in the United States resembles a patchwork quilt that largely reflects local custom," *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (Hardiman, J., dissenting), to make an individual's entitlement to the Second Amendment right itself turn on the predilections of the legislature governing his or her patch is deference the Constitution won't bear. *See McDonald*, 561 U.S. at 750 (holding that "the Second Amendment right is *fully* applicable to the States" (emphasis added)).

---

The import of this analogy for the Second Amendment is straightforward: although certain types of criminals are excluded from the right to keep and bear arms, this traditional limitation on the scope of the right may not be expanded by legislative fiat. To hold otherwise would treat the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780 (plurality opinion). The historical record indicates that the right to keep and bear arms was publicly understood at the time of the Constitution's enactment to secure a broadly held natural right that did not extend to violent criminals. To redefine the type of "criminal" that would qualify for dispossession via a malleable "virtuousness" standard in order to capture former nonviolent misdemeanants who are in all other respects indistinguishable from normal, law-abiding citizens would be akin to redefining "fighting words" to encompass run-of-the-mill "trash talk." The Constitution takes each of these temptations "off the table." *Heller*, 554 U.S. at 636.

Even if we were to attempt to apply the notion of civic virtue to felon dispossession, it is doubtful the Government would prevail. Although felons at common law "were essentially stripped of property and other rights," the term "felony" "applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery"—in other words, crimes closely associated with violence. Kates & Cramer, 60 Hastings L.J. at 1362. *But see* Marshall, 32 Harv. J.L. & Pub. Pol'y at 715–16 (casting doubt on the claim that a felony conviction necessarily entailed permanent dispossession). Indeed, one of the scholars cited by the Government concludes that insofar as a statute "would seek to bar arms possession by" persons who have been convicted of a nonviolent "felony" in the modern sense, "those laws would seem to be invalid." Kates & Cramer, 60 Hastings L.J. at 1363. *See* Barrett, 93 B.U. L. Rev. at 196 ("[E]ven if some felons were historically understood to be barred from possessing firearms, the common law term 'felony' applied to only a few select categories of serious crimes at the time the Second Amendment was ratified, while in modern times, vast categories of 'non-dangerous' activities qualify as felonious."); Marshall, 32 Harv. J.L. & Pub. Pol'y at 729–30 (explaining that the first federal felony dispossession laws applied only to a core group of crimes including "murder, manslaughter, rape, mayhem, aggravated assault . . . robbery, burglary, housebreaking, and attempt to commit any of these crimes"). And at least one of our sister courts faced with the virtuousness argument treated "virtue" as basically synonymous with "non-dangerous." *See United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) ("To be sure, there is an ongoing debate among historians about the extent to which the right to bear arms in the founding period turned on concerns about the possessor's 'virtue,' *i.e.*, on a legislative

judgment that possession of firearms by a certain class of individuals would pose a *serious danger to the public*." (emphasis added)). Accordingly, we reject the Government's suggestion that Second Amendment protections are limited "to those members of the polity who were deemed capable of exercising [the right to keep and bear arms] in a virtuous manner." Gov't Suarez Br. 14.

## C

All this means that Binderup and Suarez must distinguish themselves and their circumstances from those of persons not entitled to keep and bear arms because of their propensity for violence. And as the District Courts found, both men did so. Specifically, each is a misdemeanant convicted of a non-violent crime who has shown "that he is no more dangerous than a typical law-abiding citizen." *See Barton*, 633 F.3d at 174. While we agree with the Government that the felony-misdemeanor distinction is "minor and often arbitrary," especially since "numerous misdemeanors involve conduct more dangerous than many felonies," Gov't Binderup Br. 19 and Gov't Suarez Br. 18 (quoting *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)), that is beside the point here. Our focus must remain on the legitimate (*i.e.*, traditional) concern that justifies the dispossession of certain offenders: we cannot trust them not to commit violent crimes with firearms. The Government concedes that "the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the ban,"[21] Gov't Binderup Br. 15 and Gov't Suarez Br. 15

---

[21] The Dissent acknowledges this view, but expresses confidence that "institutional considerations" will prevent particularly absurd disarmaments. Dissent at 61. In our view,

(quoting *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011)), but it insists that Binderup's and Suarez's misdemeanors do not qualify. We disagree.

For purposes of the traditional justifications animating § 922(g)(1), both Binderup's corruption of minors offense and Suarez's licensing violation were nonviolent misdemeanors. In *Barton*, we described the violent crimes of the sort that motivated felon dispossession since 1938 in the following way: "For nearly a quarter century, § 922(g)(1) had a narrower basis for a disability, limited to those convicted of a 'crime of violence.' 'Crimes of violence' were commonly understood to include only those offenses 'ordinarily committed with the aid of firearms.'" *Barton*, 633 F.3d at 173 (quoting Marshall, 32 Harv. J.L. & Pub. Pol'y at 698, 702 (2009)) (some internal quotation marks omitted); *see also United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (noting that the "Federal Firearms Act of 1938 only restricted firearm possession for those individuals convicted of a 'crime of violence,' defined as 'murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking, and certain forms of aggravated assault—assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year'"). Dispossession on the basis of a conviction for these sorts of crimes comports with the original public understanding of the scope of the right to keep and bear arms.

---

questionable disarmaments raise questions of constitutional law.

Neither Binderup's improper relationship with an employee capable of consent nor Suarez's possession of a handgun that he could have possessed lawfully had he acquired a license meets this description. Nor did their offenses involve any actual violent behavior. It is true that a small handful of States would classify Binderup's offense as statutory rape[22] or sexual abuse. And there are certainly circumstances in which an inappropriate and illegal relationship like Binderup's might involve implicit or genuine violence. Such facts would make his a much different case. But as the District Court explained:

> There is simply nothing in the record here which would support a reasonable inference that [Binderup] used any violence, force, or threat of force to initiate or maintain the sexual relationship with his seventeen-year-old employee. Moreover, there is no record evidence present here which would support a reasonable inference that [he] was convicted of any crime of violence (or that he even engaged in any violent or threatening conduct) before or after his November 1997 conviction for [c]orruption of minors.

---

[22] As the District Court pointed out, however, Black's Law Dictionary "defines 'statutory rape' as '[u]nlawful sexual intercourse with a person *under the age of consent* (as defined by statute), regardless of whether it is against that person's will.'" *Binderup v. Holder*, 2014 WL 4764424, at *24 (E.D. Pa. Sept. 25, 2014) (quoting Black's Law Dictionary 1374 (9th ed. 2009)) (emphasis added).

*Binderup*, 2014 WL 4764424, at \*22. Nor is there any "record evidence [that] supports a reasonable inference that he has a propensity to commit violent acts, sexual or otherwise." *Id.* at \*23. In a real stretch, the Government likens Binderup's conduct to that which was felonized by a 1576 English statute that forbade "carnal[] knowl[edge]" of "any woman child under the age of ten years." Gov't Binderup Br. 15–16 (quoting Mortimer Levine, *A More Than Ordinary Case of "Rape," 13 and 14 Elizabeth I*, 7 Am. J. Legal Hist. 159, 163 (1963)). Deplorable as it was, however, Binderup's conduct involved a seventeen-year-old capable of consent,[23] was not subject to criminal sanction at the time of the founding, and— most importantly—did not involve violence, force, or threat of force.

The nonviolent nature of Suarez's offense is evident as well. The Government's unremarkable observation that Maryland's licensing requirement relates to public safety does not make Suarez's offense a violent crime. It neither involved the actual use or threatened use of force, nor was it "closely related to violent crime" in the way that drug trafficking and receiving stolen weapons are. *See Barton*, 633 F.3d at 174. *Heller* characterized the Second Amendment as guaranteeing "the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). The Government relies on the Fourth Circuit's

---

[23] *Cf. Commonwealth v. Hughlett*, 378 A.2d 326, 329 (Pa. Super. 1977) (noting that "[i]t is axiomatic that females under the age of 16 may not legally assent to sexual acts of . . . any kind").

decision in *United States v. Pruess* to argue that Suarez's violation of a lawful, well-established firearm regulation demonstrates that he is not a responsible, law-abiding citizen. That reliance is misplaced.

In *Pruess*, the Fourth Circuit rejected an as-applied challenge to § 922(g)(1) by a felon whose disqualifying convictions related to his prior sales of illegal arms, concluding that Pruess could not "rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him." 703 F.3d 242, 246 (4th Cir. 2012). Although Pruess, like Suarez, had committed regulatory violations, his circumstances were dissimilar from Suarez's in every other way. For example, Pruess had committed "repeated violations of the firearms laws, leading to at least twenty prior convictions," and admitted that although he "did not intend to use them for violence himself . . . he believed that [certain] weapons and ammunition underlying his convictions were stolen." *Id.* His repeated dealings in stolen, illegal weapons—such as fully automatic AK-47's and grenades—appropriately led the court to conclude that Pruess had committed acts "closely related to violent crime" and "flunk[ed] the 'law-abiding responsible citizen' requirement." *Id.* at 244, 246. Suarez, by comparison, committed a nonviolent firearms licensing offense with respect to an otherwise lawful weapon decades ago, the circumstances of which were unassociated with violence.[24]

---

[24] A number of other cases have applied *Barton* in rejecting as-applied challenges to § 922(g)(1). Like Pruess, the challengers in those cases have little in common with Suarez. *See United States v. Moore*, 666 F.3d 313, 319–20 (4th Cir. 2012) ("[T]hree prior felony convictions for

In addition to showing that neither their offenses nor the circumstances surrounding them involved any violence or threat of violence, Binderup and Suarez have also demonstrated that their subsequent behavior confirms their membership among the class of responsible, law-abiding citizens to whom Second Amendment protection extends. As the District Courts found, both men presented compelling evidence that they are responsible citizens, each with a job, a family, and a clean record since 1997 and 1998. Their home State has seen fit to reinstate their right to keep and bear arms. And though it's by no means dispositive in Suarez's case, the fact that the United States deems him upright enough to entrust him with the Nation's secrets is further evidence that he is a "typical law-abiding citizen." *Barton*, 633 F.3d at 174.

The Government has presented no evidence that either Binderup or Suarez has been, or would be, dangerous, violent, or irresponsible with firearms.[25] For all these reasons, the

common law robbery and two prior convictions for assault with a deadly weapon on a government official clearly demonstrate that [Moore] is far from a law-abiding, responsible citizen."); *United States v. Smoot*, 690 F.3d 215, 221–22, 221 & n.8 (4th Cir. 2012) (32 arrests and 16 convictions for offenses such as assault of a police officer, possession of cocaine with intent to distribute, and destruction of property); *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (three prior felony convictions for aggravated assault and resisting arrest).

[25] To be sure, Suarez's 1998 DUI conviction was a dangerous act—but not in the sense of the traditional concerns motivating felon dispossession. *See, e.g.*, *Begay v. United States*, 553 U.S. 137, 145 (2008) (holding that drunk

District Courts did not err when they found § 922(g)(1) unconstitutional as applied to Binderup and Suarez.

D

The Government cites a number of recidivism studies as a final justification for permanently disarming Binderup and Suarez. It notes that felons commit violent crimes more frequently than nonfelons. *See* Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 1994* at 6 (2002) (finding that, within a population of 234,358 federal inmates released in 1994, the rates of arrest for homicides were 53 times the national average). Relatedly, it highlights a 1994 study finding that approximately one in five offenders imprisoned for nonviolent crimes were rearrested for violent offenses within three years of their release. *See* Bureau of Justice Statistics Fact Sheet, *Profile of Nonviolent Offenders Exiting State Prisons*, tbl.11 (Oct. 2004), *available at* http://bjs.gov/content/pub/pdf/pnoesp.pdf. The Government's second piece of evidence is a study comparing denials of handgun purchases to convicted felons with successful purchases by persons arrested but not convicted of a felony. The study found that the "denial of handgun purchases is associated with a reduction in risk for later criminal activity of approximately 20% to 30%." Mona A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999).

---

driving is not a "violent felony" under the Armed Career Criminal Act because it does not involve "purposeful, violent, and aggressive conduct").

Finally, with respect to Binderup, it notes that "[s]ex offenders" (which Binderup is not) "present a high risk of recidivism." Gov't Binderup Br. 28 (citing Pennsylvania Dep't of Corrections, *Recidivism Report*, 21 tbl. 12 (Feb. 8, 2013), *available at* http://www.nationalcia.org/wp-content/uploads/2013-PA-DOC-Recidivism-Report.pdf) (finding that 50 percent of persons convicted of *statutory rape* and 60.2 percent of those convicted of "[o]ther [s]exual [o]ffenses" were rearrested or reincarcerated within three years of release from Pennsylvania prison) and U.S. Dep't of Justice, Office of Justice Programs, *Bureau of Justice Statistics Special Report: Recidivism of Prisoners Released in 1994*, 8 tbls.9, 15, *available at* http://www.bjs.gov/content/pub/pdf/rpr94.pdf (finding a 41.4 percent rearrest rate among persons convicted for "other sexual assault"). And with respect to Suarez, the Government emphasizes that persons arrested for "weapons offenses" are rearrested at high rates within a few years. Gov't Br. 30 & nn. 10–11 (citing studies). In addition, it relies upon a study indicating that California handgun purchasers in 1977 "who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses," were over four times more likely to be charged with a later violent offense than a person with no criminal history. *See* Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 Am. Med. Ass'n 2083, 2086 (1998).

The Government presents this evidence in its argument that § 922(g)(1) satisfies intermediate scrutiny as applied to

Binderup and Suarez.[26] But as we have explained, that inquiry is inappropriate in this case. Applying some form of

[26] Applying intermediate scrutiny, the Dissent agrees with the Government that—to the extent that Binderup and Suarez are protected by the Second Amendment—their permanent disarmament under § 922(g)(1) is a "'reasonable fit' to carry out the Government's purpose[s]." Dissent at 65. Should we be incorrect that § 922(g)(1) is categorically unconstitutional as applied to challengers who fall within the protective scope of the Second Amendment, we find Judge Ambro's analysis more persuasive. Of course, the gap between Judge Ambro's and the Dissent's applications of *Marzzarella*'s "step two" assessment in this case highlights our concern that such interest-balancing exercises are too malleable when it comes to laws that eviscerate fundamental rights. Indeed, we fear that the winners and losers of "heightened" scrutiny contests are increasingly reflective of what rights—enumerated or not—"scrutinizing" judges favor or disfavor. As a Ninth Circuit judge presciently noted: "Judges know very well how to read the Constitution broadly when they are sympathetic to the right being asserted. . . . When a particular right comports especially well with our notions of good social policy, we build magnificent legal edifices on elliptical constitutional phrases—or even the white spaces between lines of constitutional text. But . . . when we're none too keen on a particular constitutional guarantee, we can be equally ingenious . . . ." *Silveira v. Lockyer*, 328 F.3d 567, 568 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc of a panel decision adopting the "collective right" interpretation of the Second Amendment), *panel decision abrogated by Heller*, 554 U.S. 570.

means-end scrutiny in an as-applied challenge against an absolute ban—after it has already been established that the individual has a right to keep and bear arms—eviscerates that right via judicial interest balancing in direct contravention of *Heller*. *See McDonald*, 561 U.S. at 785 ("In *Heller* . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."). What matters, when it comes to a presumptively lawful regulation that eliminates the right to keep and bear arms, is whether Binderup and Suarez can distinguish themselves as responsible, law-abiding citizens in contrast to the class of persons historically understood to be excluded from Second Amendment protection.

Even if the Government's generalized studies are recast as addressing the issue of scope,[27] they still fall short. Perhaps the Government might use statistics to demonstrate that persons who commit certain nonviolent crimes have a high likelihood of violent recidivism, even decades later. But that conclusion would stretch the notion of "close association" and the historical roots of felon disarmament. Moreover, it would require untangling a number of complicating variables, such as the effects of incarceration. Recidivism studies of this type would be better suited to demonstrating a means-end fit for less restrictive firearm regulations on criminals otherwise protected by the Second Amendment (such as waiting periods or licensing

---

[27] Judge Gardner astutely observed that "the contentions [that the Government] contend[s] these studies support are . . . pertinent to the analysis of [an] as-applied challenge under the *Barton* framework." *Binderup*, 2014 WL 4764424, at *26.

requirements). Either way, the studies cited by the Government don't cut it.

First, Binderup and Suarez were not convicted of felonies and have never been incarcerated, which renders irrelevant most of the Government's studies. The Government argues that even criminals placed on probation rather than sent to prison have a heightened risk of recidivism. But the study it cites found that "[g]enerally, the risk of recidivism was highest during the first year after admission to probation," and that "[a]s released prisoners and probationers age, they tend to exhibit lower rates of recidivism." Iowa Div. of Crim. & Juvenile Justice Planning, *Recidivism Among Iowa Probationers*, at 2 (July 2005), available at http://publications.iowa.gov/15032/ (last visited Sept. 3, 2016). Given Binderup's and Suarez's ages, the study cited by the Government would predict that they pose a negligible chance of being arrested for a violent crime and a zero percent chance of being arrested for a violent felony. *Id.* at 39–40. Second, the denial-of-handgun survey was restricted to felons with extensive criminal records and conceded not only that the "modest benefit" it observed "may reflect the fact that the members of both study groups had extensive criminal records and therefore were at high risk for later criminal activity," but also that "this study was too small to determine whether the differences occurred by chance." Wright et al., 89 Am. J. of Pub. Health at 89.

Finally, the Government's sex-offender recidivism evidence paints with too broad a brush. Binderup's misdemeanor was not classified as a sexual offense and did not trigger a duty to register as a sex offender. *Compare* 18 Pa. Const. Stat. Ann. § 6301(a)(1)(i), *with* 18 Pa. Const. Stat. Ann. § 3103–3144. The report does not appear to cover

51

corruption-of-minors recidivists and lumps Binderup together with an amalgam of persons guilty of a broad range of unspecified sexual offenses. *See* U.S. Dep't of Justice, Office of Justice Programs, *Bureau of Justice Statistics Special Report: Recidivism of Prisoners Released in 1994*, 8 tbls.9, 15. The same goes for the dated firearm-offense recidivism study the Government invokes against Suarez, which covers a wide, unspecified range of "nonviolent firearm-related offenses." Wintemute, 280 Am. Med. Ass'n at 2086. Common sense dictates that violent recidivism rates are different for drug dealers carrying unlicensed firearms to protect their turf and ordinary citizens carrying unlicensed firearms for self-defense (behavior that several states do not even criminalize). *See* GAO, *States' Laws and Requirements for Concealed Carry Permits Vary Across Nation* 8–9 (2012), available at http://www.gao.gov/assets/600/592552.pdf (last visited Sept. 3, 2016).

Without more, the Government's studies don't support the application of § 922(g)(1) to Binderup and Suarez. Given the uncontroverted evidence they have presented distinguishing themselves from persons who are not entitled to keep and bear arms, the Government needs to offer more than regression analyses of recidivism (largely by felons who, unlike Binderup and Suarez, were incarcerated). An as-applied challenge ultimately rests on the question of whether "application [of a statute] to a *particular person* under *particular circumstances* deprive[s] that person of a constitutional right." *Marcavage*, 609 F.3d at 273 (emphases added). Binderup and Suarez have presented unrebutted evidence that their offenses were nonviolent and now decades old, and that they present no threat to society, which places them within the class persons who have a right to keep and

52

bear arms. Accordingly, 18 U.S.C. § 922(g)(1) is unconstitutional as applied to them.

*   *   *

In the years since the Supreme Court's decision in *Heller*, courts have had to wrestle with difficult Second Amendment questions. Although these questions can be challenging and the stakes high—the guarantee is one to deadly weapons, after all—it is no answer to say that legislatures "have near total control" over the right. Dissent at 61. That is not how constitutional rights work. Because their personal circumstances are distinguishable from those of the class of persons historically excluded from Second Amendment protections due to their propensity for violence, Daniel Binderup and Julio Suarez fall outside the proper scope of the felon dispossession statute. And their Second Amendment rights cannot be withdrawn merely because § 922(g)(1) broadly serves the public good. Where the Second Amendment's guarantees apply, as they do for Binderup and Suarez, "certain policy choices" are "necessarily" taken "off the table." *Heller*, 554 U.S. at 636. Forever prohibiting them from possessing any firearm is one of those policy choices.

FUENTES, *Circuit Judge*, concurring in part, dissenting in part, and dissenting from the judgments, with whom McKEE, *Chief Judge*, and VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and ROTH, *Circuit Judges*, join.

_____

The plaintiffs ask us to do something that no federal appellate court has done before:  to hold that, even though they were both convicted of crimes punishable by multiple years in prison, Congress may not constitutionally prevent them from owning firearms.  They ask us to do this notwithstanding a long tradition in this country of preventing criminals from owning guns, and despite the fact that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), has been in force for over half a century.[1]  Most troubling of all, they

---

[1]  Section 922(g)(1) makes it "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Under 18 U.S.C. § 921(a)(20), "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include . . . any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  We therefore refer to § 922(g)(1) as the "felon-in-possession" ban.  Courts commonly use this shorthand even though the statute itself does not use the term "felon," and even though it includes

ask us to saddle district court judges with a seemingly unending obligation to review as-applied challenges like theirs, even as they fail to provide us with any workable standards that would make such a regime administratively feasible or doctrinally coherent.

Judges Ambro and Hardiman believe that the Second Amendment requires us to sustain the plaintiffs' challenges, although they arrive at that conclusion along different routes and would shape our Second Amendment doctrine in divergent ways. By contrast, I would hold that the plaintiffs' as-applied challenges to § 922(g)(1) must fail. The Second Amendment, important as it may be, does not prevent Congress from deciding that convicted criminals should not have access to firearms. We as a society require persons convicted of crimes to forfeit any number of rights and privileges, including the right to sit on a jury, the right to hold elective office, and the right to vote.[2] However much the plaintiffs may see unfairness in the fact that their law-abiding peers can legally own firearms and they cannot, that disparity is a consequence of their own unlawful conduct. Because I

within its scope certain individuals who committed offenses labeled as "misdemeanors." *See, e.g.*, *Logan v. United States*, 552 U.S. 23, 27 (2007).

[2] Nothing herein should be interpreted as taking any position on the validity of statutes that deprive convicted felons of the right to vote. The issue of felon disenfranchisement is not presented here, and there may well be very different considerations that distinguish a felon's loss of the right to vote from the loss of the right to possess a gun.

2

believe that the Second Amendment permits Congress to disarm persons who commit serious crimes, and because § 922(g)(1) reasonably circumscribes what counts as such a crime, I would reject the plaintiffs' as-applied challenges and reverse the judgments of the District Courts.

What's more, even if we were to apply intermediate scrutiny to test the validity of § 922(g)(1), I would conclude that the statute is reasonably tailored to promote the substantial government interest of suppressing armed violence. Congress itself previously created and then defunded an administrative regime for providing individualized exceptions to the felon-in-possession ban.[3] When it terminated that program, it stated that the review of such applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made,"[4] and warned that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms."[5] These congressional judgments stand in stark contrast to the plaintiffs' arguments. Congress has already experimented with a system of what were, in effect, as-applied challenges and concluded that it was unworkable and dangerous.

I therefore concur with Judge Ambro's opinion in part, dissent from it in part, and dissent from the majority's decision to affirm the judgments of the District Courts.

---

[3] *See* 18 U.S.C. § 925(c).

[4] S. Rep. No. 102-353, at 19 (1992).

[5] H.R. Rep. No. 104-183, at 15 (1995).

3

## I. The Current State of the Law Regarding Challenges to § 922(g)(1)

No federal appellate court has yet upheld a challenge, facial or as-applied, to the felon-in-possession statute. It may therefore be helpful to begin by summarizing the Supreme Court's limited guidance on this issue and to explore how our sister circuits have applied that guidance in the context of § 922(g)(1).

### A. The Meaning of *Heller*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[6] The touchstone in any Second Amendment case is *District of Columbia v. Heller*,[7] the Supreme Court decision holding that the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[8] While *Heller* recognized an individual right to bear arms, it also explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited."[9] The Court went on to provide us with important guidance about the Second Amendment's scope:

---

[6] U.S. Const. amend. II.

[7] 554 U.S. 570 (2008).

[8] *Id*. at 635.

[9] *Id*. at 626.

4

[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[10]

In a footnote, the Court described these laws collectively as "presumptively lawful regulatory measures," making clear that "[the] list does not purport to be exhaustive."[11] The Court also stated that people have the right to keep a loaded firearm in their homes for self-defense, provided that that they are "not disqualified from the exercise of Second Amendment rights."[12]

Two interpretive questions about *Heller* therefore arise

---

[10] *Id*. at 626–27.

[11] *Id.* at 627 n.26. Elsewhere in the opinion, the Supreme Court described these regulations as "permissible" and as "exceptions" to the Second Amendment. *Id.* at 635. And two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), without otherwise expounding on *Heller*'s delineation of the scope of the Second Amendment right, the Court recapitulated the list of "longstanding regulatory measures" in *Heller* and "repeat[ed] [*Heller*'s] assurances" that such laws were not "imperil[ed]" by the Second Amendment. *Id.* at 786.

[12] *Heller*, 554 U.S. at 635.

again and again. First, what does it mean to say that the felon-in-possession ban is "presumptively lawful"? Second, what does it mean to say that a person may only possess a firearm if he or she has not been "disqualified from the exercise of Second Amendment rights"? As we shall see, our sister circuits have already done yeoman's work exploring these questions and suggesting possible answers.

## B.  Four Circuits Have Rejected As-Applied Challenges Altogether

Four circuits—the Fifth, Ninth, Tenth, and Eleventh— have concluded that as-applied challenges to § 922(g)(1) are not permissible, at least with respect to felons.

We begin with the Fifth Circuit, which held years before *Heller* that the Second Amendment protects an individual right to bear arms.[13]  In another pre-*Heller* case, *United States v. Everist*,[14] the Fifth Circuit held that the felon-in-possession ban was constitutional with respect to both violent and nonviolent offenders.[15]  In the Fifth Circuit's view, "[i]rrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others" and "[h]e may not justly complain of the limitation on his liberty when his possession of firearms would otherwise

---

[13]  *United States v. Emerson*, 270 F.3d 203, 229 (5th Cir. 2001).

[14]  368 F.3d 517 (5th Cir. 2004).

[15]  *See id.* at 519 ("It is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms.").

6

threaten the security of his fellow citizens."[16] The issue of the constitutionality of § 922(g)(1) arose again after *Heller* in *United States. v. Scroggins*.[17] The Fifth Circuit there said that nothing in *Heller* caused it to question its prior conclusion in *Everist* that § 922(g)(1) is constitutional even as applied to non-violent felons.[18]

The Ninth Circuit addressed the issue of as-applied challenges in *United States v. Vongxay*.[19] The defendant there raised both a facial and an as-applied challenge to § 922(g)(1). With respect to the defendant's facial challenge, the Ninth Circuit concluded that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)."[20] With respect to the defendant's as-applied challenge, *Vongxay* concluded that § 922(g)(1) is constitutional even as applied to non-violent felons. The Ninth Circuit articulated several rationales for this conclusion. First, it noted that the right to bear arms could be restricted at common law. Second, it observed "that to date

---

[16] *Id.*

[17] 599 F.3d 433 (5th Cir. 2010).

[18] *Id.* at 451; *see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (stating that "*Heller* provides no basis for reconsidering" whether § 922(g) is constitutional) (citing *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003) ("Section 922(g)(1) does not violate the Second Amendment.")).

[19] 594 F.3d 1111 (9th Cir. 2010).

[20] *Id.* at 1114.

7

no court that has examined *Heller* has found 18 U.S.C. § 922(g) constitutionally suspect."[21]   Third, it stated that "[d]enying felons the right to bear arms is . . . consistent with the explicit purpose of the Second Amendment to maintain 'the security of a free State.'"[22]  To that end, "[f]elons are often, and historically have been, explicitly prohibited from militia duty."[23]  Lastly, it stated that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]'" and that "'the right to bear arms does not preclude laws disarming the unvirtuous citizens,'" including criminals.[24]

A recent Ninth Circuit decision, *United States v. Phillips*,[25] re-affirmed *Vongxay*, although with some

---

[21] *Id.* at 1117 (internal quotation marks omitted).

[22] *Id.* (quoting U.S. Const. amend. II).

[23] *Id.*

[24] *Id.* at 1118 (alteration in original) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)).  As discussed *infra*, the strength of this historical interpretation has since been challenged by other scholars.  *See, e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374–75 (2009) (analyzing sources cited by earlier scholars); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009).

[25] --- F.3d ---, 2016 WL 3675450 (9th Cir. July 6, 2016).

8

skepticism. The defendant there argued that his prior criminal conviction could not support disarmament under § 922(g)(1) because his crime, which consisted of concealing an ongoing felony from federal officials, was "a non-violent, passive crime of inaction."[26] The Ninth Circuit said that "there may be some good reasons to be skeptical about the correctness of the current framework of analyzing the Second Amendment rights of felons,"[27] but it nonetheless concluded that *Heller* and *Vongxay* foreclosed the defendant's argument.[28]

The Tenth Circuit rejected a constitutional challenge to § 922(g)(1) in *United States v. McCane*.[29] It focused on the fact that the Supreme Court "explicitly stated in *Heller* that 'nothing in our opinion should be taken to cast doubt on

---

[26] *Id.* at *2 (internal quotation marks omitted).

[27] *Id.* at *5.

[28] *Id.* at *4 ("[A]ssuming the propriety of felon firearm bans—as we must under Supreme Court precedent and our own—there is little question that Phillips's predicate conviction . . . can constitutionally serve as the basis for a felon ban."); *see also Van Der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014) ("We addressed whether § 922(g)(1) violates the Second Amendment in [*Vongxay*] and determined that it did not."). *But see United States v. Duckett*, 406 F. App'x 185, 187 (9th Cir. 2010) (Ikuta, J., concurring) (stating that it might be constitutionally problematic to prevent non-violent felons from possessing firearms).

[29] 573 F.3d 1037 (10th Cir. 2009).

longstanding prohibitions on the possession of firearms by felons.'"[30] While Judge Tymkovich complained in concurrence that "[t]he Court's summary treatment of felon dispossession in dictum forecloses the possibility of a more sophisticated interpretation of § 922(g)(1)'s scope,"[31] the Tenth Circuit has not revisited the issue. To the contrary, it said in a later case that it had "already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)."[32]

Lastly, the Eleventh Circuit upheld the constitutionality of § 922(g)(1) in *United States v. Rozier*.[33] That opinion focused on the Supreme Court's language in *Heller* regarding "disqualifi[cation] from the exercise of Second Amendment rights."[34] Interpreting this language, the Eleventh Circuit concluded that one of *Heller*'s implied premises was that certain persons can be permissibly disqualified from exercising their Second Amendments rights altogether. The court went on to say that *Heller*'s list of "longstanding prohibitions" indicated that "statutes disqualifying felons from possessing a firearm *under any and all circumstances* do not offend the Second Amendment."[35] As a result, it concluded that "statutory restrictions of firearm

---

[30] *Id.* at 1047 (quoting *Heller*, 554 U.S. at 626).

[31] *Id.* at 1049.

[32] *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009).

[33] 598 F.3d 768 (11th Cir. 2010).

[34] *Id.* at 770 (quoting *Heller*, 554 U.S. at 635).

[35] *Id.* at 771 (emphasis added).

possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people," and that "Rozier, by virtue of his felony conviction, falls within such a class."[36]

## C.    Three Circuits Are Wary of As-Applied Challenges

The First Circuit has expressed skepticism about as-applied challenges to the federal firearms laws, although it has not foreclosed such challenges. In *United States v. Torres-Rosario*,[37] the First Circuit considered a defendant's as-applied challenge to his conviction under § 922(g)(1). The defendant's prior convictions were for possession with intent to distribute and distribution of controlled substances, and the court concluded that the defendant's challenge failed because "drug dealing is notoriously linked to violence."[38] In reaching that conclusion, the First Circuit stated that the "Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," and likewise "might even be open to highly fact-specific objections."[39] Even so, the court observed that permitting "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration,

---

[36] *Id.*

[37] 658 F.3d 110 (1st Cir. 2011).

[38] *Id.* at 113.

[39] *Id.*

11

consistency and fair warning."[40]   The First Circuit thus suggested that defendants could bring as-applied challenges, even while recognizing the difficulties that considering such challenges would create.

The Second Circuit upheld the constitutionality of § 922(g)(1) in *United States v. Bogle*.[41]  It did not analyze the issue in great depth.  Instead, it pointed to *Heller*'s language about "longstanding prohibitions" and "join[ed] every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons."[42]  The court did not distinguish between facial and as-applied challenges.[43]

Meanwhile, the jurisprudence of the Sixth Circuit appears to be in flux.  That court dealt with challenges to § 922(g)(1) in two non-precedential opinions.  In one, *United States v. Frazier*,[44] the court rejected a challenge to § 922(g)(1) on the view that "congressional regulation of

---

[40] *Id.*

[41] 717 F.3d 281 (2d Cir. 2013).

[42] *Id.* at 281–82.

[43] Bogle did not raise an as-applied challenge to § 922(g)(1) on the basis of the Second Amendment.  Even so, the Second Circuit's broad language and its citations to numerous courts that have considered such challenges suggest that it intended to broadly approve restrictions on the Second Amendment rights of individuals who are not law-abiding.

[44] 314 F. App'x 801 (6th Cir. 2008).

12

firearms [remained] constitutional" even post-*Heller*.[45]   In another, *United States v. Khami*,[46] the court recognized the theoretical possibility of an as-applied challenge to § 922(g)(1) but said that, on the facts before it, "[e]ven an as applied challenge would be difficult . . . to mount."[47]  A later precedential opinion, *United States v. Carey*,[48] stated flatly that "prohibitions on felon possession of firearms do not violate the Second Amendment."[49]  And most recently, the Sixth Circuit has considered the issue of whether the federal statute making it unlawful to possess a firearm after having been committed to a mental institution, 18 U.S.C. § 922(g)(4), permits as-applied challenges.  That issue, which raises a doctrinal conundrum similar to the one we confront here, has also triggered *en banc* review.[50]

---

[45] *Id.* at 807.

[46] 362 F. App'x 501 (6th Cir. 2010).

[47] *Id.* at 508.

[48] 602 F.3d 738 (6th Cir. 2010).

[49] *Id.* at 741.

[50] *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014), *reh'g en banc granted*, *opinion vacated* (Apr. 21, 2015).

## D.    Four Circuits Permit As-Applied Challenges

The Fourth,[51] Seventh,[52] Eighth,[53] and D.C. Circuits[54] have left the door open to a successful as-applied challenge. Even so, none of these courts has yet upheld one.

In many instances, these courts have also narrowed the

---

[51] *United States v. Moore*, 666 F.3d 313, 320 (4th Cir. 2012) ("We do not foreclose the possibility that a case might exist in which an as-applied Second Amendment challenge to § 922(g)(1) could succeed.").

[52] *Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016) ("We have not decided if felons historically were outside the scope of the Second Amendment's protection and instead have focused on whether § 922(g)(1) survives intermediate scrutiny.    As to violent felons, the statute does survive intermediate scrutiny, we have concluded, because the prohibition on gun possession is substantially related to the government's interest in keeping those most likely to misuse firearms from obtaining them." (internal citations omitted)); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.").

[53] *United States v. Woolsey*, 759 F.3d 905 (8th Cir. 2014).

[54] *Schrader v. Holder*, 704 F.3d 980, 991–92 (D.C. Cir. 2013) (rejecting as-applied challenge to § 922(g)(1) brought by common-law misdemeanants as a class).

14

universe of as-applied challenges that are permissible. The Fourth Circuit, which has repeatedly said that it might affirm an as-applied challenge in the right circumstances, has rejected the proposition that Congress may disarm only persons who commit violent crimes. In *United States v. Pruess*,[55] the court considered a challenge to § 922(g)(1) brought by a firearms dealer and collector who also had over twenty prior convictions for failing to comply with various gun laws, although none of those convictions were for violent crime. *Pruess* held "that application of the felon-in-possession prohibition to allegedly non-violent felons . . . does not violate the Second Amendment."[56]

There is also some ambiguity in the jurisprudence of the Eighth Circuit. That court upheld the facial constitutionality of § 922(g)(1) in *United States v. Seay*.[57] It also addressed as-applied challenges to § 922(g)(1) in *United States v. Woolsey*,[58] where it cited one of its prior non-

---

[55] 703 F.3d 242 (4th Cir. 2012).

[56] *Id.* at 247.

[57] 620 F.3d 919 (8th Cir. 2010). *Seay* technically addressed § 922(g)(3), which prohibits gun possession by drug users. In reviewing the Eighth Circuit's precedents, *Seay* stated that a prior non-precedential opinion upholding the constitutionality of § 922(g)(1) was correct. *See id.* at 924 (citing *United States v. Irish*, 285 F. App'x 326 (8th Cir. 2008)). The Eighth Circuit rejected a facial challenge to § 922(g)(1) a second time in *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011).

[58] 759 F.3d 905.

15

precedential opinions, *United States v. Brown*,[59] that in turn relied on our decision in *United States v. Barton*.[60] Following *Barton*'s logic, *Woolsey* rejected a defendant's as-applied challenge to § 922(g)(1) because he had not "presented 'facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections.'"[61]

Even so, another Eighth Circuit decision, *United States v. Bena*,[62] suggests that as-applied challenges might rest on shaky ground. *Bena* involved a facial challenge to § 922(g)(8), which bars possession of firearms by those subject to a restraining order. In addressing that challenge, *Bena* stated that the *Heller*'s list of "longstanding prohibitions" suggested that the Supreme Court "viewed [those] regulatory measures . . . as presumptively lawful because they do not infringe on the Second Amendment right."[63] In support of that conclusion, the court cited our own analysis in *United States v. Marzzarella*.[64] The Eighth Circuit also pointed to the fact that, as a historical matter, several states viewed the right to bear arms as limited to

---

[59] *Id.* at 909 (citing *Brown*, 436 F. App'x 725 (8th Cir. 2011)).

[60] 633 F.3d 168 (3d Cir. 2011).

[61] *Woolsey*, 759 F.3d at 909 (quoting *Brown*, 436 F. App'x at 726).

[62] 664 F.3d 1180 (8th Cir. 2011).

[63] *Id.* at 1183.

[64] 614 F.3d 85, 91 (3d Cir. 2010).

peaceable, responsible citizens. The court expressly declined to consider the question of "whether § 922(g)(8) would be constitutional as applied to a person who is subject to an order that was entered without evidence of dangerousness."[65]

Meanwhile, the D.C. Circuit considered the issue of as-applied challenges in *Schrader v. Holder*.[66] In that case, the court concluded that the plaintiffs had brought, at most, a challenge to § 922(g)(1) "as applied to common-law misdemeanants as a class," not as applied to Shrader individually.[67] The court easily rejected that challenge. It stated that the "plaintiffs [had] offered no evidence that individuals convicted of [common-law misdemeanors] pose an insignificant risk of future armed violence."[68] It also adopted the view that even if "*some* common-law misdemeanants . . . may well present no such risk . . . 'Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence

---

[65] *Bena*, 664 F.3d at 1185.

[66] 704 F.3d 980 (D. C. Cir. 2013).

[67] *Id.* at 991.

[68] *Id.* at 990.

17

presented in court.'"[69]

*     *     *

As this survey of cases demonstrates, federal judges face an almost complete absence of guidance from the Supreme Court about the scope of the Second Amendment right. Even so, only four of our sister courts have clearly stated that as-applied challenges to § 922(g)(1) are even permissible. In taking the further step of upholding such a challenge, we stand entirely alone.

With this background in mind, it is possible to explain where I agree—and disagree—with my colleagues.[70]

---

[69] *Id.* at 990–91 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)) (emphasis in original). *Schrader* suggested that, had the plaintiffs properly raised an as-applied challenge by arguing "that the statute is invalid as applied to Schrader specifically," then "*Heller* might well dictate a different outcome" than the decision the court reached with respect to the class-wide challenge. *Id.* at 991.

[70] As an initial matter, I agree with both Judge Ambro and Judge Hardiman that the plaintiffs' statutory arguments are unavailing. The two statutory provisions here are straightforward: § 922(g)(1) makes it unlawful for anyone to possess a firearm after having been convicted of a crime punishable by more than one year in prison, and § 921(a)(20)(B) removes from that prohibition persons convicted of misdemeanors with a maximum punishment of two years or less.

## II. *Marzzarella* Step-One and Exclusions from the Second Amendment Right

Our decision in *Marzzarella* establishes a two-step test for assessing challenges to the constitutionality of statutes under the Second Amendment:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.[71]

I agree with Judge Ambro that *Marzzarella* provides the correct framework for assessing challenges to the constitutionality of § 922(g)(1). I also agree with him that, at *Marzzarella* step-one, persons who commit serious crimes are

---

In other words, the only persons subject to § 922(g)(1) are (i) felons and (ii) misdemeanants whose crimes are punishable by more than two years in prison. I therefore join Parts I and II of Judge Ambro's opinion.

[71] *Marzzarella*, 614 F.3d at 89 (internal citation and footnote omitted).

disqualified from asserting their Second Amendment rights.[72]

Unfortunately, Judge Ambro and I disagree over how to decide whether any *particular* crime is serious enough to cause a loss of firearm rights. Judge Ambro believes that the category of "serious crime" is amorphous. While some crimes may be serious by definition, including those in which the actual or attempted use of violence is an element of the offense,[73] other crimes may be serious—or not—depending on the circumstances. In Judge Ambro's view, the seriousness inquiry therefore requires district courts to engage in person-specific assessments based on the facts of any particular case. By contrast, I would hold that *Heller* itself tells us that felons are disqualified from exercising their Second Amendment rights. Because there is no principled basis, at least in this context, for distinguishing felons from misdemeanants who commit crimes punishable by more than two years in prison, all crimes currently within § 922(g)(1)'s scope are serious by definition. I would therefore hold that the plaintiffs' challenges fail at *Marzzarella* step-one, full stop.

---

[72] Accordingly, I join Parts III.A, III.B, III.C.1, III.C.2, and III.C.3.a of Judge Ambro's opinion in their entirety. I would also vote to overrule *Barton*, at least insofar as it states that as-applied challenges to § 922(g)(1) are permissible as that statute is currently codified. In my view, they are not.

Chief Judge McKee, Judge Shwartz, and Judge Restrepo join only Parts I and II of Judge Ambro's opinion. (*See* Ambro Op. Typescript at 6–7 n.1.)

[73] *See* Ambro Op. Typescript at 24, 31.

20

### A. Congress May Permissibly Disarm Felons at *Marzzarella* Step-One

In applying step-one of the *Marzzarella* analysis, we ask whether § 922(g)(1) burdens any Second Amendment right. At least as to the prohibition on felons possessing firearms, *Heller* and *Marzzarella* answer that question directly.

The *Heller* Court was careful to tell us that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[74] It also referred to the felon-in-possession ban as one of several "presumptively lawful regulatory measures."[75] In *Marzzarella*, we concluded that the "better reading" of *Heller* was that these measures were complete "*exceptions* to the right to bear arms."[76] On this view, felons do not simply have narrower Second Amendment rights than their law-abiding counterparts; they "are disqualified from exercising their Second Amendment rights" altogether.[77] While felons certainly have an interest in using firearms "for defense of hearth and home," *Marzzarella* stated that "a felony

---

[74] 554 U.S. at 626.

[75] *Id.* at 627 n.26.

[76] 614 F.3d at 91 (emphasis added).

[77] *Id.* at 91–92; *see also* Jeff Golimowski, Note, *Pulling the Trigger: Evaluating Criminal Gun Laws in a Post-*Heller *World*, 49 Am. Crim. L. Rev. 1599, 1616 (2012) (contending that felons forfeit Second Amendment rights through affirmative decisions to violate the social contract).

conviction disqualifies an individual from asserting that interest."[78]

At the time *Marzzarella* came down, this reading of *Heller* was in accord with the views of several of our sister courts.[79] Other circuits have since adopted the same position,[80] and we ourselves have recommitted to it.[81]

Apart from the text of *Heller* itself, history and tradition also support *Marzzarella*'s conclusion that the felon-in-possession ban is a permissible exclusion from the Second Amendment right. Without "engaging in a round of full-

---

[78] 614 F.3d at 92.

[79] *See Rozier*, 598 F.3d at 770–71 ("Prior to taking into account Rozier's purpose for possessing the handgun, we must determine whether he is qualified to possess a handgun."); *Vongxay*, 594 F.3d at 1113 ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms, and Vongxay's reliance on *Heller* is misplaced." (footnote omitted)).

[80] *See, e.g.*, *Bena*, 664 F.3d at 1183 ("It seems most likely that the Supreme Court viewed the regulatory measures listed in *Heller* as presumptively lawful because they do not infringe on the Second Amendment right.").

[81] *See Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (reiterating that "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment").

blown historical analysis,"[82] it suffices for now to say that numerous courts have reviewed the historical record and concluded that Founding-era sources support the constitutionality of § 922(g)(1) even as applied to non-violent felons.[83]

With respect to the Founding generation, the Eighth Circuit points us to Blackstone, who "explained that English subjects enjoyed a right to have arms for their defense, 'suitable to their condition and degree' and 'under due restrictions.'"[84] As to the Founders themselves, several judges—including Judge Hardiman—have recounted how "[s]hortly after the Pennsylvania ratifying convention for the original Constitution . . . the Anti–Federalist minority recommended the following amendment: 'That the people have a right to bear arms for the defense of themselves and

---

[82] *Id.*

[83] *See, e.g.*, *Bena*, 664 F.3d at 1183 ("Scholarship suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible."); *Vongxay*, 594 F.3d at 1113 ("[M]ost scholars of the Second Amendment agree that the right to bear arms 'was . . . inextricably tied to' the concept of 'virtuous citizen[ry]' . . . ." (all alternations except first in original) (quoting Kates, *supra* note 24)); *Emerson*, 270 F.3d at 226 n.21 (citing sources for the proposition that "the Second Amendment does not prohibit legislation such as [the felon-in-possession ban]").

[84] *Bena*, 664 F.3d at 1183 (quoting 1 William Blackstone, Commentaries 139).

their own state, or the United States . . . and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals.'"[85]    *Heller* identified this proposal as a "precursor" that was "highly influential" to the ratification of the Second Amendment.[86]

The Seventh Circuit has also done helpful work mining the historical sources.   Sitting *en banc*, the court highlighted the fact that, during the Founding era, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime."[87]  In *United States v. Yancey*,[88] the court stated that "[w]hatever the pedigree of the rule against even nonviolent felons possessing weapons . . . most scholars of the Second Amendment agree that the right to bear arms was tied to the

---

[85] *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012) (emphasis removed) (quoting Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 233 (1999)); *see also* Hardiman Op. Typescript at 24 (discussing the same proposal).

[86] 554 U.S. at 604.

[87] *Skoien*, 614 F.3d at 640 (citing Stephen P. Halbrook, The Founders' Second Amendment 273 (2008); Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y at 700–13).

[88] 621 F.3d 681 (7th Cir. 2010).

concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"[89] *Yancey* also noted that, "while felon-in-possession laws could be criticized as 'wildly overinclusive' for encompassing nonviolent offenders, every state court in the modern era to consider the propriety of disarming felons under analogous state constitutional provisions has concluded that step to be permissible."[90]

The federal statutory ban on convicts possessing firearms itself has a lengthy pedigree. In 1932, Congress passed a law imposing restrictions on the possession of machine guns, sawed-off shotguns, and certain other weapons in the District of Columbia.[91] That law also made it illegal for any "person who has been convicted in the District of Columbia or elsewhere of a crime of violence [to] own or have in his possession a pistol, within the District of

---

[89] *Id.* at 684–85 (considering a challenge to 18 U.S.C. § 922(g)(3), which makes it unlawful to possess firearms as a person who is "an unlawful user of or addicted to any controlled substance").

[90] *Id.* at 685 (quoting Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 721 (2007)).

[91] Act of July 8, 1932, ch. 465, § 14, 47 Stat. 650, 654.

Columbia."[92]  In 1938, Congress passed a broader statute—the Federal Firearms Act—that made it unlawful for those who had been convicted of a "crime of violence" to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[93]  Congress removed the "crime of violence" limitation in 1961[94] and "changed the 'receipt' element of the 1938 law to 'possession' [in 1968], giving § 922(g)(1) its current form."[95] The stated purpose of the 1968 revision was "to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"[96]

The development of § 922(g) also evinces Congress's desire to keep guns away from persons other than those

---

[92] *Id.* § 3, 47 Stat. at 651.  The 1932 Act defined a "crime of violence" as "[m]urder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary," or "an attempt to commit any of the same." *Id.* § 1, 47 Stat. at 650.

[93] Act of June 30, 1938, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51.

[94] Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757.

[95] *Skoien*, 614 F.3d at 640 (statutory citation truncated).

[96] *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 90–1501, at 22 (1968)).

26

whose past unlawful conduct indicates a likelihood of future dangerousness. The current iteration of § 922(g) prohibits nine groups of persons from possessing guns, including fugitives, drug addicts, persons previously committed to mental institutions, persons under a court order for threatening a partner or child, and persons with misdemeanor convictions for crimes of domestic violence. The other prohibitions of § 922(g), however, rest on a slightly different rationale. In 1968, Congress expanded what is now § 922(g) to cover undocumented or non-immigrant aliens, persons dishonorably discharged from the military, and persons who have renounced their U.S. citizenship. These additions, which were "enacted in response to the wave of political and civil rights assassinations during the 1960s,"[97] reflected Congress's judgment that persons within these categories "may not be trusted to possess a firearm without becoming a threat to society."[98] Rather than disarm persons based on a rigid link between past violent acts and future dangerousness, these restrictions—consistent with the tradition at the Founding of tying gun rights to civic virtue—disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of

---

[97] *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984).

[98] *Scarborough v. United States*, 431 U.S. 563, 572 (1977) (quoting 114 Cong. Rec. 14,773 (1968)); *see also Stevens v. United States*, 440 F.2d 144, 146–49, 152–70 (6th Cir. 1971) (recounting the relevant legislative history).

citizenship.[99]

To be fair, one might quibble with this kind of historical explanation for § 922(g)(1)'s scope. With regard to the statute itself, one might ask if 50 years is a long enough period of time to entrench a constitutional tradition—although several courts have said as much when assessing Second Amendment challenges.[100] And with respect to Founding-era sources, some judges have expressed the view that the historical record is too infirm a platform on which to rest hard-and-fast decisions about the scope of the Second

---

[99] I note that permitting plaintiffs to bring as-applied challenges to § 922(g)(1) opens the door to similar challenges under these other provisions. For example, once a plaintiff can challenge application of the felon-in-possession ban on the ground that his or her prior crime does not indicate a likelihood of future dangerousness, the next case might involve an as-applied challenge to § 922(g)(6), the provision concerning dishonorable discharge from the Armed Forces, for the same reason.

[100] *See, e.g.*, *Pruess*, 703 F.3d at 245 n.1 (rejecting the argument that the ban on non-violent felons possessing firearms is not "longstanding," since it has been in place "for more than half a century").

Amendment right.[101]  Our Court's multiple opinions in this case illustrate just how contested Founding-era historiography can be.

Even so, my review of the relevant history leads me to conclude that § 922(g)(1)'s categorical ban on felons possessing firearms is rooted deeply enough in our tradition to operate as a *bona fide* disqualification from the Second Amendment right.

## B.    Misdemeanors Within § 922(g)(1)'s Scope Are Functionally Felonies

Having established that felons are categorically disqualified from asserting their Second Amendment rights, the next question is whether misdemeanants, like the plaintiffs, are situated differently.  The plaintiffs insist that they are.  In their view, "[w]hen *Heller* spoke of 'felons,' it

---

[101] *See, e.g.*, *United States v. Chester*, 628 F.3d 673, 680–81 (4th Cir. 2010) (stating that the relevant historical scholarship is, at best, "not conclusive" as to how the Founding generation treated felon dispossession); *Skoien*, 614 F.3d at 650 (Sykes, J., dissenting) ("[S]cholars disagree about the extent to which *felons*—let alone misdemeanants—were considered excluded from the right to bear arms during the founding era."); *McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring) ("But more recent authorities have *not* found evidence of longstanding dispossession laws.  On the contrary, a number have specifically argued such laws did not exist and have questioned the sources relied upon by the earlier authorities.").

spoke of a traditional common-law classification known to the Framers, not a late-twentieth century statute including some vast (if disputed) number of misdemeanor offenses."[102] Judge Ambro is sympathetic to that notion.[103] I am not.

As an initial matter, nothing in *Heller* suggests that the felony-misdemeanor distinction is a meaningful one. It is true, of course, that *Heller*'s list of "presumptively lawful regulatory measures" includes "longstanding prohibitions on the possession of firearms by felons."[104] One could perhaps read those words and conclude that the Supreme Court was purposefully placing felons—and only felons—in the category of persons who may be permissibly disqualified from the exercise of their Second Amendment rights. Still, one could just as easily conclude that the Court was using shorthand to refer to § 922(g)(1) as a whole. After all, the Court was careful elsewhere in *Heller* to say that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."[105] Neither felons nor misdemeanants are the kinds of "law-

---

[102] Binderup Br. at 55–56.

[103] *See, e.g.*, Ambro Op. Typescript at 30–31 ("Congress may not overlook entirely the misdemeanor label, which, in the Second Amendment context, is also important.").

[104] 554 U.S. at 626–27 & n.26.

[105] *Id.* at 635.

abiding" citizens whose rights *Heller* vindicated.[106]

More fundamentally, the notion that there is a sharp distinction between felonies and misdemeanors, at least within the universe of crimes covered by § 922(g)(1), is not correct. Our own Court has long recognized that, in the modern world, a "felony" is any crime punishable by at least one year and one day in prison.[107] And the Supreme Court has explained that, in contemporary law, "the distinction [between felonies and misdemeanors] is minor and often arbitrary."[108] The kinds of misdemeanors within the scope of § 922(g)(1)—those punishable by more than two years in prison—are effectively felonies in all but name.[109]

---

[106] *Heller* also underscored that its list of longstanding prohibitions "does not purport to be exhaustive," while emphasizing that the list flows from "historical justifications." *Id.* at 627 n.26, 635. This guidance suggests a more practical approach than focusing on the word "felon" alone.

[107] *See, e.g.*, *Thorm v. United States*, 59 F.2d 419, 419 (3d Cir. 1932) (noting that Congress has historically defined felonies as crimes punishable by a prison term exceeding one year).

[108] *Tennesee v. Garner*, 471 U.S. 1, 14 (1985) ("[T]he assumption that a 'felon' is more dangerous than a misdemeanant [is] untenable. Indeed, numerous misdemeanors involve conduct more dangerous than many felonies.").

[109] The Supreme Court's recent decision in *Voisine v. United*

Indeed, we have previously held that Congress has the power to define a "felony" for purposes of federal law in ways that depart even from the year-and-a-day rule. In *United States v. Graham*,[110] we considered how to apply Congress's definition of an "aggravated felony" to a provision of the Sentencing Guidelines that "increase[d] the penalty for the crime of reentering the country after

---

*States*, 136 S. Ct. 2272 (2016), also addressed the distinction between misdemeanors and felonies. That case raised an issue of statutory interpretation regarding 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a "misdemeanor crime of domestic violence."

Because *Voisine* did not involve a challenge to the constitutionality of § 922(g)(9), it bears on these cases only indirectly. Still, *Voisine* recognized that Congress passed § 922(g)(9) "to close [a] dangerous loophole in the gun control laws." *Id.* at 2276 (alteration in original) (internal quotation marks omitted). In particular, Congress enacted § 922(g)(9) to address the fact that "many perpetrators of domestic violence are charged with misdemeanors rather than felonies, notwithstanding the harmfulness of their conduct." *Id.* Congress believed that closing this loophole was important because, in the Supreme Court's words, "[f]irearms and domestic strife are a potentially deadly combination." *Id.* (alteration in original) (quoting *United States v. Hayes*, 555 U.S. 415, 427 (2009)).

[110] 169 F.3d 787 (3d Cir. 1999).

deportation."[111]  The issue in the case was two-fold.  First, the federal statute defined the term "aggravated felony" as an offense punishable by at least one year in prison—not, as is more typical, an offense punishable by *more than* one year in prison.[112]  Second, the prior state offense that triggered the defendant's federal sentencing enhancement was technically a misdemeanor under New York law.[113]

*Graham* recognized that "[t]he line between felonies and misdemeanors is an ancient one," but it also noted that, "[w]ith the rise of the penitentiary and the disappearance of the death penalty for most felonies . . . the felony-misdemeanor distinction solidified at the one-year line."[114]  Even so, we concluded that Congress could ignore the year-and-a-day rule in its own statutory law.  As a result, the label New York had affixed to Graham's offense was immaterial; what mattered was the fact that his misdemeanor fell within

---

[111] *Id.* at 789 (discussing 8 U.S.C. § 1101(a)(43) and U.S.S.G. § 2L1.2(b)(1)(B)).

[112] *Id.* at 791 ("8 U.S.C. § 1101(a)(43)(G) defines an aggravated felony as a theft offense with a sentence of at least one year.").

[113] *Id.* at 789.

[114] *Id.* at 792.

the technical federal definition of an "aggravated felony."[115]

Contrary to the statutory scheme we confronted in *Graham*, § 922(g)(1) *respects* the more modern, year-and-a-day distinction between felonies and misdemeanors. Indeed, it does more than respect it: it actually excludes from its scope misdemeanors that are punishable by two years of imprisonment or less. In this way, § 922(g)(1) incorporates certain state-law judgments about what crimes count as "serious" misdemeanors. In other contexts, the Supreme Court has affirmed the value of easily administrable statutory schemes by stating that Congress can adopt clear, uniform rules about what counts as a "felony" for purposes of federal

---

[115] *Id.* ("Congress has the power to define the punishment for the crime of reentering the country after deportation, and we conclude that Congress was defining a term of art, 'aggravated felony,' which in this case includes certain misdemeanants who receive a sentence of one year.").

law, even where state-level definitions are more nuanced.[116]

The bottom line is this: once a misdemeanor is punishable by more than two years in prison, treating it as though it were intrinsically different than a felony is unjustifiably formalistic. By choosing to punish such misdemeanors more severely than a traditional felony, a state has *already* indicated that such crimes are serious. In my view, Congress is entitled to rely on that judgment.

Accordingly, my resolution of this case would be simple. *Heller* tells us that "nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[117] Our Court has since interpreted *Heller* to say that the ban on felons possessing firearms is a complete carve-out from the Second Amendment right. Since, for present purposes, there is no

---

[116] *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 134 (2008) (recounting how Congress amended a statute's definition of "felony drug offense," which in its previous form "depended on the vagaries of state-law classifications of offenses as felonies or misdemeanors," to instead use a "uniform federal standard"); *Logan*, 552 U.S. at 35 (explaining that Congress could choose to "revise § 921(a)(20) to provide . . . that federal rather than state law defines a conviction for purposes of [§ 922]"); *United States v. Turley*, 352 U.S. 407, 411 (1957) ("[I]n the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law.").

[117] 554 U.S. at 626.

functional difference between felons and persons who commit misdemeanors punishable by more than two years in prison, all persons with the scope of § 922(g)(1)—including the plaintiffs here—are *disqualified* from asserting their interest in using firearms "for defense of hearth and home."[118] At *Marzzarella* step-one, no further analysis is necessary.

### C. A Note on *Heller*'s Use of the Word "Presumptively"

A majority of my colleagues disagree with the proposition that the felon-in-possession ban is a constitutional carve-out from the Second Amendment right. In affirming the plaintiffs' challenges, they make it clear that district courts in our Circuit must now conduct person-by-person, individualized inquiries in order to determine whether the application of § 922(g)(1) is constitutional in any particular case.

In reaching that conclusion, my colleagues treat *Heller*'s use of the word "presumptively" as though it *requires* courts to consider as-applied challenges to the felon-in-possession ban. Judge Hardiman, for example, cites the Seventh Circuit's decision in *United States v. Williams*, which read *Heller*'s reference "to felon disarmament bans only as 'presumptively lawful'" to imply "the possibility that the ban could be unconstitutional in the face of an as-applied challenge."[119] Likewise, Judge Ambro insists that "[u]nless

---

[118] *Marzzarella*, 614 F.3d at 92.

[119] Hardiman Op. Typescript at 9–10 n.6 (citing *Williams*, 616 F.3d at 692).

flagged as irrebutable, presumptions are rebuttable."[120] The shared assumption here is that, when the Supreme Court used the word "presumptively" in *Heller*, it meant to convey something like the definition of "presumption" that one might find in a legal dictionary—*i.e.*, "a rule of law, statutory or judicial, by which [a] finding of a basic fact gives rise to existence of presumed fact, until [the] presumption is rebutted."[121]

This reading of "presumptively" in *Heller* puts more weight on that word than it can fairly bear. It is important to keep in mind the context within which the word appears. The key text of *Heller* says:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[122]

Footnote 26 of *Heller*, which accompanies this passage, states: "We identify these presumptively lawful regulatory measures only as examples; our list does not

---

[120] Ambro Op. Typescript at 28.

[121] *United States v. Chase*, 18 F.3d 1166, 1172 n.7 (4th Cir. 1994) (quoting Black's Law Dictionary 1185 (6th ed. 1990)).

[122] 554 U.S. at 626–27.

purport to be exhaustive."[123]

Judge Ambro and Judge Hardiman read the word "presumptively" as though the Supreme Court was communicating, through its use of a single adverb in a footnote, a *mandate* that the Second Amendment now *requires* courts to hear as-applied challenges to certain laws that limit gun rights. That interpretation strikes me as exactly backwards. The Supreme Court was not putting us on notice that "longstanding prohibitions" universally considered constitutional pre-*Heller* were, post-*Heller*, constitutionally suspect. The Court was instead trying to provide assurances that, whatever else *Heller* might portend, it did not provide a basis for future litigants to upend any and all existing restrictions on the right to bear arms. In other words, *Heller*'s language about "longstanding prohibitions" was meant to *cabin* its holding, not to expand it.

It is also important to underscore that not all of the "longstanding prohibitions" on *Heller*'s list are the same. The ban on "the possession of firearms by felons"[124] is a black-and-white proscription that has deep roots in our shared constitutional tradition. There is also nothing unclear about when it applies. *Marzzarella* recognized as much, reasoning that *Heller* "suggests [that] felons . . . are disqualified from exercising their Second Amendment rights" because the "validity" of the felon-in-possession ban does not "turn on the

---

[123] *Id.* at 627 n.26.

[124] *Id.* at 626.

presence or absence of certain circumstances."[125]

The latter two kinds of "longstanding prohibitions" are different. These categories—"laws forbidding the carrying of firearms in sensitive places" and "laws imposing conditions and qualifications on the commercial sale of arms"[126]—have much more ambiguous boundaries. One might well ask: other than a school and a government building, what kind of location counts as a "sensitive place"? What kinds of conditions on the sale of arms are truly "longstanding"? In a case involving such a regulation, a court will need to engage in a more probing inquiry to determine whether the

---

[125] 614 F.3d at 91–92. Judge Ambro states that "the two-step *Marzzarella* framework controls all Second Amendment challenges," (Ambro Op. Typescript at 40), and I agree. Yet *Marzzarella* plainly stated that "the better reading" of *Heller* is that felons are *disqualified* from asserting their Second Amendment rights. *Marzzarella*, 614 F.3d at 91–92. Judge Ambro departs from this reading to leave open the possibility of "a successful as-applied challenge by a state-law felon" to § 922(g)(1), although he cautions that the "individual's burden would be extraordinarily high—and perhaps even insurmountable." (Ambro Op. Typescript at 33–34 n.6.) Nowhere does Judge Ambro explain how we can simultaneously proclaim our fidelity to *Marzzarella* while at the same time ignoring its reading of *Heller*'s key language.

[126] *Heller*, 554 U.S. at 626–27.

challenged law is constitutionally valid.[127]

And here we come back to the word "presumptively." In a case involving "laws forbidding the carrying of firearms in sensitive places" or "laws imposing conditions and qualifications on the commercial sale of arms,"[128] the word "presumptively" is important. It signals to lower court judges that they must think carefully about whether the challenged regulation is truly analogous to "longstanding prohibitions" upon which *Heller* does not "cast doubt." In the parlance of our Court's jurisprudence, not all such regulations will be "presumptively lawful" enough to satisfy the inquiry at *Marzzarella* step-one.

But with respect to the felon-in-possession ban, there is no work for the word "presumptively" to do. Section 922(g)(1) codifies the restriction on criminals possessing

---

[127] *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124–29 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 1486 (2016) (considering whether a federal regulation limiting the carrying of firearms in post office *parking lots* was constitutionally permissible in view of *Heller*'s guidance about carrying of firearms in government *buildings*); *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 203 (considering the constitutionality of a federal law prohibiting the sale of firearms to 18-to-20-year-olds by federally licensed firearms dealers, and concluding that the law "is consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection").

[128] *Heller*, 554 U.S. at 626–27.

firearms in a manner that reflects longstanding history and tradition—and the Supreme Court has explicitly told us that *Heller* does not "cast doubt" on such a law.[129]  This is not to say that Congress could never press its luck.  If Congress were to *expand* § 922(g)(1) beyond its traditional scope by, for example, banning the possession of firearms by persons convicted of crimes punishable by *six months'* imprisonment, it might well run afoul of the Second Amendment's protections.  But such a law would be outside of *Heller*'s safe harbor for "longstanding prohibitions," requiring courts—again, in the parlance of our Circuit—to proceed to *Marzzarella* step-two and assess such a law under some form of heightened constitutional scrutiny.[130]

Consequently, I disagree with Judge Ambro's view that courts must "determin[e] whether crimes are serious enough to destroy Second Amendment rights" on a case-by-case basis.[131]  To my mind, the validity of the felon-in-possession ban is not so precarious.  Congress has made a

---

[129] *Id.* at 626.

[130] The same could be said of the ban on mentally-ill persons possessing firearms.  As currently codified, § 922(g)(4) makes it unlawful for any person to possess a gun "who has been adjudicated as a mental defective or . . . committed to a mental institution," and *Heller* does not "cast doubt" on that law.  But if Congress were to expand the current restriction to, for example, all persons who have ever seen a mental health professional, *Heller*'s safe harbor for "longstanding prohibitions" would no longer apply.

[131] Ambro Op. Typescript at 29.

41

reasoned judgment that crimes currently covered by § 922(g)(1)—felonies and misdemeanors punishable by more than two years' imprisonment—*are* serious enough to support disarmament. That categorical rule is consonant with history and tradition, and *Heller* does not "cast doubt" on it at all.[132]

## III.   *Marzzarella* **Step-Two and the Proper Application of Constitutional Scrutiny**

Even if, out of an abundance of caution, we were to move on to step two of the *Marzzarella* analysis and apply heightened scrutiny—a step I do not believe is necessary—Congress's interests in preventing gun violence are sufficiently important, and the felon-in-possession statute sufficiently tailored, that § 922(g)(1) would survive the plaintiffs' challenges.

My colleagues disagree. Judge Hardiman believes that § 922(g)(1) is so destructive of Second Amendment rights that, at least as applied to non-violent criminals, it is *per se* unconstitutional. Judge Ambro, meanwhile, insists that we must apply constitutional scrutiny at the level of people *like the plaintiffs*, and that if the government cannot show that "disarming people *like them* will promote the responsible use of firearms," or that people "*like them* remain potentially irresponsible after many years of apparently responsible behavior,"[133] then application of § 922(g)(1) is unconstitutional. By contrast, I believe that conducting a tailoring analysis at Judge Ambro's level of specificity is

---

[132] 554 U.S. at 626.

[133] Ambro Op. Typescript at 39 (emphasis added).

problematic.  Even in the First Amendment context, there are some laws whose structure and purpose are *incompatible* with person-specific constitutional challenges.  For the reasons that follow, § 922(g)(1) is such a law.

### A.  Intermediate Scrutiny Is the Appropriate Standard for These Cases

In *Marzzarella*, we opted to apply intermediate rather than strict scrutiny to test the constitutionality of a federal statute.  Looking to First Amendment jurisprudence for guidance, we asked whether (i) the challenged law involved a government interest that was either "significant," "substantial," or "important," and (ii) whether "the fit between the challenged regulation and the asserted objective [was] reasonable, not perfect."[134]  The law challenged in *Marzzarella*, 18 U.S.C. § 922(k), makes it unlawful to possess a firearm with an obliterated serial number.  We concluded that the law survived intermediate scrutiny because the government had a substantial interest "in enabling the tracing of weapons via their serial numbers," and Marzzarella had failed to offer any "lawful purpose for which a person would prefer an unmarked firearm" to a marked one.[135]

In choosing to apply intermediate scrutiny,

---

[134] 614 F.3d at 98.

[135] *Id.* at 98–99.  For good measure, we noted that we would uphold the constitutionality of § 922(k) even if we applied strict scrutiny because, in our view, the statute was narrowly tailored to serve a compelling government interest.  *See id.* at 99–101.

*Marzzarella* discerned an important distinction in *Heller*. While *Heller* clearly rejected rational-basis review,[136] it did not select either intermediate or strict scrutiny as the appropriate standard for assessing the constitutionality of the District of Columbia's gun regulations. Instead, *Heller* stated that those regulations were unconstitutional "[u]nder any of the standards of scrutiny . . . applied to enumerated constitutional rights."[137] *Marzzarella* interpreted *Heller* as suggesting that firearm regulations fall along a continuum, with laws like the District of Columbia's handgun ban falling "at the far end of the spectrum of infringement."[138]

*Marzzarella* thus drew a distinction between laws that burden the "core . . . right of law-abiding citizens to possess [certain] weapons for self-defense in the home," on the one hand, and laws that "do[] not severely limit the possession of firearms,"[139] on the other. *Marzzarella* concluded that courts should apply strict scrutiny to test the constitutional validity of the former kind of regulations, while they should apply intermediate scrutiny to test the validity of other, less

---

[136] *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

[137] *Id.* at 628.

[138] 614 F.3d at 97.

[139] *Id.* at 92, 97.

44

burdensome regulations.[140]

We reaffirmed this framework in *Drake v. Filko*,[141] where we considered the constitutionality of New Jersey's regulations governing the issuance of permits to carry guns in public. *Drake* reasoned that "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue."[142] It also concluded that courts should apply intermediate scrutiny unless the challenged regulation burdens the "core" Second Amendment right.[143]

Just as intermediate scrutiny was the correct standard to apply in *Marzzarella* and *Drake*, it is also the correct standard to apply here. The felon-in-possession ban, to the extent it burdens Second Amendment rights at all, does not impinge on the rights of "law-abiding, responsible

---

[140] *See id.* at 97 ("The distinction between limitations on the exercise of protected conduct and regulation of the form in which that conduct occurs also appears in the First Amendment context. . . . Accordingly, we think § 922(k) also should merit intermediate, rather than strict, scrutiny.").

[141] 724 F.3d 426.

[142] *Id.* at 435 (quoting *United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010)).

[143] *Id.* at 436; *see also id.* at 436 & n.14 (noting a few subtle differences between the standard for intermediate scrutiny articulated by the various circuits).

citizens."[144]  Rather, it constrains the rights of persons who, by virtue of their prior criminal conduct, fall outside the core of the Second Amendment's protections.

Several of our sister circuits have assessed challenges to other provisions of § 922(g) using this same approach.  In *United States v. Carter*,[145] for example, the Fourth Circuit considered a challenge to 18 U.S.C. § 922(g)(3), which prohibits firearm possession by "any person . . . who is an unlawful user of or addicted to any controlled substance." Citing *Marzzarella* with approval, *Carter* applied intermediate scrutiny to assess the validity of the statute.[146]  It reasoned that a person within the scope of § 922(g)(3)—that is, a user of controlled substances—could not fairly claim to be asserting the "core" Second Amendment right of "law-abiding, responsible citizens."[147]  For the same reason, the Fourth Circuit has applied intermediate scrutiny to assess the validity of those provisions of § 922(g) that limit the possession of firearms by persons subject to protective orders and by persons who have committed misdemeanor crimes of

---

[144] *Heller*, 554 U.S. at 635.

[145] 669 F.3d 411 (4th Cir. 2012).

[146] *Id.* at 417.

[147] *Id.* at 416 (quoting *Heller*, 554 U.S. at 635).

domestic violence.[148]  The decisions of several other circuits are in accord.[149]

Thus, even assuming that Binderup and Suarez fall within the Second Amendment's protections, I would join our sister circuits in holding that their prior criminal convictions place them outside the core "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[150]  For this reason, intermediate scrutiny is the correct standard under which to assess their challenges.

---

[148] *See United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) ("Chapman's claim is not within the core right identified in *Heller*—the right of a law-abiding, *responsible* citizen to possess and carry a weapon for self-defense.") (considering a challenge to § 922(g)(8)); *Chester*, 628 F.3d at 682–83 ("Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* . . . by virtue of Chester's criminal history as a domestic violence misdemeanant.") (considering a challenge to § 922(g)(9)).

[149] *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) ("Section 922(g)(9) does not implicate [the] core Second Amendment right because it regulates firearm possession for individuals with criminal convictions."); *Schrader*, 704 F.3d at 989 (applying intermediate scrutiny "[b]ecause common-law misdemeanants as a class cannot be considered law-abiding and responsible"); *Reese*, 627 F.3d at 802 (applying intermediate scrutiny to § 922(g)(8)).

[150] *Heller*, 554 U.S. at 635.

## B.    Judge Hardiman's Rejection of Heightened Scrutiny

Before proceeding any further, I think it is important to pause in order to address a profound doctrinal disagreement between myself and Judge Hardiman. Like Judge Ambro and me, Judge Hardiman believes that we determine the proper scope of the Second Amendment by looking to history and tradition. Reviewing the relevant historical sources, Judge Hardiman concludes that, as a matter of past practice, the only persons subject to disarmament were those who were dangerous. Judge Ambro and I obviously disagree with that assessment, but I am happy to acknowledge that reasonable minds could differ on this score. At that point, however, Judge Hardiman makes what I believe to be a serious doctrinal error.

Having concluded that Congress may permissibly disarm persons likely to commit violent acts, Judge Hardiman then defends the proposition that all other applications of § 922(g)(1) are *per se* unconstitutional. No recourse to heightened scrutiny or means-ends balancing is necessary. After all, *Heller* struck down a local ordinance that completely prevented citizens from possessing firearms in their homes for self-defense. Section 922(g)(1) has the same effect with respect to felons and certain misdemeanants. So, Judge Hardiman concludes, § 922(g)(1) must be unconstitutional in *every* application to non-violent criminals because it "eviscerates" their Second Amendment rights.[151] I agree with Judge Ambro that such an approach is inconsistent with the development of Second Amendment doctrine in this

---

[151] Hardiman Op. Typescript at 18, 50.

48

and other circuits.[152]

In addition, the rejection of heightened scrutiny in this context seems out-of-step with *Heller* itself. As discussed earlier, *Heller* says that the "core" Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[153] Non-violent criminals are, by definition, not "law-abiding." Insofar as Judge Hardiman's opinion holds that non-violent criminals have an absolute, inviolable right to keep guns in their homes for self-defense, *Heller* seems to disagree.

The advantage of heightened scrutiny is that it allows us to think about how Congress (and, by corollary, we as a polity) can tackle real-world challenges within constitutional boundaries. Such an inquiry necessarily requires us to think about the connection between means and ends, and therefore to debate the seriousness of the problems we face—including gun violence—and the permissible means of addressing them. While history is of course important, and in many cases will be dispositive, the tiers of scrutiny provide us with a useful analytical framework for assessing the constitutionality of laws that burden Second Amendment rights—even those, like § 922(g)(1), that disarm certain persons altogether.

### C. The Felon-in-Possession Ban Survives Intermediate Scrutiny

Applying intermediate scrutiny, we ask whether the

---

[152] Ambro Op. Typescript at 15–18.

[153] 554 U.S. at 635.

challenged law involves a government interest that is "significant," "substantial," or "important," and then assess whether "the fit between the challenged regulation and the asserted objective [was] reasonable, not perfect."[154] Section 922(g)(1) easily clears those hurdles.

Courts have identified Congress's objective in passing § 922(g) as "keep[ing] guns out of the hands of presumptively risky people" and "suppressing armed violence."[155] As Congress explained when passing the 1968 modifications to the statute, "[T]he ease with which any person can acquire firearms other than a rifle or shotgun (including criminals . . . ) is a significant factor in the prevalence of lawlessness and violent crime in the United States."[156]

Our Court has also said that governments "undoubtedly [have] a significant, substantial and important interest in protecting [their] citizens' safety."[157] As the Second Circuit stated shortly after the horrific shootings in Newtown, Connecticut, "[t]he regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the

---

[154] *Marzzarella*, 614 F.3d at 98.

[155] *Yancey*, 621 F.3d at 683–84 (citing S. Rep. No. 90–1501, at 22 (1968)).

[156] Pub. L. No. 90–351, § 901(a)(2), 82 Stat. 197, 225 (1968).

[157] *Drake*, 724 F.3d at 437 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (punctuation modified).

wrong hands."[158]

Having established that the government's objective is a substantial one, we next ask if the challenged law is a "reasonable fit" to carry out the government's purposes. In making that assessment, the "State bears the burden of justifying its restrictions [and] it must affirmatively establish the reasonable fit we require."[159] Seeking to satisfy this burden, the government points to numerous studies that explore the link between past criminal conduct and future crime, including gun violence.[160] The plaintiffs challenge the

---

[158] *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir.) (O'Connor, J.), *certifying question to the New York Court of Appeals*, *certified question answered*, 999 N.E.2d 516 (N.Y. 2013); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("It is beyond cavil that both states have substantial, indeed compelling, governmental interests in public safety and crime prevention." (internal quotation marks and citation omitted)).

[159] *Drake*, 724 F.3d at 453 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

[160] *See* Gov't Br. in *Binderup* at 28 (citing Bureau of Justice Statistics, Recidivism of Prisoners Released in 1994, at 6 (2002); Mona A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed To Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999)). The government also points out that the risk of recidivism is particularly high for sex offenders like Binderup irrespective of whether or not states categorize their crimes as felonies or as serious misdemeanors.

51

relevance of the government's cited studies, asserting that while they may show a connection between past criminal conduct and gun violence, they do not show such a link with respect to criminals who share their characteristics and who committed offenses similar to theirs.[161]   Judges Ambro and Hardiman share this criticism.

Several courts have—correctly, in my view—refused to parse the government's evidence as finely as the plaintiffs ask us to.[162]   The question is not whether someone *exactly like the plaintiffs* poses a threat to public safety.  The question is whether "the fit between the challenged regulation and the asserted objective [is] reasonable, not perfect."[163]   The plaintiffs seem to want something more.

---

[161] We might also consider the fact that, as we noted in *Drake*, legislatures generally crafted the regulatory schemes governing firearms before *Heller* concluded that the Second Amendment protected an individual right to bear arms. Consequently, the statistical evidence of "fit" may be lacking in certain instances because the drafters of the regulations did not realize they would need to compile it.  *See Drake*, 724 F.3d at 437–38.

[162] *See, e.g.*, *Yancey*, 621 F.3d at 685 ("[M]ost felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." (citing *United States v. Lane*, 252 F.3d 905, 906 (7th Cir. 2001)).

[163] *Marzzarella*, 614 F.3d at 98; *see also Drake*, 724 F.3d at 436 (same).

Assessing the strength of the government's evidence as assiduously as the plaintiffs demand would also raise separation of powers concerns, at least in the context of intermediate scrutiny. We generally say that "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments."[164] Our Court has cautioned that "conflicting empirical evidence . . . does not suggest, let alone compel, a conclusion that the 'fit' between [a challenged firearm regulation] and public safety is not 'reasonable.'"[165] Other courts have said that Congress may regulate firearms on the basis of "correlational evidence" that does not necessarily "prove a causal link" between the conduct at issue and a particular provision of § 922(g).[166] In the words of the D.C. Circuit, "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks."[167] Judge Wilkinson of the Fourth Circuit has been even more direct: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we

---

[164] *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012).

[165] *Drake*, 724 F.3d at 439.

[166] *United States v. Carter*, 750 F.3d 462, 469 (4th Cir.), *cert. denied*, 135 S. Ct. 273 (2014).

[167] *Schrader*, 704 F.3d at 990 (quoting *Kachalsky*, 701 F.3d at 97).

miscalculated as to Second Amendment rights."[168]

Against this backdrop, I conclude that the government's evidence adequately establishes a connection between past criminal conduct and future gun violence. I also conclude that Congress's decision to disarm felons and those who commit misdemeanors punishable by more than two years in prison is reasonably tailored to preventing such violence.

---

[168] *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). I do not take Judge Wilkinson's admonition to imply that judges are incapable of making decisions about whether particular persons are dangerous. Every day judges decide whether to grant bail, impose prison time, or revoke a period of supervised release—and all of these determinations touch on dangerousness. The key point is that, in these contexts, there are mechanisms in place for informing judicial discretion. In sentencing, revocation, and bail hearings, for example, judges have the benefit of presentence and pretrial services reports, input from trained probation and pretrial services professionals, and recommendations from prosecutors.

By contrast, there are no tools readily at-hand for deciding whether an individual person should have access to a firearm despite a past criminal conviction. *See also infra* at pages 66−69 (discussing previous cases that have recognized the inherent difficulties in making such determinations).

**D.    Tailoring § 922(g)(1) Too Narrowly Is Problematic**

The foregoing analysis, of course, speaks to the issue of tailoring with respect to the connection between the risk of gun violence and the universe of offenses that trigger § 922(g)(1) (*i.e.*, felonies and misdemeanors punishable by more than two years in prison). The plaintiffs believe that the statute must be tailored more narrowly still—indeed, so narrowly that it takes account of their individual characteristics.

And here we come to the difficult conceptual issue in this case: is this sort of as-applied challenge to § 922(g)(1) even permissible? This issue has divided the Courts of Appeals, caused endless trouble for the government at oral argument, and has at times perplexed me as well. But I ultimately conclude that the answer must be "no."[169]

The notion of an as-applied challenge is familiar to us in the context of First Amendment law. In such cases, the government enacts some kind of law limiting speech for either logistical reasons (such as time, place, and manner restrictions) or to promote its own conception of the public good (such as regulations governing campaign financing). In

---

[169] I offer here an alternative assessment of the problem of as-applied challenges in the context of intermediate scrutiny (*i.e.*, at *Marzzarella* step-two). Because I believe that felons and serious misdemeanants can be disarmed at *Marzzarella* step-one, I would hold as an initial matter that the plaintiffs have been disqualified from the exercise of their Second Amendment rights altogether.

such situations, it is entirely predictable that a certain number of citizens will raise the argument that the law makes little sense as applied to them. These arguments typically sound in overbreadth. The normal claim is that a person's inclusion within the scope of the law has no meaningful connection to the government's purported objective, leading to an impermissible infringement on that person's free speech rights.

But Second Amendment limitations like the felon-in-possession ban and the ban on mentally-ill persons possessing guns are different—and the *reason* they're different is because, in this context, the government's objective is neither logistical nor abstract. It is, quite simply, to prevent armed mayhem and death.[170] As a result, when we conduct a tailoring analysis in such a case, we must assess whether the challenged law is reasonably tailored to prevent future violence.

---

[170] The Supreme Court's decision in *Vartelas v. Holder*, 132 S. Ct. 1479 (2012), reiterated these congressional purposes. *Vartelas* addressed whether a provision of the immigration laws could be applied retroactively (that is, to conduct occurring before the law's enactment). The government tried to draw an analogy between the challenged statute and § 922(g). The Court, rejecting that comparison, stated that the law at issue in *Vartelas* targeted "past misconduct," *id.* at 1489, whereas "'longstanding prohibitions on the possession of firearms by felons' . . . target a present danger, *i.e.*, the danger posed by felons who bear arms." *Id.* (quoting *Heller*, 554 U.S. at 626).

And *this* is why as-applied challenges to § 922(g)(1) are so problematic.  Binderup and Suarez are, in effect, saying, "Trust us:  we are not the kind of people who will cause future gun violence."  The problem is that it is practically impossible to make this kind of individualized prediction with any degree of confidence.  Mistakes—costly ones—are simply too likely.

That is not my judgment, but rather the judgment of Congress itself.  A separate provision of the federal gun laws, 18 U.S.C. § 925(c), states that "[a] person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Attorney General for relief from the disabilities imposed by Federal laws."  The Attorney General may "grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."[171]  If an application is denied, the applicant may petition a district court for relief.  As it turns out, this "relief provision has been rendered inoperative" by virtue of the fact that "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.'"[172]

Congress defunded this provision in 1992.  In a

---

[171] 18 U.S.C. § 925(c).

[172] *Logan*, 552 U.S. at 28 n.1 (alteration in original) (quoting *United States v. Bean*, 537 U.S. 71, 74–75 (2002)).

Department of Justice appropriations statute, it provided that "none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c)."[173] That embargo on funds has remained in place ever since. And why did Congress effectively write § 925(c) out of the statute books? Because it concluded that the task of granting individual applications for relief from § 922(g)(1) was *too prone to error*. A 1992 Senate report stated that the Justice Department's review of applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made,"[174] and noted that the Bureau of Alcohol, Tobacco, and Firearms ("ATF") spent "approximately 40 man-years . . . annually to investigate and act upon these investigations and applications."[175] Similarly, a later House report stated that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms," and concluded that "[t]here is no reason to spend the Government['s] time or taxpayer's money to restore a convicted felon's right to own a firearm."[176]

In other words, Congress reviewed the evidence from its prior regime of what were, in effect, as-applied challenges

---

[173] Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992).

[174] S. Rep. No. 102-353, at 19 (1992).

[175] *Id.* at 20.

[176] H.R. Rep. No. 104-183, at 15 (1995).

to § 922(g)(1) and concluded that such a system was unworkable. This should have a profound impact on our tailoring analysis. Under intermediate scrutiny, we ask whether there is a "reasonable" fit between the challenged regulation and the government's objective.[177] Here, Congress tried the plaintiffs' way of doing things and concluded that it was too error-prone to support the government's objective of preventing armed violence.[178] There were too many mistakes—and, unlike in the First Amendment context, those mistakes were potentially fatal.

Notwithstanding Congress's experience with § 925(c), the plaintiffs seem to believe that by shoehorning their complaints about § 922(g)(1)'s scope into the rubric of "as-applied challenges," they necessarily force us to assess their individual characteristics rather than rely on Congress's categorical rule. I disagree. Even in the First Amendment context, where courts routinely assess as-applied challenges

---

[177] *Marzzarella*, 614 F.3d at 98.

[178] As one of our colleagues in the D.C. Circuit has put it, "the reality of gun violence means our constitutional analysis should incorporate deference to the legislature." *Heller v. District of Columbia*, 801 F.3d 264, 283 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34–36 (2010)). Deference in this context is even more appropriate when Congress has not simply made a policy judgment about preventing gun violence, but has actually experimented with a system of gun regulation and concluded—based on lived experience—that it was unworkable.

to speech-limiting laws, there are circumstances where such challenges must fail in the face of reasonable deference to legislative judgments.

The Supreme Court's decision in *United Public Workers of America (C.I.O.) v. Mitchell*[179] is a perfect example. The Supreme Court there confronted an as-applied challenge to the Hatch Act, which bans government employees from engaging in certain kinds of partisan political activity, including some forms of political speech. Congress's goal in passing the Act was "to promote efficiency and integrity in the discharge of official duties."[180] The challenger, a "skilled mechanic" at the United States Mint, argued that he was simply not the type of government employee whose conduct was likely to raise integrity concerns.[181] Structurally, this argument is identical to the one the plaintiffs make here—*i.e.*, that they are too far removed from the core group of people who pose the risk of harm that Congress sought to address by passing § 922(g)(1) for that law to be constitutional as applied to them.

The Supreme Court rejected that argument. In its view, the Hatch Act survived constitutional scrutiny because the conduct it outlawed was "reasonably deemed by Congress to interfere with the efficiency of the public service."[182] The

---

[179] 330 U.S. 75 (1947).

[180] *Id.* at 96–97 (quoting *Ex parte Curtis*, 106 U.S. 371, 373 (1882)).

[181] *Id.* at 101.

[182] *Id.*

Court recognized that, given his role at the Mint, the challenger was situated somewhat differently than white-collar employees who might be more inclined to take on management roles in political campaigns. Even so, the Court did not think these distinctions were constitutionally dispositive.[183] As the Court observed:

> Whatever differences there may be between administrative employees of the Government and industrial workers in its employ are differences in detail so far as the constitutional power under review is concerned. Whether there are such differences and what weight to attach to them, are all matters of detail for Congress. . . .
>
> *        *        *
>
> When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need.[184]

The logic of *Mitchell* applies with equal force to the present case. Here, too, Congress has passed a law to respond to a public danger. Here, too, individualized predictions are impossible with any degree of accuracy. Here, too, a regime

---

[183] *Id.* at 102.

[184] *Id.* at 102–03.

of person-by-person regulation would present grave problems of administrability. But here, unlike in *Mitchell*, the potential harm is not only serious and widespread, but also deadly.

*Mitchell* instructs us that Congress has the power in such circumstances to impose a complete ban on the exercise of a constitutional right by a category of persons who, in its reasonable estimation, pose a threat to the public. While courts must, of course, entertain constitutional challenges to statutes that infringe on constitutional rights, *Mitchell* makes it clear that there are some laws with respect to which as-applied challenges will categorically fail. I believe that § 922(g)(1) is such a law.[185]

Moreover, insofar as the plaintiffs' claims sound in overbreadth, it is worth emphasizing that the federal regime for regulating firearm possession by convicts has numerous safety valves that make any complaint about unfairness far less persuasive.

*First*, we should remember that § 922(g)(1) is a statute predicated on principles of federalism. Rather than specifying a list of qualifying offenses, "[i]t looks to state

---

[185] The First Circuit, too, has recognized that categorical rules are sometimes constitutionally permissible in the Second Amendment context. *See United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("[T]he Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." (internal citation omitted)).

law" and imposes "restrictions on certain convicts based on decisions made by state legislatures and courts."[186]  In this way, the federal statute leaves the judgment about which offenses should trigger disarmament to the discretion of state legislators who are, at least in theory, closer to the lived experience of their constituents.  To put it another way, Congress did not decide that the plaintiffs' convictions would have the effect of preventing them from owning firearms; rather, their state legislatures did.

At this point, one might reasonably object that, by refusing to permit as-applied challenges to § 922(g)(1), we give legislatures far too much power to disarm citizens.  After all, what prevents a state from passing a law saying that jaywalking is punishable by five years in prison?  Or a speeding ticket?  Or littering?  "Surely," one might think, "Congress cannot disarm people who commit *those* offenses?"

I understand and appreciate these concerns.  But institutional considerations lead me to conclude that Congress may permissibly use the existence of a prior criminal conviction as a trigger for collateral consequences under federal law.  This necessarily means that states have near total control over what offenses will trigger those federal consequences.  If the citizens of a particular state believe that a criminal offense is too minor to trigger disarmament, their remedy is to petition the state legislature to amend the law—not to seek redress in the federal courts.  Indeed, there is evidence that state authorities are perfectly capable of assessing the consequences of § 922(g) and acting to counter

---

[186] *Chovan*, 735 F.3d at 1151 (Bea, J., concurring).

them if they feel that doing so is appropriate.[187]    The alternative, a regime of judges serving as a super-legislature to review the reasonableness of the criminal codes in all 50 states, is inconsistent with the way we have regulated gun ownership for more than half a century.

To put it another way, § 922(g) reflects a congressional policy judgment that states should have a role in determining what kinds of misdemeanor offenses will trigger disarmament.  That is a question over which the states will predictably disagree.  The Supreme Court itself recognized as much in *Logan v. United States*.[188]    The petitioner there asserted that his conviction for violating § 922(g)(1) was unlawful because, properly construed, that statute did not apply to state offenses—like his—that did not

---

[187] *See* Robert A. Mikos, *Enforcing State Law in Congress's Shadow*, 90 Cornell L. Rev. 1411, 1463–64 & nn.187, 188 (2005) (finding that expungement of domestic violence convictions increased following the enactment of § 922(g)(9)); *see also Logan*, 552 U.S. at 33 (recounting that "Wisconsin no longer punishes misdemeanors by more than two years of imprisonment").

[188] 552 U.S. 23, 34–36 (2007).

trigger any loss of civil rights.[189]  The Supreme Court found that argument unpersuasive.  In the course of its analysis, it favorably cited *McGrath v. United States*,[190] a Second Circuit opinion stating that "anomalies" in the application of the federal firearms laws are "inevitable" when those laws "depend on the differing laws and policies of the several states."[191]  *Logan* also recognized that application of the federal firearm laws would be more uniform if "federal rather than state law define[d] a conviction for purposes of [§ 922]."[192]  Even so, *Logan* treated the issue of how to balance uniformity and state-by-state variation in this context as a policy question properly reserved to the legislative

---

[189] *See id.* at 26.  The petitioner's argument relied on 18 U.S.C. § 921(a)(20), which provides that "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."

[190] 60 F.3d 1005 (2d Cir. 1995).

[191] *Id.* at 1009; *see also Logan*, 552 U.S. at 33–34 (quoting the same passage).

[192] 552 U.S. at 35.

branch.[193]

*Second*, federal law lifts the felon-in-possession ban whenever a conviction "has been expunged, or set aside," or is one "for which a person has been pardoned or has had civil rights restored."[194] This is a second way in which the statute devolves regulatory power to state authorities. As a consequence, § 922(g) "in its normal application does not create a perpetual and unjustified disqualification" from the Second Amendment right.[195] As the Ninth Circuit has explained, any burden imposed by the provisions of § 922(g) "is lightened by these exceptions" in ways that can factor into

---

[193] *See id.* ("We may assume, *arguendo*, that when Congress revised § 921(a)(20) in 1986 . . . it labored under the misapprehension that all offenders—misdemeanants as well as felons—forfeit civil rights, at least temporarily. Even indulging the further assumption that courts may repair such a congressional oversight or mistake, we could hardly divine the revision the Legislature would favor." (footnote omitted)).

[194] 18 U.S.C. § 921(a)(20); *see also United States v. Leuschen*, 395 F.3d 155, 159–60 (3d Cir. 2005) (discussing the meaning of "civil rights" in our circuit).

[195] *Skoien*, 614 F.3d at 645 (discussing expungement as a way to lift the ban imposed by § 922(g)(9)); *see also id.* ("Some of the largest states make expungement available as of right to misdemeanants who have a clean record for a specified time. California, for example, has such a program." (citing Cal. Penal Code § 1203.4a)).

the relevant constitutional calculus.[196]

*Third*, there is the right to petition Congress itself. With respect to § 925(c), some members of Congress have announced their support for appropriating the funds necessary for the Justice Department to once again consider applications for relief from the felon-in-possession ban.[197] Whether Congress will do so in light of its prior determination that such a regime is unworkable is an open question.

There is also the possibility of obtaining offense-specific carve-outs from § 922(g)(1). For example, another provision of the federal gun laws says that the term "crime punishable by imprisonment for a term exceeding one year" in § 922(g)(1) "does not include . . . any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices."[198] If the plaintiffs believe that the crimes of corrupting a minor and carrying a firearm without a license belong on that list, their efforts may be more fruitfully directed towards the national legislature

---

[196] *Chovan*, 735 F.3d at 1138.

[197] *See* Press Release, Rep. Ken Buck, Buck Fights for Second Chance at Second Amendment Rights (June 2, 2015), https://buck.house.gov/media-center/press-releases/ buck-fights-restore-second-amendment-rights (last visited Sept. 2, 2016).

[198] 18 U.S.C. § 921(a)(20)(A); *see also United States v. Schultz*, 586 F.3d 526, 529–31 (7th Cir. 2009) (considering the proper application of this statutory carve-out).

instead of the courts.

Accordingly, I believe that § 922(g)(1) is a reasonable fit to carry out the government's purpose of reducing armed violence. Congress has made a reasoned judgment that persons who commit felonies and misdemeanors punishable by more than two years in prison are likelier to commit future gun violence than law-abiding citizens. That judgment is informed by Congress's experience with § 925(c), which it concluded was unworkable and dangerous because, in its view, that law did not provide a way for the government to make accurate judgments about the safety of re-arming particular people.

I would therefore uphold § 922(g)(1) under intermediate scrutiny, both as applied to these plaintiffs and as applied to future plaintiffs who might bring similar challenges.

## IV. The Problems with As-Applied Challenges to § 922(g)(1) Are Insurmountable

Finally, it is important to step back and take stock of what the plaintiffs are actually asking us to do, which is to create an entirely new judicial process for resolving as-applied challenges to § 922(g)(1). Such an approach is both doctrinally unnecessary and administratively unworkable.

The current rule for determining whether § 922(g)(1) applies is about as straightforward as it gets: "the fact of a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability

by some affirmative action."[199]  The advantage of this scheme is its simplicity.  The alternative, "a free floating prohibition," would be "very hard to administer."[200]  Indeed, it would create a never-ending stream of "serious problems of administration, consistency and fair warning."[201]

This becomes apparent once we consider how a regime of as-applied challenges would function in the real world. We previously examined this issue in *Pontarelli v. United States Department of the Treasury*.[202]  That case arose from Congress's previously discussed decision in 1992 to defund § 925(c).  In the early 2000s, plaintiffs began filing suits in federal court alleging that, by refusing to process their applications due to lack of funding, the Justice Department had effectively denied those applications.  Because § 925(c) provides for judicial review of such denials, these litigants asserted that they could ask federal district courts to "review" their applications in the first instance.

*Pontarelli* rejected that argument.  Sitting *en banc*, we concluded that Congress's denial of funds to process § 925(c) applications stripped the federal district courts of jurisdiction to review the Justice Department's refusal to act on those

---

[199] *Lewis v. United States*, 445 U.S. 55, 60–61 (1980) (considering a challenge to 18 U.S.C. § 1202, the predecessor to the current § 922).

[200] *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012).

[201] *Torres-Rosario*, 658 F.3d at 113.

[202] 285 F.3d 216 (3d Cir. 2002) (en banc).

applications. We also expressed skepticism that courts were capable of making individualized determinations about whether any particular felon should have his or her firearm rights restored. We stated that "[d]istrict courts' institutional limitations suggest that Congress could not have intended for the appropriations ban to transfer to them the primary responsibility for determining whether to restore felons' firearm privileges."[203] Such a task required "interviewing a wide array of people, including the felon, his family, his friends, the persons whom he lists as character references, members of the community where he lives, his current and former employers, his coworkers, and his former parole officers," and, unlike a federal agency, "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety."[204]

The Supreme Court later unanimously vindicated *Pontarelli* in *United States v. Bean.*[205] The Court there explained that "[i]naction by ATF does not amount to a 'denial' within the meaning of § 925(c)," and "an actual decision by ATF on an application is a prerequisite for judicial review."[206] It further noted that "[w]hether an applicant is 'likely to act in a manner dangerous to public safety' presupposes an inquiry into that applicant's background—a function best performed by the Executive,

---

[203] *Id.* at 230–31.

[204] *Id.* at 231.

[205] 537 U.S. 71 (2002).

[206] *Id.* at 75–76.

which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation."[207] The Court summarized its view by stating that § 925(c) requires an "inherently policy-based decision best left in the hands of an agency."[208]

*Pontarelli* and *Bean* recognized the many pitfalls inherent in a regime of as-applied challenges. We should embrace the wisdom of those opinions now.[209]

Indeed, the great advantage of § 922(g)(1) is that its application turns on a *prior* adjudication. There is a real risk that by instead peering into the seriousness of a plaintiff's prior conviction, we are inviting what are, in effect, collateral attacks on long-closed proceedings. The Tenth Circuit recognized as much in *United States v. Reese*.[210] That case involved a challenge to 18 U.S.C. § 922(g)(8), which makes it unlawful to possess firearms while subject to a domestic protection order. The defendant argued that his prosecution for violating § 922(g)(8) was improper due to alleged infirmities in the underlying state court proceeding. The Tenth Circuit rejected this argument, stating that "the

---

[207] *Id.* at 77.

[208] *Id.*

[209] I recognize, of course, that *Heller* changed the constitutional landscape. But again: *Heller* held that the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.

[210] 627 F.3d 792 (10th Cir. 2010).

71

overwhelming weight of federal case law precludes a defendant in a § 922(g)(8) prosecution from mounting a collateral attack on the merits of the underlying state protective order."[211]   As-applied challenges to § 922(g)(1) invite the same kinds of collateral attacks that *Reese* firmly rejected.[212]

My colleagues' approaches are also vulnerable on another front.   Their suggested criteria for assessing as-applied challenges *might* be feasible if every challenger, like the plaintiffs here, filed a declaratory judgment action.  But at this point it is important to reiterate that § 922(g)(1) is a provision of *criminal law*.   This raises its own set of constitutional difficulties.

---

[211] *Id.* at 804; *see also id.* at 805 ("[A]ny such challenges could and should have been raised by Reese in the Hawaii Family Court.").

[212] We ourselves recently reiterated that, as a general rule, collateral attacks on past state convictions are disfavored in our federal system.  In *United States v. Napolitan*, --- F.3d ---, 2016 WL 3902164 (3d Cir. July 19, 2016), we concluded that a defendant could not challenge the reasonableness of his federal sentence on the ground that it was to run consecutively to a state sentence that the defendant claimed was unconstitutional.  In our view, permitting such an attack "would be a cumbersome imposition on federal sentencing and a clear repudiation of the finality typically afforded to state court judgments."  *Id.* at *4.  Asking district courts to litigate the seriousness of prior crimes giving rise to disarmament under § 922(g)(1) raises similar concerns.

First, our decision today places an extraordinary administrative burden on district courts handling criminal prosecutions under § 922(g)(1). Once as-applied challenges start to work their way through our courts, there will be an increasingly large body of "re-armament orders" that restore individuals' firearm rights. As a consequence, there will be more and more people who believe that they can rely on a particular judicial decision to claim that they, too, are entitled to possess a firearm. District court judges will find themselves in an ever-thickening morass of as-applied precedent, trying to make fine-grained distinctions about whether individual felon-in-possession prosecutions can proceed. Given that my colleagues leave the door open to as-applied challenges even with respect to persons who have committed felonies, we can expect these challenges to begin working their way through our Circuit almost immediately.[213]

Still worse, my colleagues' approaches appear to be on a collision course with the Due Process Clause of the Fifth Amendment, which prohibits the government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."[214] It seems to me that, under a regime of as-

---

[213] *See, e.g.*, *Woolsey*, 759 F.3d at 907 (noting defendant moved to dismiss indictment on Second Amendment grounds); *Moore*, 666 F.3d at 315 (same); *Barton*, 633 F.3d at 169 (same); *Vongxay*, 594 F.3d at 1114 (same); *see also United States v. Hauck*, 532 F. App'x 247, 249 (3d Cir. 2013) (not precedential) (same).

[214] *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983)).

applied challenges to § 922(g)(1), compliance with principles of due process will quickly prove impossible.

Keep in mind that both Judge Ambro and Judge Hardiman are open to the possibility that a person convicted of a crime might, over time, be able to present evidence of rehabilitation sufficient to mount a successful as-applied challenge to the felon-in-possession ban.[215] But if time-from-conviction is really one of the relevant criteria, there is no clear reason why a person subject to § 922(g)(1) could not bring *seriatim* challenges in the hope that, at some point, his or her conviction would be too far in the past to support the statute's application. Perhaps in future cases we could try to jerry-rig some kind of doctrinal framework to address this situation (*e.g.*, multiple challenges in a single year are disfavored; one challenge every five years is permissible), but we would be doing so on the basis of nothing more than our own judicial intuitions.

Imagine, for example, that three people are prosecuted for committing a non-violent felony. One was convicted 1 year ago, one 15 years ago, and one 30 years ago. All three are caught by police officers at a shooting rage with guns-in-

---

[215] *See* Hardiman Op. Transcript at 35 n.15 ("We have not been presented with historical evidence one way or another whether [the passage of time or evidence of rehabilitation] might be a route to restoration of the right to keep and bear arms in at least some cases, so we leave for another day the determination whether that turns out to be the case."); Ambro Op. Typescript at 36–37 n.7 ("[U]nder the right circumstances the passage of time since a conviction can be a relevant consideration in assessing recidivism risks.").

hand, thereby violating § 922(g)(1). Are the ensuing indictments constitutional, or are the convictions too far in the past? Under the approach adopted by my colleagues, I simply have no idea. Neither will future defendants, to whom the Fifth Amendment guarantees some clarity as to whether their conduct is, or is not, unlawful.

In response to this evident quagmire, one might propose a series of bright-line rules for determining when application of § 922(g)(1) is constitutional. Unfortunately, my colleagues do not offer such rules. Under their more holistic standards, the constitutionality of the felon-in-possession statute in any particular case may depend on the judge's views about the offense and offender. As a result, defendants may not have fair notice of when and against whom the statute will be—or constitutionally can be—enforced.

The federal judiciary's recent experience with the Armed Career Criminal Act makes it plain that our new regime of as-applied challenges may be heading towards a doctrinal dead-end. The Act increases the penalties on violations of § 922(g) whenever a defendant has three or more earlier convictions for a "serious drug offense" or a "violent felony."[216] The so-called "residual clause" of the Act defined a "violent felony," in part, as a crime that "involves conduct that presents a serious potential risk of physical injury to another."[217] This clause bedeviled the Supreme Court for nearly a decade as it considered numerous

[216] 18 U.S.C. § 924(e)(1).

[217] *Id.* § 924(e)(2)(B)(ii).

cases raising the question of whether a particular offense presented a "serious potential risk of physical injury to another." Finally, in the recent case of *Johnson v. United States*,[218] the Supreme Court declared that the residual clause was void for vagueness. In the Court's view, the clause created "grave uncertainty about how to estimate the risk posed by a crime"[219] and generated too much "uncertainty about how much risk it takes for a crime to qualify as a violent felony."[220]

I take *Johnson* to stand for the proposition that the category of "violent felony" is simply too indefinite to use as a basis for determining who is and is not subject to criminal liability under § 922(g)(1). Judge Hardiman, by contrast, would permit plaintiffs to bring as-applied challenges on the ground that their previous crimes were not sufficiently violent to support disarmament. This raises the question of *how violent*, exactly, a crime has to be for application of § 922(g)(1) to be constitutional. Citing *Barton*, Judge Hardiman focuses on offenses "closely related to violent crime,"[221] but goes on to state that "'[c]rimes of violence' were commonly understood [in the early part of the 20th century] to include only those offenses 'ordinarily committed

---

[218] 135 S. Ct. 2551 (2015).

[219] *Id.* at 2257.

[220] *Id.* at 2258.

[221] Hardiman Op. Typescript at 13 (quoting *Barton*, 633 F.3d at 174).

76

with the aid of firearms.'"[222]  We and future litigants can only guess whether this definition, unbounded as it is by reference to the elements of an offense, extends to drug possession with intent to distribute, human trafficking, extortion, or RICO violations.  We need not wonder, however, whether it provides fair notice and comports with due process:  the Supreme Court made clear in *Johnson* it does not, and thus Judge Hardiman's approach would lead inexorably to courts having to strike down § 922(g)(1) as void for vagueness.[223]

Unfortunately, Judge Ambro's approach raises its own set of problems.  He would require district court judges to consider a variety of factors in order to assess a crime's "seriousness," including, among other things, (i) whether a crime is a misdemeanor or a felony,[224] (ii) the sentence imposed,[225] and (iii) whether there is a "cross-jurisdictional consensus regarding the seriousness" of the crime giving rise

---

[222] *Id.* at 42 (material in second set of brackets added) (quoting *Barton*, 633 F.3d at 173).

[223] This is to say nothing of Judge Hardiman's approach to assessing whether Binderup and Suarez are "responsible citizens."  In answering that question, Judge Hardiman considers not only the plaintiffs' recent avoidance of criminal conduct, but also personal traits like the fact that they both have "a job [and] a family." *Id.* at 46.  This approach seems to require an analysis so particularized as to be practically characterological, raising additional problems of fair warning and due process.

[224] Ambro Op. Typescript at 30–31.

[225] *Id.* at 31–32.

to the federal firearm disability.[226]  Judge Ambro leaves it to future cases to explain more fully how to weigh and balance these various factors.  Unfortunately, once district court judges start disagreeing about how to conduct this inquiry, it will only be a matter of time before void-for-vagueness challenges to § 922(g)(1) start to percolate throughout our courts.[227]

I see nothing in the Second Amendment that compels us to abandon the current system of administrable firearms regulation for such an uncertain future.

## V.    Conclusion

It is easy to empathize with the plaintiffs in these cases.  Having committed misdemeanors far in the past, they fail to see how they can fairly be denied a right guaranteed to them by the Constitution.  *Heller* says that the "core" Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[228]  The

---

[226] *Id.* at 32.

[227] Not to put too fine a point on it, but I disagree with Judge Ambro's conclusions as to seriousness in this very case. While it may not have involved the threat of violence, Binderup's relationship with a teenager in his employ involved power dynamics that were, at the very least, troubling.  And Suarez's offense—carrying an unlicensed firearm—indicates a cavalier attitude towards *gun safety regulations*.  Neither offense strikes me as frivolous or "non-serious."

[228] *Heller*, 554 U.S. at 635.

plaintiffs say that they are now "law-abiding, responsible citizens"—so why should they be unable to protect themselves and their families with a gun?

As understandable as that intuition may be, our emerging law of the Second Amendment does not permit this kind of as-applied challenge. First, *Heller* establishes a clear rule: statutes like § 922(g)(1) are "longstanding prohibitions" that are "presumptively lawful."[229] Interpreting that directive, our Court has said that Congress may permissibly disqualify certain people from asserting their Second Amendment rights on a categorical basis.[230] As a matter of tradition and history, persons who commit felonies and misdemeanors punishable by more than two years in prison (which are felonies in all but name) fall into that category. Second, even if we were to consider the plaintiffs' challenges under the rubric of intermediate scrutiny, Congress has reasonably concluded that persons who commit crimes are also likelier to commit gun violence. Because § 922(g)(1) is appropriately tailored to address that problem, the plaintiffs' challenges must fail.

The plaintiffs' suggestion that we should get into the business of issuing individualized exceptions to the felon-in-possession ban is, in the final analysis, administratively unworkable and constitutionally suspect. By affirming the plaintiffs' challenges today, I fear my colleagues are sending our nascent law of the Second Amendment into a doctrinal Labyrinth from which it may not soon return.

---

[229] *Id.* at 626–27 & n.26.

[230] *Marzzarella*, 614 F.3d at 92.

79

I therefore respectfully dissent.